**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES INDUSTRY AND<br>FINANCIAL MARKETS ASSOCIATION,<br>1101 New York Avenue, N.W.<br>8th Floor<br>Washington, D.C.  20005,<br><br>INTERNATIONAL SWAPS AND<br>DERIVATIVES ASSOCIATION,<br>1101 Pennsylvania Avenue, N.W.<br>Suite 600<br>Washington, D.C.  20004,<br><br>and<br><br>INSTITUTE OF INTERNATIONAL<br>BANKERS,<br>299 Park Avenue<br>17th Floor<br>New York, NY 10171,<br><br>     Plaintiffs,<br><br>  v.<br><br>UNITED STATES COMMODITY FUTURES<br>TRADING COMMISSION,<br>Three Lafayette Centre<br>1155 21st Street, N.W.<br>Washington, D.C.  20581,<br><br>     Defendant. | Civil Action No. 13-CV-1916 |

**COMPLAINT**

Plaintiffs SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION,

INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, and INSTITUTE OF

INTERNATIONAL BANKERS for their complaint against Defendant, UNITED STATES

COMMODITY FUTURES TRADING COMMISSION, allege, by and through their attorneys, and on information and belief, as follows:

1.      This is a lawsuit under the Administrative Procedure Act ("APA") and the Commodity Exchange Act ("CEA") intended to halt an unprecedented and unlawful effort by the Commodity Futures Trading Commission ("CFTC" or "Commission") to regulate financial activity around the world without complying with fundamental requirements of agency rulemaking.  The Commission has promulgated, in the guise of "guidance," an expansive new body of regulations under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") that seeks to extend the CFTC's authority and requirements across the globe.  In doing so, the Commission failed to conduct the cost-benefit analysis required by law or to comply with other essential prerequisites of rulemaking under the APA and the CEA.  This flawed attempt to act as the paramount regulator of international swaps trading, even where there is no significant connection with United States commerce, will harm investors, impair U.S. and foreign businesses, impose inconsistent, duplicative requirements on firms that are regulated by other nations, and exceeds the CFTC's lawful authority.  Plaintiffs' members support vigilant regulation of the derivatives markets to improve transparency, mitigate systemic risk, and protect against market abuse, and have attempted in good faith to comply with the CFTC's improperly-adopted regulations.  However, Plaintiffs are compelled to bring this action now to stop what is proving to be an unceasing effort by the Commission to regulate the global swaps markets through unpredictable "guidance" documents, advisories, and directives, and to force the CFTC instead to abide by the requirements for rulemaking laid down by Congress.  Plaintiffs therefore seek a court order vacating the Commission's improperly promulgated cross-border rule and

enjoining the CFTC from giving extraterritorial effect to its swaps regulations, until a valid rulemaking regarding extraterritorial application has been completed.

2.      In adopting a series of rules under Title VII of Dodd-Frank, the Commission initially refused to address the crucial question of their application to parties or transactions abroad, either ignoring concerns raised by commenters in the rulemaking process or promising to address the issue at a later date.   But the Commission never promulgated a rule on the extraterritorial reach of its Title VII regulations that complied with the strictures of the APA and the CEA.   Instead, the Commission attempted to excuse itself from those requirements by issuing a sweeping, international compliance directive that it characterized as mere "guidance."   This "guidance," referred to herein as the "Cross-Border Rule," spans 78 pages in the Federal Register and includes 650 footnotes and numerous charts and appendices; establishes a host of new regulatory definitions; and contains myriad directives for financial institutions and investors around the globe.   Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations, 78 Fed. Reg. 45292 (July 26, 2013).

3.      Despite calculated suggestions throughout the "guidance" that its terms are non-binding, the Commission has made clear at every turn that the Cross-Border Rule is intended to bind Commission staff and the public.   Both the CFTC and Federal Register websites refer to the Cross-Border Rule as a "rule."   *See* FINAL RULES, http://www.cftc.gov/LawRegulation/ FederalRegister/FinalRules/2013-17958 (last visited Dec. 4, 2013) ("Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations; *Rule*") (emphasis added); Federal Register, INTERPRETIVE GUIDANCE AND POLICY STATEMENT REGARDING COMPLIANCE WITH CERTAIN SWAP REGULATIONS, https://www.federalregister.gov/articles/ 2013/07/26/2013-17958/interpretive-guidance-and-policy-statement-regarding-compliance-with-

certain-swap-regulations (denoting the regulation as a "Rule" in heading) (last visited Dec. 4, 2013).   As Chairman Gensler declared when the Cross-Border Rule was issued, the Rule "provides that swap dealers, foreign or U.S., transacting with U.S. persons . . . *must comply* with Dodd-Frank's swap market reform."   78 Fed. Reg. at 45371, App'x 2 (emphasis added).   The Commission unambiguously confirmed that it was compelling compliance with the Cross-Border Rule—for some provisions after October 9, 2013, and for others after December 21, 2013—by issuing an "exemptive order" providing limited temporary relief from compliance before those dates.   In the words of Commissioner O'Malia, "the Guidance has a practical binding effect and should have been promulgated as a legislative rule under the APA . . . .   Avoiding cost-benefit analysis by labeling the document as guidance is unacceptable."   *See id.* at 45372-73, App'x 3.

4.     The Commission's disregard for rulemaking requirements has now been replicated by Commission staff, whose recent attempts to regulate without proper rulemaking have surprised market participants, foreign regulators, and even some members of the Commission.   On November 14 and 15, 2013, the Division of Swap Dealer and Intermediary Oversight and the Division of Market Oversight issued two separate advisories declaring that the CFTC regulations will reach swaps that are merely arranged, negotiated, or executed by personnel or agents located in the United States, even if the trade itself has no impact on U.S. financial markets.   European Union officials—whom the CFTC is required by law to "consult and coordinate with," 15 U.S.C. § 8325—were "very surprised" by the advisories, stating that they "go against both the letter and spirit of" previous bilateral agreements and "are another step away from the kind of inter-operable global system that we want to build."   Jim Brunsden, *EU Says Gensler Swaps Rule Clashes With Trans-Atlantic Pact*, BLOOMBERG (Nov. 21, 2013), *available at* http://www.bloomberg.com/news/2013-11-21/eu-says-gensler-swaps-rule-clashes-

with-trans-atlantic-pact.html (last visited Dec. 4, 2013).  CFTC Commissioner Bart Chilton also expressed surprise, stating that he had not even seen one of the advisories before it was issued. Zachary Warmbrodt, POLITICO PRO (Nov. 18, 2013).  By dictating private parties' obligations through sudden and unpredictable regulatory fiat, the Commission and its staff are harming the business relationships of U.S. companies, whose business partners are increasingly wary of being drawn into a regulatory environment in which the rules of the road may be changed overnight.

5.     Days after issuing the November 14 and 15 "advisories," Commission staff responded to objections by the public and regulators by issuing a "no action letter" promising that the requirements announced in the advisories would not be enforced until early 2014— thereby further confirming that the Cross-Border Rule and the advisories implementing it are indeed *rules* that the Commission and staff intend to apply and enforce against transactions and market participants worldwide.

6.     The CFTC stands alone in attempting to implement Dodd-Frank by guidance rather than through the procedures required by law.  The Securities and Exchange Commission ("SEC"), which is also responsible for promulgating cross-border derivatives regulations to implement Title VII of Dodd-Frank, has proposed a cross-border rule that is subject to notice and comment and contains an economic and cost-benefit analysis.  After considering the comments and conducting a complete cost-benefit analysis, the SEC intends to issue final rules relating to the cross-border application of its Title VII rules.

7.     The financial industry and derivatives users have strived to comply with the CFTC's recent regulations and have invested significant resources in furtherance of that aim. Plaintiffs do not object to, and do not seek to alter, the domestic application of the Commission's Title VII rules.  However, the CFTC's burgeoning disregard for statutory responsibilities when

applying those rules in the case of non-U.S. entities and transactions compels legal action.  The APA and the CEA establish vital rulemaking procedures that are intended to ensure care, thoroughness, and deliberation when promulgating regulations that could have a critical impact on the financial system, investors, and end-users of derivatives and commodities.  The CFTC's willful evasion of those procedures sows unpredictability and confusion in the markets, produces irresponsible rules that are not cost effective, deprives the public of the opportunity to assist the government in developing smarter regulations, and undermines our Nation's settled framework for legislative rulemaking.

8.     Accordingly, this Court should vacate the Commission's Cross-Border Rule; enjoin the CFTC from implementing, enforcing, or giving any extraterritorial effect to its swaps regulations until it promulgates a rule that specifies their extraterritorial application consistent with the requirements of the APA and the CEA; and order other relief as the Court may deem appropriate.

## I. PARTIES

9.     Plaintiff Securities Industry and Financial Markets Association ("SIFMA") is an association of hundreds of securities firms, banks, and asset managers.  Its members include financial institutions incorporated and headquartered in the United States, Great Britain, Germany, Japan, and throughout the world.  Its mission is to support a strong financial industry, investor opportunity, capital formation, job creation, and economic growth, while building trust and confidence in the financial markets.

10.    Plaintiff International Swaps and Derivatives Association ("ISDA") is an association that represents participants in the privately negotiated derivatives industry.  It promotes sound risk-management practices and processes and engages constructively with policymakers and legislators around the world to advance the understanding and treatment of

derivatives as a risk-management tool.  ISDA has more than 825 members, including global, international, and regional banks; asset managers; energy and commodities firms; government and supranational entities; insurers and diversified financial institutions; and corporations, law firms, exchanges, clearinghouses, and other service providers.

11.     Plaintiff Institute of International Bankers ("IIB") is the only national association devoted exclusively to representing and advancing the interests of the international banking community in the United States.  Its membership is comprised of internationally-headquartered banking and financial institutions from over 35 countries around the world doing business in the United States.  The IIB devotes considerable efforts to addressing the many issues that arise regarding the extraterritorial application of U.S. laws to the global operations of its member institutions.

12.     Defendant CFTC is an agency of the United States Government, which is subject to the APA.  *See* 5 U.S.C. § 551(1); 7 U.S.C. § 2(a)(2).

## II.  JURISDICTION AND VENUE

13.     This action arises under the APA, 5 U.S.C. §§ 500 *et seq.*, and the CEA, 7 U.S.C. §§ 1 *et seq.*  Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.

14.     Plaintiff SIFMA has standing to bring this suit on behalf of its members because at least one of its members would have standing to sue in its own right, the interests it seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit.  *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010).

15.     Plaintiff ISDA likewise has standing to bring this suit on behalf of its members because at least one of its members would have standing to sue in its own right, the interests it

seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit.  *Id*.

16.     Plaintiff IIB likewise has standing to bring this suit on behalf of its members because at least one of its members would have standing to sue in its own right, the interests it seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit.  *Id*.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against an agency of the United States that resides in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## III.  BACKGROUND

### A.     The Swaps Market and the Dodd-Frank Act

18.     A derivative is a financial instrument that derives its value from the performance of an underlying asset.  Participation in the derivatives markets by financial institutions fosters market liquidity and provides high-quality counterparties for those that wish to hedge or mitigate risk.

19.     A "swap" is a derivative contract that typically involves an exchange of one or more payments based on the notional amount of the underlying value of one or more assets, or other financial or economic interest, and that transfers between the parties the risk of future change in that value without also transferring an ownership interest in the underlying asset or liability.  *See* 7 U.S.C. § 1a(47); 77 Fed. Reg. 48208 (Aug. 13, 2012).  The swaps market is truly global, with U.S. companies frequently transacting with foreign companies that are separately regulated in their home jurisdiction.  The global swaps market totals almost $700 trillion in notional amount, *see* Bank of International Settlements, OTC derivatives statistics at end-June 2013, 2 (Nov. 2013), *available at* http://www.bis.org/publ/otc_hy1311.pdf (last visited Dec. 4,

2013), and approximately half of the swaps market worldwide involves one or more non-U.S. parties (last visited Dec. 4, 2013).

20.     Title VII of Dodd-Frank establishes a statutory framework for the regulation of swaps and swap entities.  Pub. L. No. 111-203, tit. VII, §§ 711-74, 124 Stat. 1375, 1641-1802 (2010).   Dodd-Frank requires the CFTC—on its own or jointly with the SEC and other regulators—to promulgate rules to implement Title VII's framework for swaps regulation.  The rules the CFTC has issued include rules defining various statutory terms related to swap transactions and the entities that engage in them, and rules that apply to specific entities or transactions—what the Cross-Border Rule has classified as "Entity-Level Requirements" and "Transaction-Level Requirements."  *See* 78 Fed. Reg. at 45331-35.  As relevant here, Entity-Level Requirements impose on swap dealers and major swap participants requirements relating to maintaining minimum capital, establishing risk management procedures, designating a chief compliance officer, reporting swaps to a swap data repository, reporting significant price discovery swaps, and maintaining swap records.  Transaction-Level Requirements include requirements for clearing, trading, business conduct, documentation, real-time reporting, and daily recordkeeping related to covered transactions.

21.     A Swap Execution Facility ("SEF") is a system or platform on which swaps can be listed and executed.  7 U.S.C. § 1a(50); § 7b-3(a)(1).  SEFs are required to register with the CFTC under Dodd-Frank and rules promulgated by the CFTC.  7 U.S.C. § 7b-3; Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33476 (June 4, 2013).

22.     Section 2(i) of the CEA prohibits the application of Title VII's provisions "to activities outside the United States" except where (1) "those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States"; or (2)

those activities "contravene such rules or regulations as the Commission may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of" Title VII. 7 U.S.C. § 2(i).  The Commission has not sought to justify the rules challenged in this suit under the anti-evasion prong of Section 2(i), and instead has rested its assertion of cross-border authority entirely upon the Section 2(i) provision dealing with foreign "activities" that "have a direct and significant connection with activities in, or effect on, commerce of the United States."

**B.    The Commission Promulgated The Title VII Rules In Violation Of The APA And The CEA**

23.    Title VII of Dodd-Frank amends the CEA to reduce risk, increase transparency, and promote financial market integrity.  *See* Registration of Swap Dealers and Major Swap Participants, 77 Fed. Reg. 2613, 2613 (Jan. 19, 2012).  The Act authorizes the Commission to adopt rules and regulations to implement the amendments to the CEA.  *See* 7 U.S.C. § 7a-1(c)(2).

24.    A separate provision of the CEA provides that, before promulgating any "regulation," the Commission must "evaluat[e]" the "costs and benefits" of such a rule "in light of—(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations."  7 U.S.C. § 19(a).

25.    The APA requires federal agencies to publish, prior to promulgating a rule, a "notice of proposed rule making" and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. § 553(b), (c).  Under the APA, courts will hold unlawful any agency rule that, as relevant here, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," is "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that was adopted "without observance of procedure required by law."  5 U.S.C. § 706(2).

26.     Relevant to this case are certain final CFTC rules intended to implement Dodd-Frank (the "Title VII Rules") by imposing requirements regarding registration, documentation, business conduct, reporting, trade execution, recordkeeping, and mandatory clearing on swap market participants, including members of the Plaintiff associations.

27.     During the notice-and-comment process for many of these rules, commenters repeatedly expressed concerns relating to the rules' extraterritorial (or "cross-border") application.  Despite these comments, the CFTC deliberately omitted any determination of the extraterritorial application of the Title VII Rules.  Having declined to determine the extraterritorial reach of the Title VII Rules—and, accordingly, the costs the rules would impose on international commerce and U.S. investors, and the disincentives they would create for trading with U.S. companies—the CFTC was wholly unable to consider the costs and benefits of each rule properly.  The cost-benefit evaluation required by the CEA is therefore fundamentally flawed for each rule.  In addition, rather than address the public's comments and include provisions defining the cross-border application of the Title VII Rules, the CFTC either failed to address the comments or declared—inaccurately—that the issue of extraterritorial application would be appropriately addressed in the future.

<u>The Swap Entity Registration Rule</u>

28.     The "Swap Entity Registration Rule" concerns the registration of "swap dealers" and "major swap participants."  Registration of Swap Dealers and Major Swap Participants, 77 Fed. Reg. 2613, 2614 (Jan. 19, 2012) (final rule).  Section 731 of Dodd-Frank provides that "[i]t shall be unlawful for any person to act as a swap dealer unless the person is registered as a swap

dealer with the [CFTC]." 7 U.S.C. § 4s(a)(1). The same is true for "major swap participant[s]." *Id.* § 4s(a)(2). Entities register by filing an application with the CFTC; Dodd-Frank empowers the CFTC to prescribe the form and manner of that application. *Id.* § 4s(b).

29.     In late November 2010, the CFTC proposed a rule to establish the process for registering swap dealers and major swap participants. Registration of Swap Dealers and Major Swap Participants, 75 Fed. Reg. 71397 (Nov. 23, 2010) (proposed rule). In this proposal, the CFTC solicited comments on "what level of swap dealing activity outside the U.S. would qualify as having a direct and significant connection with activities in or effect on commerce of the U.S., thereby requiring a person outside the U.S. to register." *Id.* at 71382.

30.     In response, numerous commenters questioned the application of the Swap Entity Registration Rule to foreign entities and entities engaged in cross-border transactions, predicting "massive and potentially expensive internal reorganizations" for foreign registrants. Registration of Swap Dealers and Major Swap Participants, 77 Fed. Reg. 2613, 2624 (Jan. 19, 2012) (final rule); *e.g.*, Société Générale Comment Letter at 7 (discussing "re-papering for thousands of clients" that would be "lengthy" and "costly"); Barclays et al. Comment Letter at 2 n.4 (warning that requirements could be "prohibitively expensive"). Commenters, including Plaintiffs SIFMA and IIB, also requested a clear limitation on the extraterritorial application of the registration requirements. *E.g.*, SIFMA Comment Letter at 4 ("[A] non-U.S. entity that conducts swaps transactions solely outside of the United States with non-U.S. persons should not fall within the definition of 'swap dealer' and should not be subject to Title VII regulation."); IIB January 10, 2011 Comment letter at 2 ("inherent limitations on the Commissions' ability to effectively oversee extraterritorial activities, and the legitimate interests of regulators outside the U.S. in

discharging their responsibilities as the primary supervisors of foreign banks" must be taken into account in devising the cross-border framework under Title VII).

31.     In January 2012, the CFTC issued its final Swap Entity Registration Rule "adopting the Proposal mainly in the form as issued."  Registration of Swap Dealers and Major Swap Participants, 77 Fed. Reg. 2613, 2614 (Jan. 19, 2012) (final rule).  In adopting its proposed rule largely without alteration, the CFTC acknowledged but ultimately dismissed the comments relating to the extraterritorial application of the Rule.

32.     With respect to the costs for foreign registrants, the CFTC declared without support that it "does not believe that foreign-based Swaps Entities will bear higher costs associated with the registration process than U.S.-based Swaps Entities."  *Id.* at 2625.  It did not, for example, address the effects on the markets and liquidity of requiring large-scale registration by foreign-based entities.  Despite its solicitation of comments on the extraterritorial application of the registration requirement, the CFTC "determined to limit this final rulemaking to the process of registration," concluding that extraterritoriality issues "are beyond the scope of this rulemaking."  *Id.* at 2619-20.

33.     Thus, in promulgating the Swap Entity Registration Rule, the CFTC failed to address how the Rule would apply extraterritorially, failed to address comments relating to the Swap Entity Registration Rule's extraterritorial application, and failed to consider the costs and benefits of applying the Swap Entity Registration Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Entity Definition Rule

34.     The "Entity Definition Rule" further defines various entities for the purposes of Dodd-Frank and its implementing rules.  *See* Further Definition of "Swap Dealer," "Security-

Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant," and "Eligible Contract Participant," 77 Fed. Reg. 30596 (May 23, 2012) (final rule).  Dodd-Frank defines the terms "swap dealer," "security-based swap dealer," "major swap participant," "major security-based swap participant," and "eligible contract participant," and requires the CFTC and the SEC to further define these terms through a joint rulemaking.  *See* Dodd-Frank §§ 712(d), 721(a).  In December 2010, the CFTC and the SEC proposed a joint rule further defining these terms by, in general, "consider[ing] that person's activities in relation to the other parties with which it interacts in the swap markets."  Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant," and "Eligible Contract Participant," 75 Fed. Reg. 80174, 80177 (Dec. 21, 2010) (proposed rule); *see* Definitions Contained in Title VII of Dodd-Frank Wall Street Reform and Consumer Protection Act, 75 Fed. Reg. 51429 (Aug. 20, 2010) (advance notice of proposed rulemaking).

35.    Interested parties submitted numerous comments on the application of these definitions extraterritorially.  *E.g.*, Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant," and "Eligible Contract Participant," 77 Fed. Reg. 30596, 30605 (May 23, 2012) (final rule) ("[S]everal commenters addressed the extraterritorial application of the definitions of the terms 'swap dealer' . . . ."); *see, e.g.*, *id.* at n.148 (listing numerous letters).  As to the legal grounds for applying these definitions abroad, Plaintiff SIFMA argued that *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), required that the CFTC's and the SEC's extraterritorial jurisdiction under Title VII "be narrowly construed."  SIFMA Comment Letter at 5.  SIFMA also explained that, as a matter of policy, "[t]he Commissions should . . . avoid a framework that is duplicative, inefficient (for supervisors and market participants) and would result in unrealistic

14

extraterritorial supervisory responsibilities for the Commissions and potential fragmentation of the derivatives markets." *Id.* at 7.   SIFMA advocated an approach that "gives effect to the principles of international comity" and that "accommodate[s] the global risk management and efficient operational structures currently in place." *Id.* at 1-2.   SIFMA argued that it is not "necessary to require a foreign entity to register with the Commissions as a swap dealer if the foreign entity's sole U.S. swaps activities are dealings with U.S.-registered swap dealers." *Id.* at 14.   That is because "if interdealer trades between a foreign dealer and a U.S. dealer could per se trigger the foreign dealer's registration with the Commissions, then the foreign dealer would be less willing to enter into swaps with U.S. swap dealers." *Id.*   "As a result, U.S. swap dealers would have reduced access to foreign markets; such access being important for liquidity and risk management purposes and the competitiveness of the U.S. market." *Id.*   Other commenters submitted a detailed 20-page letter arguing that activities of "[n]on-U.S. [o]perations [which] take place with non-U.S. persons outside of the United States" do not make an entity subject to the CFTC's authority.   Bank of America and JP Morgan Comment Letter at 2.

36.   In May 2012, the CFTC and the SEC promulgated the final Entity Definition Rule.   77 Fed. Reg. at 30596.   Although the Rule made clear that foreign entities were not excluded (*id.* at 30692-93), it went no further to address the extent to which the Entity Definition Rule applied to such entities.   Instead, the Entity Definition Rule simply stated that the agencies "intend to separately address issues related to the application of these definitions to non-U.S. persons in the context of the application of Title VII to non-U.S. persons." *See, e.g.*, *id.* at 30605, 30684 n.1078, 30688 n.1119.

37.   Thus, in promulgating the Entity Definition Rule, the CFTC failed to address how the Rule would apply extraterritorially, failed to address comments relating to the Entity

Definition Rule's extraterritorial application, and failed to consider the costs and benefits of applying the Entity Definition Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Portfolio Reconciliation and Documentation Rule

38.     The "Portfolio Reconciliation and Documentation Rule" concerns requirements for swap confirmation, portfolio reconciliation and compression, and swap trading relationship documentation.  *See* Confirmation, Portfolio Reconciliation, Portfolio Compression, and Swap Trading Relationship Documentation Requirements for Swap Dealers and Major Swap Participants, 77 Fed. Reg. 55904 (Sept. 11, 2012).  The final Rule was preceded by three notices of proposed rulemakings, one of which was issued in December 2010 and the other two in February 2011.  77 Fed. Reg. at 55904 & n.2.  The Rule effectively requires market participants that engage in certain transactions with swap dealers and major swap participants to enter into specialized agreements and make certain representations so that their swap dealer and major swap participant counterparties can comply with the Rule.

39.     Numerous commenters expressed concerns about the Rule's cross-border application.  For example, twelve foreign financial institutions submitted a joint comment detailing precisely how the documentation requirements, among others, should be applied to foreign entities and cross-border activities.  *See* Barclays Bank PLC et al. Comment Letter at 2. Similarly, the three largest Japanese bank groups jointly submitted a comment requesting that foreign swap dealers "not be made subject to requirements that would otherwise arise as a result of transactions by the foreign dealer with a U.S.-based dealer regulated as a swap dealer under Title VII."  Bank of Tokyo-Mitsubishi UJF, Ltd. et al. Comment Letter at 5.  The Japanese banks explained that extending requirements to foreign swap dealers would provide no benefit to U.S.

markets because any transaction with U.S. counterparties would already be regulated via the rules imposed on the U.S. counterparties. *Id.* at 5-6.

40.     In promulgating the final Portfolio Reconciliation and Documentation Rule, the CFTC did not mention or address any of the comments relating to extraterritoriality.  Indeed, the CFTC did not address how the Portfolio Reconciliation and Documentation Rule would apply to transactions involving foreign entities or entities engaged in cross-border transactions.  Similarly, the CFTC never considered the costs or benefits of applying the Portfolio Reconciliation and Documentation Rule's requirements to foreign entities and cross-border transactions.

The Real-Time Reporting Rule

41.     The "Real-Time Reporting Rule" concerns the public dissemination of data for certain swap transactions, as required by Section 721 of Dodd-Frank.  7 U.S.C. § 2(a)(13); Real-Time Public Reporting of Swap Transaction Data, 77 Fed. Reg. 1182 (Jan. 9, 2012) (final rule). In December 2010, the CFTC published a proposed rule on real-time public reporting of swap data.  Real-Time Public Reporting of Swap Transaction Data, 75 Fed. Reg. 76139, 76140 (Dec. 7, 2010).

42.     The proposed Real-Time Reporting Rule drew many comments relating to cross-border application, including requests that the Commission "explicitly require that only data relating to swap transactions involving at least one U.S. person must be reported and publicly disseminated," requests that "the Commission consult with foreign regulators before establishing extraterritoriality scope," concerns regarding "whether the Commission has the legal authority to implement [the proposed rule] with respect to non-U.S. partie,s" and the suggestion that the Commission "reach agreements with foreign regulators before requiring that all transactions with any U.S. person be subject to [those] requirements."  77 Fed. Reg. at 1190.

43.     The Commission adopted the final Real-Time Reporting Rule substantially as proposed on January 9, 2012.  77 Fed. Reg. at 1186.  The CFTC responded to the comments on extraterritoriality by noting that it continues to have discussions with foreign regulators regarding extraterritoriality.  *Id.*  It also stated that it recognized the need for flexibility where one party to a transaction is non-U.S. based, allowing "parties to a publicly reportable swap transaction involving an off-facility swap to mutually agree on the reporting party for such transaction."  *Id.* at 1190.  But the final Rule failed to address the other concerns with extraterritoriality that commenters had raised, including when cross-border swaps would need to be reported and which foreign entities and entities engaged in cross-border transactions would need to report.  Indeed, the CFTC made no mention of how the Rule would apply abroad, and simply adopted the Rule largely in its proposed form.

44.     Thus, in promulgating the Real-Time Reporting Rule, the CFTC failed to address how the Rule would apply extraterritorially, failed to address comments relating to the Real-Time Reporting Rule's extraterritorial application, and failed to consider the costs and benefits of applying the Real-Time Reporting Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Daily Trading Records Rule

45.     The "Daily Trading Records Rule" seeks to implement Section 731 of Dodd-Frank, which requires swap dealers and major swap participants to "maintain daily trading records of the swaps . . . and all related records . . . and recorded communications, including electronic mail, instant messages, and recordings of telephone calls."  7 U.S.C. § 4s(g); Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief

Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants, 77 Fed. Reg. 20128 (Apr. 3, 2012) (final rule).

46. In December 2010, the CFTC published a proposed rule detailing daily trading record requirements, including the preservation and maintenance of "trade information related to pre-execution, execution, and post-execution data," such that a person could "conduct a comprehensive and accurate trade reconstruction for each swap." Reporting, Recordkeeping, and Daily Trading Records Requirements for Swap Dealers and Major Swap Participants, 75 Fed. Reg. 76666, 76668 (Dec. 9, 2010) (proposed rule). Several commenters raised concerns about how the Rule would apply to cross-border transactions, and offered detailed recommendations on how to apply the Rule's requirements extraterritorially. *See* Barclays et al. Comment Letter; *see also* Bank of Tokyo-Mitsubishi UJF, Ltd. et al. Comment Letter. Nevertheless, the CFTC adopted the final Daily Trading Records Rule substantially as proposed, without any mention of how the Rule would apply extraterritorially. *See* 77 Fed. Reg. at 20132-34.

47. Thus, in promulgating the Daily Trading Records Rule, the CFTC failed to address how the Daily Trading Records Rule would apply extraterritorially, failed to address comments relating to the Daily Trading Records Rule's extraterritorial application, and failed to consider the costs and benefits of applying the Daily Trading Records Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Trade Execution Rule

48. Section 2(h)(8) of the CEA provides that any swap transaction that is required to be cleared must be executed on a SEF or a Designated Contract Market ("DCM"), unless no SEF or DCM makes the swap "available to trade." 7 U.S.C. § 2(h)(8). The "Trade Execution Rule"

concerns the process by which trading platforms make swaps "available to trade," and therefore subject to the mandatory execution requirements.   7 U.S.C.   §   2(h)(8)(B);   Process for a Designated Contract Market or Swap Execution Facility To Make a Swap Available To Trade, Swap Transaction Compliance and Implementation Schedule, and Trade Execution Requirement Under the Commodity Exchange Act, 78 Fed. Reg. 33606 (June 4, 2013) (final rule).

49.     In December 2012, the Commission proposed a rule that would allow a SEF or DCM to determine whether to make a swap available to trade by considering eight factors and then submitting that determination to the CFTC.  Process for a Designated Contract Market or Swap Execution Facility To Make a Swap Available To Trade, 76 Fed. Reg. 77728, 77737 (Dec. 14, 2012) (proposed rule).  In June 2013, the Commission adopted the Trade Execution Rule as a final rule that is substantially similar to the proposed rule, without any mention of how the Rule would apply extraterritorially.  78 Fed. Reg. at 33606.

50.     Thus, in promulgating the Trade Execution Rule, the CFTC failed to address how the Trade Execution Rule would apply extraterritorially and failed to consider the costs and benefits of applying the Trade Execution Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Straight Through Processing Rule

51.     The "Straight Through Processing Rule" imposes requirements for swap dealers, major swap participants, and other swap intermediaries in connection with the processing and timing of submissions of swaps for central clearing.  Customer Clearing Documentation, Timing of Acceptance for Clearing, and Clearing Member Risk Management, 77 Fed. Reg. 21278 (Apr. 9, 2012) (final rule).  The final Straight Through Processing Rule adopted requirements proposed in four separate notices of proposed rulemakings.  77 Fed. Reg. at 21278.  Generally, the Straight

Through Processing Rule sets documentation and conflict-of-interest standards for swap dealers, major swap participants, and intermediaries that clear the swaps on behalf of customers. *Id.* Specifically, the Straight Through Processing Rule (among other things) "require[s] and establish[es] uniform standards for prompt processing, submission and acceptance for clearing of swaps eligible for clearing." *Id.* at 21310. The Rule does not specify how it will apply extraterritorially.

52.     Thus, in promulgating the Straight Through Processing Rule, the CFTC failed to address how the Straight Through Processing Rule would apply extraterritorially and failed to consider the costs and benefits of applying the Straight Through Processing Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Clearing Determination Rule

53.     The "Clearing Determination Rule" concerns the types of swaps that need to be "cleared" at a derivatives clearing organization ("DCO"). Clearing Requirement Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 74284 (Dec. 13, 2012) (final rule). Section 723 of Dodd-Frank makes it unlawful "for any person to engage in a swap unless that person submits such swap for clearing" to a DCO "if the swap is required to be cleared." 7 U.S.C. § 2(h)(1)(A).

54.     In August 2012, the Commission proposed a rule that would require certain interest rate swaps and credit defaults swaps to be cleared at a DCO. Clearing Requirement Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 47169 (Aug. 7, 2012) (proposed rule). The proposed rule noted that certain of these swaps involve cross-border transactions and only those covered by the proposed Cross-Border Rule, discussed below, would be required to be cleared. *Id.* at 47213 & n.188. On December 13, 2012, the CFTC adopted a final Clearing Determination Rule substantially similar to the proposed rule. 77 Fed. Reg. at 74284, 74326 &

n.216 (Dec. 13, 2012) (final rule).  The Clearing Determination Rule does not state how it will apply extraterritorially, other than by referring to the Cross-Border Rule that, at the time, was in the form of proposed, non-final, regulatory "guidance."

55.     Thus, in promulgating the Clearing Determination Rule, the CFTC failed to specify how the Clearing Determination Rule would apply extraterritorially and failed to consider the costs and benefits of applying the Clearing Determination Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Chief Compliance Officer Rule

56.     In the same rulemaking in which the Commission adopted the Daily Trading Records Rule, the Commission also adopted the "Chief Compliance Officer Rule," which requires all registered swap dealers and major swap participants to designate for their firm a chief compliance officer ("CCO") who has specified qualifications, responsibilities, and authority as dictated by the Commission.   Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants, 77 Fed. Reg. 20128, 20200-01 (Apr. 3, 2012) (final rule); *see also* Dodd-Frank § 725; 7 U.S.C. § 7a-1(i).

57.     Several commenters raised extraterritoriality concerns regarding the proposed Chief Compliance Officer Rule.   Designation of a Chief Compliance Officer; Required Compliance Policies; and Annual Report of a Futures Commission Merchant, Swap Dealer, or Major Swap Participant, 75 Fed. Reg. 70881 (Nov. 19, 2010) (proposed rule).  For example, twelve foreign banks suggested that, with respect to the appointment of a CCO, "a foreign bank swap dealer [should] be [subject to] the rules established by its home country regulator, if the

Commissions determine these home country's rules to be 'comparable.'" Barclays et al. Comment Letter at 16.  The letter went on to explain that "the home country regulator is in the best position to comprehensively regulate a foreign bank swap dealer under its primary supervision.  Where the home country regulator has already set Entity-Level Requirements for the foreign bank, the principle of comity would militate against the Commissions' imposition of potentially inconsistent or unnecessarily duplicative requirements under Title VII."  *Id.* at 17. Similarly, three Japanese banks submitted a comment letter requesting that, pursuant to G-20 agreements, Japanese banks, including their U.S. branches, should "not [be] made subject to the application of Title VII requirements," including the Chief Compliance Officer Rule.  Bank of Tokyo-Mitsubishi UJF, Ltd. et al. Comment Letter at 4.

58.  The Commission never addressed these cross-border concerns regarding the Chief Compliance Officer Rule, and never addressed how the Rule would apply extraterritorially.  *See* 77 Fed. Reg. at 20128.  Thus, in promulgating the Chief Compliance Officer Rule, the CFTC failed to address how the Rule would apply extraterritorially, failed to address comments relating to the Chief Compliance Officer Rule's extraterritorial application, and failed to consider the costs and benefits of applying the Chief Compliance Officer Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Risk Management Rule

59.  In the same rulemaking in which it adopted the Daily Trading Records Rule and the Chief Compliance Officer Rule, the Commission also adopted the "Risk Management Rule," which requires registered swap dealers and major swap participants to develop and implement a comprehensive risk management program that meets the CFTC's detailed requirements.  Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures

Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants, 77 Fed. Reg. 20128, 20205-11 (Apr. 3, 2012) (final rule); *see also* Dodd-Frank § 731; 7 U.S.C. § 4s(j).

60.     Several commenters raised concerns regarding the extraterritorial application of the proposed Risk Management Rule.  Regulations Establishing and Governing the Duties of Swap Dealers and Major Swap Participants, 75 Fed. Reg. 71397 (Nov. 23, 2010) (proposed rule). For example, the twelve foreign banks urged:  "In deciding how to apply their rules requiring these [risk management] procedures to foreign banking entities, the Commissions should take account of the fact that many foreign banks already have in place extensive control mechanisms, which are subject to existing home country rules and supervision as well as imminent derivatives-specific regulation.   In particular, the Commissions should avoid applying requirements that mandate specific organizational structures, such as proposed CFTC requirements concerning . . . the organization of the risk management function, to foreign bank swap dealers."  Barclays et al. Comment Letter at 4-5.  Similarly, another foreign bank asked the CFTC to clarify the extraterritorial reach of its risk management requirements.  Société Générale Comment Letter at 2, 4-5 & n.8.

61.     The Commission never addressed these concerns in the final Risk Management Rule.  *See* 77 Fed. Reg. at 20128.  Thus, in promulgating the Risk Management Rule, the CFTC failed to address how the Rule would apply extraterritorially, failed to address comments relating to the Risk Management Rule's extraterritorial application, and failed to consider the costs and benefits of applying the Risk Management Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The SDR Reporting Rule

62.     Section 727 of Dodd-Frank requires all swaps to be reported to a Swap Data Repository (or "SDR"), which is a new registered entity created by section 728 of Dodd-Frank to collect and maintain data related to swap transactions as prescribed by the Commission. 7 U.S.C. § 2(a)(13)(G).  The "SDR Reporting Rule" details what data needs to be reported, the manner of reporting, the counterparty required to report, and other requirements for swap data recordkeeping and reporting.  Swap Data Recordkeeping and Reporting Requirements, 77 Fed. Reg. 2136 (Jan. 13, 2012) (final rule).

63.     Several commenters raised concerns regarding the extraterritorial application of the proposed SDR Reporting Rule.  Swap Data Recordkeeping and Reporting Requirements, 75 Fed. Reg. 76573 (Dec. 8, 2010) (proposed rule).   For example, Plaintiffs SIFMA and ISDA explained: "We do not believe that the Commission should require reporting of transactions between two non-U.S. counterparties, nor is it clear that the Commission has the authority to do so."  SIFMA & ISDA Comment Letter at 27-29.

64.     The final SDR Reporting Rule noted the Commission's ongoing discussions with foreign regulators and specified which entity needed to report in a swap where one or both counterparties are not a "U.S. person," but the final Rule failed to address the extraterritoriality concerns raised by commenters, never defined what was meant by the key term "U.S. person," and never addressed how the Rule's use of that term—as ultimately defined—would affect U.S. businesses and investors, foreign entities, and U.S. and global markets.  77 Fed. Reg. at 2167.

65.     Thus, in promulgating the SDR Reporting Rule, the CFTC failed to address how the Rule would apply extraterritorially, failed to adequately address all the comments relating to the SDR Reporting Rule's extraterritorial application, and failed to consider the costs and

benefits of applying the SDR Reporting Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Historical SDR Reporting Rule

66.    The "Historical SDR Reporting Rule" requires the reporting of swap data for transactions that occurred *prior* to the enactment of and during the transition to the Title VII SDR reporting regime.  Swap Data Recordkeeping and Reporting Requirements: Pre-Enactment and Transition Swaps, 77 Fed. Reg. 35200 (June 12, 2012) (final rule).

67.    Several commenters raised concerns about reporting requirements for historical cross-border swaps.  For example, Plaintiff ISDA stated:  "If a non-U.S. person trades with a non-U.S. [swap dealer], those trades should not be reportable to the U.S. regulators even if the non-U.S. person or [swap dealer] is a subsidiary of a U.S. person."  ISDA Comment Letter at 6.

68.    The Historical SDR Reporting Rule addressed reporting requirements for "non-U.S. persons," 77 Fed. Reg. at 35211-12, but never defined "U.S. person," never addressed the consequences under the Rule of that term's ultimate definition, and never addressed the issues raised in ISDA's comment letter.  Thus, in promulgating the Historical SDR Reporting Rule, the CFTC failed to address how the Rule would apply extraterritorially, failed to adequately address all the comments relating to the Historical SDR Reporting Rule's extraterritorial application, and failed to consider the costs and benefits of applying the Historical SDR Reporting Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The Large Trader Reporting Rule

69.    The "Large Trader Reporting Rule" requires regular reports from swap dealers that hold significant positions in swaps that are linked, directly or indirectly, to a prescribed group of U.S.-listed physical commodity futures contracts.  Large Trader Reporting for Physical

Commodity Swaps, 76 Fed. Reg. 43851 (July 22, 2011).  The Large Trader Reporting Rule does not specify how it will apply extraterritorially.

70.    Thus, in promulgating the Large Trader Reporting Rule, the CFTC failed to address how the Large Trader Reporting Rule would apply extraterritorially and failed to consider the costs and benefits of applying the Large Trader Reporting Rule's requirements to foreign entities and entities engaged in cross-border transactions.

The SEF Registration Rule

71.    The "SEF Registration Rule" creates a framework for the registration and operation of SEFs, a new classification for multilateral swap trading platforms or systems provided for by Section 733 of Dodd-Frank.  7 U.S.C. § 5(g); Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33476 (June 4, 2013) (final rule).  The rule was proposed in January 2011, Core Principles and Other Requirements for Swap Execution Facilities, 76 Fed. Reg. 1214 (Jan. 7, 2011) (proposed rule), and finalized in June 2013, 78 Fed. Reg. at 33476.

72.    Several commenters requested that the CFTC address the issue of cross-border application during the SEF Registration Rule comment period.  *See, e.g.*, ISDA Comment Letter of June 2, 2011 at 3 ("[L]ack of clarity with regards to extraterritoriality application of the regulations could limit participation by non-U.S. firms in the U.S. capital markets.");  Cleary Gottlieb Comment Letter at 21 ("To avoid undue interference with the way in which other jurisdictions implement [standardizing OTC derivatives contracts to be traded on exchanges or electronic trading platforms], the Commissions should clarify that Dodd-Frank's mandatory execution requirement applies only to transactions with a U.S. person subject to the execution requirement.").

73.     Yet, in adopting the final SEF Registration Rule, the CFTC failed to address these comments and did not explain the application of the Rule extraterritorially.   The SEF Registration Rule explains that if any trading platform that meets the definition of a SEF lists any swap—not just those that are required to be executed on a SEF—it must register with the CFTC as a SEF.   The CFTC did not address the cross-border implications of such a requirement that could result in a non-U.S. multilateral trading platform that only lists swaps on non-U.S. underlying assets (e.g., European natural gas) being required to register as a SEF.

74.     On November 15, 2013, the CFTC's Division of Market Oversight ("DMO") addressed the cross-border application of the SEF Registration Rule.   Division of Market Oversight Guidance on Application of Certain Commission Regulations to Swap Execution Facilities (Nov. 15, 2013) (the "DMO Guidance").   The DMO Guidance stated that the SEF Registration Rule applies to non-U.S. trading platforms, which includes requiring them to register as SEFs when they provide "U.S. persons or persons located in the U.S. (including personnel and agents of non-U.S. persons located in the United States) ('U.S.-located persons') with the ability to trade or execute swaps on or pursuant to the rules of the platform, either directly or indirectly through an intermediary . . . ." *Id.*   For example, non-U.S. trading platforms that provide non-"U.S. persons" a venue for derivatives execution could be required to register with the CFTC simply because one of the non-U.S. persons uses an agent located in the United States to assist in trade execution on the platform.   The SEF Registration Rule, as interpreted by the DMO Guidance, thus has the practical effect of forcing non-U.S. multilateral swaps trading platforms that allow access to any "U.S. person or U.S.-located person" to choose between registering as a SEF or denying access to such "U.S. persons" in the future.

75.     In promulgating the SEF Registration Rule, the CFTC never addressed how the Rule would apply extraterritorially.   Thus, foreign platforms did not know under what circumstances they were required to register as SEFs.   Nor did the CFTC address the costs or benefits of applying the SEF Registration Rule to foreign entities and cross-border transactions, which would impose irrational, unnecessary burdens and costs on foreign business activities with insignificant U.S. connections, and create economic incentives for foreign platforms to refuse to serve U.S. firms, non-U.S. branches of U.S. swap dealers, and even some foreign firms— including the members of Plaintiffs—to avoid the onerous SEF registration and other requirements.

**C.      The Commission Promulgated The Binding Cross-Border Rule Without Even Purporting To Comply With The Rulemaking Requirements Of The APA And The CEA**

76.     The CFTC finally addressed the cross-border application of the Title VII Rules with its promulgation of the Cross-Border Rule.   Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations, 78 Fed. Reg. 45292 (July 26, 2013). But rather than cure the procedural deficiencies of the Title VII Rules, the Cross-Border Rule purposefully circumvented the congressionally-required procedures for CFTC rulemaking.   As Commissioner O'Malia explained, the CFTC styled the Rule as an "Interpretive Guidance" precisely to avoid such requirements.   *Id.* at 45373, App'x 3.

77.     The Commission published a proposed Cross-Border Rule on July 12, 2012, Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, 77 Fed. Reg. 41213 (July 12, 2012), and published revised portions of the proposed rule on January 7, 2013, Further Proposed Guidance Regarding Compliance With Certain Swaps Regulations, 78 Fed. Reg. 909 (Jan. 7, 2013).   Both proposals purported to be mere "guidance," but—as explained below—in fact were adopted as a binding final rule.   Indeed, spanning almost 30 pages

in the Federal Register and containing over 150 footnotes, this supposed "guidance" proposal

detailed a complex regime for governing cross-border transactions.  *See* 77 Fed. Reg. at 41214.

78.     Regulated parties submitted numerous comments on the proposed Cross-Border

Rule, addressing both its procedural and substantive failings.

a.      As to procedure, commenters explained that the proposed rule—if adopted

as final—would be a binding rule, not mere "guidance," and thus had to be promulgated

consistently with the rulemaking requirements of the APA and the CEA.  *See* Coalition

for Derivatives End-Users Comment Letter at 7-8; ISDA Comment Letter at 3 ("An

apparent legislative rule of the scope and magnitude of the [proposal] without any

acknowledgement of its costs and benefits—let alone a reasoned cost-benefit

evaluation—risks appearing arbitrary.").

b.      As to substance, commenters explained that the proposed regulatory

regime reached "far beyond" the CFTC's cross-border authority under Section 2(i) of the

CEA.  *See* Sullivan & Cromwell Comment Letter at 6 ("We do not believe that the

Companies' Non-U.S. Operations have a 'direct and significant connection with

activities, or effect on, U.S. commerce' based solely on the existence of an affiliation

with a U.S. banking organization."); *accord* ISDA Comment Letter at 16 ("[T]he

Commission's interpretation overshoots the statutory mark"); Coalition for Derivatives

End-Users Comment Letter at 3 (treating foreign affiliates of U.S. end-users as "U.S.

persons" would create competitive disadvantages for those affiliates).  And they criticized

the proposal's inconsistent application of what it classified as "Entity-Level" and

"Transaction-Level" Requirements.  *See* Coalition of Derivatives End-Users Comment

Letter at 3-5 (proposal creates altogether new concept of a "conduit entity that applies to

end-users even though end-users do not increase systemic risk"); SIFMA Comment Letter at A-36-37 (unlike non-U.S. swap dealers and non-U.S. branches, U.S. swap dealers are denied the opportunity to comply with foreign regulations in lieu of complying with the Transaction-Level Requirements for swaps with non-U.S. entities).

79.     The Commission adopted the Cross-Border Rule in its final form on July 26, 2013.  78 Fed. Reg. at 45292.  The final Rule established for the first time the cross-border scope of a variety of Title VII Rules, including: (i) who is a "U.S. person" for purposes of the CFTC's regulations, *id.* at 45308-16; (ii) which non-U.S. entities are required to register with the CFTC as swap dealers and major swap participants, including a detailed explanation of which swaps count towards a swap dealer's *de minimis* threshold, *id.* at 45318-26; (iii) which "Entity-Level Requirements" apply to non-U.S. swap dealers and major swap participants, *id.* at 45348-50; and (iv) which "Transaction-Level Requirements," including clearing and trade execution requirements, apply to transactions involving one or more "non-U.S. persons," *id.* at 45350-54, 45355-57, 45358-64.

80.     The Cross-Border Rule sets out a comprehensive, binding regulatory framework. Although the CFTC characterized the Rule as a mere statement of "general policy," 78 Fed. Reg. 45297, that claim is wholly inconsistent with the language and structure of this comprehensive regime, and with the Commission's actions and statements.

a.     The Cross-Border Rule binds the CFTC and regulated parties through the use of mandatory language.  *See, e.g.*, *id.* at 45309-15 (describing the elements that the CFTC "will" consider in determining whether an entity is a "U.S. person"); *id.* at 45344 ("Once a comparability determination is made for a jurisdiction, it will apply for all entities or transactions in that jurisdiction to the extent provided in the determination, as

approved by the Commission.").  The Cross-Border Rule includes seven pages of detailed appendices illustrating which entities or transactions must comply with various "Entity-" and "Transaction-Level" Requirements.  *Id.* at 45364-70.  The appendices include tables clearly stating whether regulations "apply" or "do not apply" for each combination of counterparties.  *Id.* at 45638-70.

b.      The Cross-Border Rule provides definitions and detailed explanations of which entities are covered by the Title VII Rules, *id.* at 45364-66; which non-U.S. entities must register as swap dealers or major swap participants, *id.* at 45348-50; and which entities must comply with the "Entity"- and "Transaction-Level Requirements," *id.* at 45364-68.  It sets forth numerous detailed definitions with multiple parts and sub-parts, including, for example, an eight-part definition of "U.S. person" that includes both a subordinate definition ("legal entity") and exceptions, consuming virtually a full column in the Federal Register.  *Id.* at 45316-17.

c.      In the Cross-Border Rule, the Commission for the first time classified certain of its swaps rules as embodying "Entity-Level Requirements," others as embodying "Transaction-Level Requirements," and proceeded to define entities' compliance obligations based substantially on the degree to which the rules in each of these separate classifications would "apply."  *Id.* at 45331-40.

d.      The Cross-Border Rule also establishes a regime of "substituted compliance," whereby compliance with foreign law is treated in certain limited circumstances as sufficient to discharge obligations that the regulated entity otherwise would have under U.S. law.  *Id.* at 45342-46.  This legislative grace from the application of U.S. legal requirements, though sound policy in many instances, is an unmistakably

legislative act that cannot be accomplished through "interpretative guidance" regarding U.S. regulatory requirements that otherwise would "apply."

e.     The websites for both the Commission and the Federal Register refer to the Cross-Border Rule as a "Rule."     *See* http://www.cftc.gov/LawRegulation/ FederalRegister/FinalRules/2013-17958 (last visited Dec. 4, 2013); https:// www.federalregister.gov/articles/2013/07/26/2013-17958/interpretive-guidance-and-policy-statement-regarding-compliance-with-certain-swap-regulations (last visited Dec. 4, 2013).  The Federal Register lists the Cross-Border Rule as purporting to modify pre-existing legislative rules.  *See* 78 Fed. Reg. at 45292 ("17 CFR Chapter 1").

f.     In conjunction with promulgating the Cross-Border Rule, the Commission issued an "Exemptive Order" providing "temporary conditional relief" from the Rule to certain entities.  *See* Exemptive Order Regarding Compliance With Certain Swap Regulations, 78 Fed. Reg. 43785, 43785 (July 22, 2013).  The Cross-Border Rule's definition of "U.S. person," for example, became effective only on October 9, 2013, some 75 days after publication of the Cross-Border Rule.  *Id.* at 43787.  Non-U.S. persons were also exempt from applying the new aggregation principle for 75 days "[i]n order to facilitate transition" to the Rule's definition of (and requirements regarding) "U.S. person[s]."  *Id.* at 43787, 43788.  And in certain circumstances, foreign branches were given temporary leave to comply with their local law in lieu of complying with the Transaction-Level Requirements.  *Id.* at 43789.

g.     The various forms of relief provided in the Exemptive Order would have been unnecessary, if not for the purposeful binding effect of the Cross-Border Rule.  The Exemptive Order therefore further confirmed that the Cross-Border Rule is a binding

legislative rule. *See, e.g.*, *id.* at 43788 ("***Under the*** [Cross-Border Rule], non-U.S. [swap dealers] and non-U.S. [major swap participants] ***are required to comply*** with SDR Reporting for all swaps with U.S. counterparties.") (emphases added); *id.* at 43789 ("[A]ny foreign branch of a U.S. bank that is [a swap dealer] or [major swap participant] that was ***not required to clear*** under the January Order ***may delay complying*** with such clearing requirement until [October 9, 2013].") (emphases added).

h.     Rules the CFTC has adopted since finalizing the Cross-Border Rule confirm that the Commission intends to apply the Cross-Border Rule in defining the scope of other agency final rules, such as the Title VII Rules.  For example, the Clearing Determination Rule defined its own extraterritorial scope by reference to the proposed Cross-Border Rule.  *See* 77 Fed. Reg. at 47213 & n.188 (proposed rule); 77 Fed. Reg. at 74326 & n.216 (final rule).  Other rules have similarly incorporated the Cross-Border Rule to define their cross-border scope.  Swap Transaction Compliance and Implementation Schedule: Clearing Requirement Under Section 2(h) of the CEA, 77 Fed. Reg. 44441, 44443 & n.9 (July 30, 2012).  Like the Cross-Border Rule, none of these rules included an analysis of the costs and benefits of this extraterritorial scope.

i.     A recent advisory by CFTC staff also reflects that the Cross-Border Rule is binding.  On November 14, 2013, the Division of Swap Dealer and Intermediary Oversight ("DSIO") issued an "advisory" stating that the CFTC's "Transaction-Level Requirements" (a  classification that the Cross-Border Rule introduced) apply to U.S.-registered swap dealers that are "regularly using personnel or agents located in the U.S. to arrange, negotiate, or execute a swap with a non-U.S. person."  Division of Swap Dealer and Intermediary Oversight Advisory, "Applicability of Transaction-Level Requirements

to Activity in the United States," CFTC Letter No. 13-69 (Nov. 14, 2013) ("DSIO Advisory").  The DSIO Advisory characterized the Cross-Border Rule as a binding rule, stating, for example, that in its Cross-Border Rule "the Commission intended substituted compliance to be available, or Transaction-Level Requirements *to not apply*, where the activities of the non-U.S. [swap dealer] take place outside the United States."  *Id.* at 2 (emphasis added); *see also id.* at 1 (the Cross-Border Rule "provides . . . that substituted compliance *should be available* . . . or *should not apply* at all . . . .") (emphases added).

j.      CFTC staff have issued "no-action" letters premised on the binding effect of the Cross-Border Rule.  *See, e.g.*, No-Action Relief for Registered Swap Dealers and Major Swap Participants from Certain Requirements under Subpart I of Part 23 of Commission Regulations in Connection with Uncleared Swaps Subject to Risk Mitigation Techniques under EMIR, CFTC Letter No. 13-45 (July 11, 2013), *corrected by* Time-Limited No-Action Relief Regarding Commission Regulation 23.502 for Swap Dealers and Major Swap Participants in Connection with Uncleared Swaps Subject to Risk Mitigation Techniques under EMIR, CFTC Letter No. 13-50 (Aug. 23, 2013).  In these no-action letters, the DSIO found that the European Union derivatives rules regarding risk mitigation were essentially identical to the Commission's, and that a swap dealer or major swap participant's compliance with the European Union's rules would be deemed to be compliant with the Commission's rules.  Had the Cross-Border Rule not been perceived by Commission staff and the public as binding, there would have been no need for letters assuring the public that "no action" would be taken to enforce the Rule in the circumstances that the letters identify.

k.    CFTC staff "no-action" letters also have treated definitions in the Cross-Border Rule as definitive interpretations that, like a binding rule, determine agency action and parties' responsibilities.   *See* No-Action Relief:   Certain Transaction-Level Requirements for Non-U.S. Swap Dealers, CFTC Letter No. 13-71, at 1 n.2 (Nov. 26, 2013) ("As used in this letter, the term 'U.S. person' has the same meaning as in the Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations.") (citation omitted); DMO Guidance at 1 n.5 ("A foreign board of trade ('FBOT') registered with the Commission pursuant to CEA Section 4(b)(1) and Part 48 of the Commission's regulations satisfies this requirement.") (citing the Cross-Border Rule as authority); *id.* at 2 (using term "U.S. person," derived from the Cross-Border Rule).

l.    In his public statements, the Chairman of the CFTC also has confirmed that the Cross-Border Rule is binding.  In a speech defending the November 18 DSIO Advisory, he stated:  "If a foreign-based swap dealer has personnel in New York and they regularly arrange, negotiate, or execute swaps in the United States, then the transactions come under Dodd-Frank requirements."  Gary Gensler, Speech, SEFCON IV (11/18/13), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-152 (last visited Dec. 4, 2013).  A foreign-based swap dealer relying on personnel in the United States "ha[s] to follow the same ***rules*** when arranging, negotiating or executing a swap" as a U.S. swap dealer in the same U.S. office building, he stated.  *Id.* (emphasis added); *see id.* ("One elevator bank . . . one set of ***rules***.") (emphasis added).  Market participants thus should "come into compliance" with the Cross-Border Rule, he declared in another speech.  *See* Gary Gensler, Speech, CME Global Financial Leadership Conference (Nov.

19, 2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-153 (last visited Dec. 4, 2013).

m.      Market participants in the United States and worldwide, including Plaintiffs' members, have recognized the CFTC's intention that the Cross-Border Rule function as a binding legislative rule and have considered themselves obligated to treat the Cross-Border Rule as a binding legal requirement in planning and structuring their market conduct.

n.      Market observers, also, have uniformly understood the Cross-Border Rule to be a binding agency pronouncement.  Numerous press reports referred to the Cross-Border "rule" in the lead-up to and aftermath of its issuance.  *See, e.g.*, Ben Protess, *U.S. Regulators Approve Stricter Trading Rules Overseas*, N.Y. TIMES, at B4 (July 13, 2013); Ben Protess, *Deadline Splits an Agency on Trading Rule Abroad*, N.Y. TIMES, at B1 (July 3, 2013); Jamila Trindle & Tom Fairless, *U.S. Rules on Swaps Face a Barrier Abroad*, http://on.wsj.com/13rb2Ou (June 9, 2013) (last visited Dec. 4, 2013); Andrew Ackerman & Michael R. Crittenden, *Compared to CFTC, Heading TARP May Have Been Easy Job*, WALL ST. J., Nov. 12, 2013, *available at* http://on.wsj.com/1djBTln ("key issues facing the CFTC [include] the cross-border rule") (statement of Damon Silvers, policy director and special counsel for the American Federation of Labor and Congress of Industrial Organizations) (last visited Dec. 4, 2013).

81.     Despite its clear intent that the Cross-Border Rule function as a binding rule, the Commission did not even attempt to comply with the CEA's requirement that it evaluate the costs and benefits of the Rule.  This lapse was particularly grave because many swaps have an international component and because several of the Title VII Rules had anticipated that the

Cross-Border Rule would perform the requisite cost-benefit evaluation of Title VII Rules' cross-border application.

82.     In adopting the Cross-Border Rule, the Commission ignored numerous other requirements for rulemaking established by Congress.  It did not meaningfully respond to significant comments in the rulemaking record and radically changed aspects of the Rule from the proposed to the final version, in violation of the APA.  And the Commission entirely ignored the mandatory requirements of the Regulatory Flexibility Act (5 U.S.C. § 601), the Paperwork Reduction Act (44 U.S.C. § 3504), and the Small Business Regulatory Enforcement Fairness Act of 1996 (P.L. 104-121, Mar. 29, 1996 (as amended by P.L. 110-28, May 25, 2007)).

83.     In addition to these procedural errors, the Cross-Border Rule goes far beyond the CFTC's limited jurisdiction to regulate swaps outside of the United States, which encompasses—as relevant here—only "activities" that "have a direct and significant connection with activities in, or effect on, commerce of the United States."  7 U.S.C. § 2(i).  The Cross-Border Rule focuses largely on the status of market participants—such as whether one entity is a subsidiary of, or "guaranteed" by, another—not their actual "activities," as Section 2(i) requires. The Commission justified this novel approach by assuming that it could regulate entities engaged in activities that, when "viewed as a class or in the aggregate," have a "direct and significant connection" with U.S. commerce.  78 Fed. Reg. 45300.  This deviates from the plain text of Section 2(i) by sweeping in a broad swath of "activities" that have only an indirect or insignificant connection to activities in, or effects on, U.S. commerce.  Commissioner Sommers characterized the CFTC as taking an "intergalactic Commerce Clause" approach to its own jurisdiction.   Cross-Border Application of Certain Swaps Provisions of the Commodity

Exchange Act, 77 Fed. Reg. 41213, 41239, App'x 3 (July 12, 2012).  This overbroad approach includes, but is not limited to:

 a. *Activities by affiliate conduits*.  78 Fed. Reg. at 45358.  The Cross-Border Rule creates, for the first time, the concept of an "affiliate conduit," defined, in part, as a foreign subsidiary of a "U.S. person" that engages in swaps with non-U.S. third parties to hedge the risks of its U.S. affiliates, and enters into offsetting swaps or other arrangements with one or more U.S. affiliates.  *Id.*  The Cross-Border Rule regulates the non-U.S. transactions of these "affiliate conduits."  *Id.*  But by their nature, the activities of these non-U.S. conduits are only indirectly connected to the United States and have no immediate effect on United States commerce.  Moreover, in many circumstances, end-user affiliate conduits' swaps with non-U.S. entities introduce no risk into the United States, and affiliate conduits can actually have a positive effect by playing a vital role as hedging centers set up to mitigate an entity's global risk.  The CFTC nevertheless found these crucial realities "irrelevant" and asserted that "the jurisdictional nexus is met by reason of the trading relationship between the conduit and the affiliate U.S. person," without further explanation or analysis.  *Id.* at 45359 n.588.

 b. *Swap transactions between a non-U.S. swap dealer and a non-U.S. counterparty that is either guaranteed by or is an affiliate conduit of a U.S. person.*  78 Fed. Reg. 45369, App'x D.  As with affiliate conduits, these swap transactions involve two entities outside the United States where there is no direct consequence to the United States.  Any effect on or connection with U.S. commerce, therefore, is only speculative, not direct or significant.

c.      *Swap transactions between non-U.S. parties, when a non-U.S. swap dealer uses a U.S. branch to execute the swap.*   78 Fed. Reg. at 45350 n.513.   The proposed Cross-Border Rule stated that the Transaction-Level Requirements would not apply "to swaps between a non-U.S. swap dealer or non-U.S. [major swap participant] with a non-U.S. counterparty that is not guaranteed by a U.S. person."   *See* Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, 77 Fed. Reg. 41213, 41229 (July 12, 2012).   Contrary to that statement, however, the final Cross-Border Rule assertedly imposed the Transaction-Level Requirements on non-U.S. swap dealers who merely use their U.S. branches to assist in executing a swap, declaring a "strong supervisory interest in regulating the dealing activities that occur with [sic] the United States."   78 Fed. Reg. at 45350 n.513; *see also* DSIO Advisory at 2.   "[This provision] reflects a new interpretation of the branch concept that was not included in the Commission's proposed cross-border guidance, its further proposed guidance, or the January [2013] Order, and was therefore not subject to public comment."   IIB Comment Letter at 10.

d.      *Activities by certain investment funds or pools.*   The Cross-Border Rule also introduced a "principal place of business test" to determine whether a collective investment vehicle, such as an investment fund or pool, is a "U.S. person."   78 Fed. Reg. at 45309-11.   Under this test, an investment vehicle could be deemed a U.S. person if senior personnel responsible for either the formation and promotion of the vehicle, or the implementation of the vehicle's investment strategy, are located in the United States.   *Id.* at 45310-11.   Such a broad application subjects collective investment vehicles with no

direct or significant connection to the United States to Transaction-Level Requirements
and requires that they be counted towards a non-U.S. swap dealer's *de minimis* threshold.

      e.    *Activities by foreign branches of U.S. banks*.  The CFTC's Cross-Border
Rule requires foreign branches to follow all Transaction-Level Requirements (including
clearing) when transacting with non-U.S. persons that are neither a guaranteed affiliate
nor an affiliate conduit unless the CFTC issues a substituted compliance finding, rather
than being able to follow local transaction-level rules.

      84.    Central to the Commission's regime for regulating cross-border swaps is the
Cross-Border Rule's unprecedented definition of "U.S. person."  That term is never used in
Dodd-Frank and was never before defined in other CFTC rules.  *See, e.g.*, Real-Time Public
Reporting of Swap Transaction Data, 77 Fed. Reg. 1182, 1196 (Jan. 9, 2012) (deciding not to
adopt a definition for "U.S. person").  Instead, the Cross-Border Rule announced, for the first
time, that in most circumstances, one's status as a "U.S. person" triggers application of all
Entity- and Transaction-Level Requirements wherever in the world the "person" happens to be.
*See* 78 Fed. Reg. at 45348, 45350.  By taking this approach, the CFTC sought to arrogate to itself
unprecedented and unauthorized extraterritorial authority on the false premise that if a "U.S.
person" enters into a swap transaction anywhere in the world, it automatically has "direct and
significant connection with activities in, or effect on, commerce of the United States."  7 U.S.C.
§ 2(i).  Dodd-Frank—which expressly *limits* the CFTC's extraterritorial reach—did not confer
this "intergalactic" jurisdiction.  77 Fed. Reg. at 41239, App'x 3 (statement of Commissioner
Sommers).

      85.    The Cross-Border Rule's novel "U.S. person" definition rests upon other arbitrary
premises and distinctions, including applying CFTC Transaction-Level Requirements differently

depending on whether one or both of the counterparties are non-"U.S. persons." 78 Fed. Reg. at

45337-40. This differential treatment results in inconsistent application of onerous requirements,

including but not limited to:

a.      Requiring non-U.S. entities to register based solely on transactions with

other non-U.S. entities, even if none of them independently engages in more than *de*

*minimis* trades with U.S. persons. In determining whether swap dealers have exceeded

the "*de minimis*" swap dealing activities that may be conducted without CFTC

registration, the CFTC will count swap dealing transactions with certain non-U.S. persons

and aggregate all such swap dealing transactions among those of other swap dealing

entities within the same corporate group. *Id.* at 45324-25. The Cross-Border Rule thus

requires non-U.S. entities—even those that engage in swaps solely with other non-U.S.

persons—to aggregate their swaps with the swaps of every other affiliate "under common

control," including other non-U.S. entities. *Id.* at 45323. This mandate applies to non-

U.S. affiliates engaged in swap-dealing activities exclusively with other non-U.S.

persons, even when no single affiliate exceeds the *de minimis* threshold. For example, if

ten different non-U.S. affiliates each engage in swaps with non-U.S. counterparties that

each amount to one-tenth of the *de minimis* threshold of swap-dealing activity normally

required to register as a swap dealer, then the Rule requires at least one of those non-U.S.

affiliates to register as a swap dealer because the aggregate exceeds the *de minimis*

threshold.

b.      Imposing Transaction-Level Requirements on swaps between two foreign

entities with no connection to the United States other than that one entity happens to

employ U.S.-based front-office personnel or agents for the swaps. 78 Fed. Reg. at 45350

n.513; *see also* DSIO Advisory at 2.   The Commission lacks authority to regulate activities that do not have a direct and significant connection with, or effect on, U.S. commerce.   Yet the Commission has arbitrarily asserted the authority to regulate swaps between two foreign entities that have no material effect on the United States merely because U.S. personnel were used to facilitate the transaction.

86.     The CFTC's procedural errors in promulgating the Cross-Border Rule are illustrated by comparison to the SEC's approach to security-based swap activities.   The SEC's cross-border proposal—unlike the CFTC's Cross-Border Rule—contains a lengthy cost-benefit evaluation, including an economic analysis of more than 85 pages.   Cross-Border Security-Based Swap Activities; Re-Proposal of Regulation SBSR and Certain Rules and Forms Relating to the Registration of Security-Based Swap Dealers and Major Security-Based Swap Participants, 78 Fed. Reg. 30968, 31118-31204 (May 23, 2013).   Whereas the CFTC has taken an uncoordinated, scattershot approach to cross-border regulation, the SEC issued a "roadmap" of its intended course of action before promulgating a single Title VII rule.   *See SEC Issues "Roadmap" on Phase in of Derivatives Regulation*, SEC. & EXCH. COMM'N, https://www.sec.gov/News/ PressRelease/Detail/PressRelease/1365171482550 (last visited Dec. 4, 2013).   The SEC has since followed that roadmap by issuing a single proposed cross-border regulation that is intended to make clear the cross-border scope of each of its final rules.   Unlike the CFTC, the SEC has re-opened the comment period for all of its affected final rules, thereby enabling market participants, other interested parties, and the SEC to consider the costs and benefits of the proposed approach as an integrated whole in light of its proposed cross-border rule, rather than in piecemeal fashion.   *See* 78 Fed. Reg. at 30973.   And in contrast to the CFTC's studied circumvention of congressionally-mandated rulemaking requirements, SEC staff explained that

"providing fairly significant guidance about how the rules would apply in a cross-border context . . . is beyond the scope of what we can do by interpretation" rather than rulemaking.  Dodd-Frank Wall Street Reform and Consumer Protection Act: 2 Years Later: Hearing Before the S. Comm. on Agric., Nutrition and Forestry, 112 Cong. 10 (2012).

**D.      The Title VII Rules And The Cross-Border Rule Have Caused And Will Continue To Cause Substantial Harm To Plaintiffs, The Markets, And The Public**

87.      The Cross-Border Rule's sweeping extension of the Title VII Rules has wide-reaching effects on Plaintiffs' member firms, the swaps market, and the public at large.  The Cross-Border Rule applies the Title VII Rules to foreign entities or entities engaging in foreign transactions, thus imposing costly, often duplicative registration, clearing, documentation, reporting, and other requirements on these entities and transactions.  This discourages entities from engaging in transactions with persons in the United States, including some of Plaintiffs' member firms.

88.      Plaintiffs' member firms have incurred, are incurring, and will continue to incur significant costs as a direct result of the procedural and substantive failures of the Commission in promulgating the Title VII Rules.  Because the Commission failed to consider and adequately address comments relating to extraterritoriality and because the Commission failed to consider the costs and benefits of these Rules' extraterritorial approach, the Commission adopted the Title VII Rules in a form that imposes substantial costs on Plaintiffs' member firms, as described below.  Had the Commission appropriately addressed comments on extraterritoriality and considered the costs and benefits of applying the Title VII Rules extraterritorially, it would not have promulgated rules that exact the costs described below.

89.      In adopting the Cross-Border Rule, the Commission exponentially increased these costs for Plaintiffs, the market, and the public, creating an arbitrary web of requirements,

exemptions, and potential "substituted compliance."  Due to the evolving requirements announced in the proposed Cross-Border Rule, re-proposed Rule, and the final Rule, Plaintiffs' members have incurred significant costs in repeatedly restructuring their organizations and automated compliance systems.

90.  Pursuant to the elaborate requirements in the Cross-Border Rule, which often duplicate or conflict with foreign regulatory requirements, Plaintiffs' members have incurred and will continue to incur costs in complying with each of the Title VII Rules, by, among other things:

a.  Registering non-U.S. entities as swap dealers, which involves, among other things, submitting Form 7-R to the National Futures Association ("NFA"), demonstrating and documenting to the NFA that the entity is in compliance with all regulations implementing 7 U.S.C. § 4s, responding to any requests for supplemental documentation from the NFA, paying substantial annual fees to the NFA, and authorizing the Commission to conduct on-site inspections of its facilities, 77 Fed. Reg. at 2626;

b.  Altering trading activities by, among other things, submitting certain swaps for clearing, 77 Fed. Reg. at 21306, 77 Fed. Reg. at 74335-38, executing swaps only on specified trading venues, 78 Fed. Reg. at 33606, coordinating with DCOs to establish procedures for prompt swap clearing and transaction processing, not engaging in certain contract arrangements with end-users, and screening orders for swaps according to certain risk-based limits, 77 Fed. Reg. at 21306-10;

c.  Developing duplicate internal compliance systems for business conduct standards, including ensuring timely confirmation of all swap transactions with a swap counterparty and conducting regular reconciliation and compression of swap portfolios

between swap dealers, major swap participants, and other counterparties, 77 Fed. Reg. at 55904, as well as creating risk management procedures, 77 Fed. Reg. at 21278;

      d.      Developing and constructing duplicate documentation systems that detail the trading relationship between swap dealers, major swap participants, and their counterparties, 77 Fed. Reg. at 55904, and that document trade information related to pre-execution, execution, and post-execution data including records of all e-mails, instant messages, and recordings of telephone calls, 77 Fed. Reg. at 20128;

      e.      Developing and constructing duplicate reporting systems that immediately report data relating to a swap transaction, including price and volume, whether or not those swaps are executed on a SEF or DCM, 77 Fed. Reg. at 1182;

      f.      Developing and constructing duplicate systems that require coordination with DCOs for clearing and accepting or rejecting trades, establishing risk-based limits, screening transactions that fail to meet those limits, and conducting certain stress tests, 77 Fed. Reg. at 21308; and

      g.      Losing non-U.S. swap counterparties as business partners for some or all transactions as a result of the Title VII Rules and the Cross-Border Rule.

91.      In addition, pursuant to the requirements in the Cross-Border Rule, Plaintiffs' members are currently incurring and will continue to incur unnecessary costs in complying with each of the Title VII Rules, by, among other things:

      a.      Reviewing and updating registration information with the NFA, 77 Fed. Reg. at 2627;

      b.      Continuing to alter trading activities, including submitting certain swaps for clearing, not trading in certain uncleared swaps, 77 Fed. Reg. at 21306, 77 Fed. Reg.

at 74335-38, coordinating with DCOs for prompt swap clearing and transaction processing, not engaging in certain contract arrangements with end-users, and screening orders for swaps according to certain risk-based limits, 77 Fed. Reg. at 21306-10;

c.      Ensuring timely confirmation of all swap transactions with a swap counterparty and conducting regular reconciliation and compression of swap portfolios between swap dealers, major swap participants, and other counterparties, 77 Fed. Reg. at 55904, and adhering to certain risk-management procedures, 77 Fed. Reg. at 21278;

d.      Documenting the trading relationship between swap dealers, major swap participants, and their counterparties, 77 Fed. Reg. at 55904, and documenting trade information related to pre-execution, execution, and post-execution data including records of all e-mails, instant messages, and recordings of telephone calls, 77 Fed. Reg. at 20128;

e.      Reporting data relating to a swap transaction within specified timeframes, including price and volume information, whether or not those swaps are executed on a SEF or DCM, 77 Fed. Reg. at 1182;

f.      Coordinating with DCOs for clearing and accepting or rejecting trades, screening transactions that fail to meet certain risk-based limitations, and regularly conducting certain stress tests, 77 Fed. Reg. at 21308; and

g.      Continuing to lose non-U.S. swap counterparties as business partners for some or all transactions because the non-U.S. counterparties do not wish to be subjected to the CFTC's onerous and duplicative requirements.

92.     In addition, as a result of the SEF Registration Rule, Plaintiffs' members are being denied access to non-U.S. multilateral swaps trading platforms.  Plaintiffs' members have

incurred and will continue to incur costs as a result of this lost access, including the loss of business that would have been transacted on those platforms and costs associated with the global fragmentation of liquidity in swaps markets.  The CFTC's cross-border approach has also driven liquidity away from these non-U.S. multilateral swaps trading platforms unjustifiably, thereby harming all participants on the platforms.

93.     The Cross-Border Rule will have significant negative effects on the U.S. and international markets, contrary to commitments of the leading "G-20 nations" to avoid cumbersome and conflicting regulation of the global swaps markets.  The swaps markets play an important role in the U.S. and international economies, as explained above.  Pushing foreign entities and cross-border transactions away from the United States through unjustified and overly-broad regulatory mandates will impair the U.S. economy and U.S. competitiveness. Liquidity in international markets will be diminished as ill-considered regulatory costs cause foreign markets and platforms to curtail transactions with U.S. entities.  The Title VII Rules, as applied by the Cross-Border Rule, will create a preference for other products, such as futures, which can be structured to deliver the same financial performance but are subject to very different regulatory requirements.  This, in turn, will contribute to "fragmentation of markets, protectionism, and regulatory arbitrage" of the sort that the leaders of the G-20 nations agreed to avoid in implementing domestic reforms of financial markets.  LEADERS' STATEMENT: THE PITTSBURGH SUMMIT, SEPT. 24-25, 2009, at ¶ 12, *available at* http://en.g20russia.ru/load/ 780988012 (last visited Dec. 4, 2013).  A recent report from the Financial Stability Board further stressed this, noting that "[i]n this global market, it is essential that consistent rules apply across jurisdictions in a non-discriminatory way" and that "[r]egulators should continue to cooperate in the application of regulations in cross-border contexts, to enable them to defer to each other's

rules where these achieve similar outcomes." Financial Stability Board, *A Narrative Progress Report on Financial Reforms*, at 6 (Sep. 5, 2013), *available at* https://www.financialstabilityboard.org/publications/r_130905a.pdf (last visited Dec. 4, 2013).

94.    The Cross-Border Rule and its extraterritorial application of the Title VII Rules are causing substantial harm to the public.  For example, commercial end-users rely on liquidity in the swaps markets to hedge and mitigate risks associated with operating their businesses. Without the ability to hedge cost-efficiently, these end-users will be forced to pass such risks and increased costs on to their customers.  Many U.S.-based commercial end-users operate globally with affiliates throughout the world, and must compete with companies in the local markets.  The Cross-Border Rule and the extraterritorial application of the Title VII Rules harm the public by limiting the ability of U.S. companies that operate globally to effectively hedge or mitigate their risk abroad, thereby reducing liquidity, increasing costs, and reducing competitiveness in foreign jurisdictions.  Further, by regulating the conduct of non-U.S. swap dealers in circumstances such as when a U.S.-located agent assists in the execution of a swap with a non-U.S. person, the Cross-Border Rule will cause direct harm to the U.S. economy by moving jobs outside of the United States.

95.    The benefits of imposing the Title VII Rules abroad to the extent dictated by the Cross-Border Rule are negligible, especially when compared to the significant corresponding costs:

a.    Non-U.S. persons that are covered by the Cross-Border Rule are already extensively regulated by foreign jurisdictions or are in the process of so being regulated, consistent with the commitment made by G-20 countries.  Contrary to the G-20's commitment to creating a level playing field for swaps throughout the world, the Cross-

Border Rule imposes additional requirements on foreign entities with no marginal benefit.  The Cross-Border Rule's requirement of duplicate registration is inconsistent with principles of international comity, particularly because some foreign jurisdictions discourage entities from being registered with governments outside of their home jurisdiction, for fear of conflicting regulatory requirements.

b.  By way of illustration, under the Cross-Border Rule, a single swap can be regulated by three separate authorities with little chance of reconciliation: if a non-U.S. swap dealer in the U.K. is trading with a Japanese technology company, but the trade is executed by traders from the non-U.S. swap dealer who are located in New York, that transaction will be subject to U.S., European Union, and Japanese derivatives laws.  This preposterous result—for a transaction that presents no cognizable risk for the U.S. economy—is the consequence of the CFTC's acting outside the scope of Section 2(i) of the CEA, failing adequately to respond to comments relating to extraterritoriality, and refusing to conduct a cost-benefit evaluation.

c.  Similarly, when the Cross-Border Rule applies regulatory requirements to foreign entities because these entities are guaranteed by U.S. firms, any benefits are negligible because the guarantees are already incorporated into the capital requirements analysis for U.S. banks.  At the same time, these duplicate registration requirements impose administrative costs and competitive disadvantages on registrants, because some foreign entities will hesitate to interact with U.S.-regulated entities for fear of being swept into the U.S. regulatory framework.  For example, given the choice between a foreign entity that is registered with the CFTC as a swap dealer and a foreign entity that is not registered, all other things being equal, a non-U.S. end-user company will choose

the latter to avoid the costs associated with complying with the CFTC's Entity-Level and Transaction-Level Requirements in addition to the regulatory requirements of its home jurisdiction.

## COUNT ONE:

## THE CROSS-BORDER RULE VIOLATES THE COMMODITY EXCHANGE ACT— FAILURE TO EVALUATE COSTS AND BENEFITS

96.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

97.    The Cross-Border Rule is a final rule that has binding effect on the Commission and mandates compliance by regulated parties.

98.    The CEA provides that before the Commission promulgates any "regulation," "[t]he costs and benefits of the proposed [rule] shall be evaluated in light of—(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations."  7 U.S.C. § 19(a)(2).

99.    Notwithstanding its statutory obligation to evaluate the costs and benefits of the Cross-Border Rule, the Commission failed to engage in <u>any</u> cost-benefit analysis in issuing the Rule.  It therefore did not, despite clear congressional command, comply with the mandatory requirements of Section 19: it did not evaluate the costs and benefits of the Cross-Border Rule in light of considerations of protection of market participants and the public; considerations of the efficiency, competitiveness, and financial integrity of futures markets; considerations of price discovery; considerations of sound risk management practices; and other public interest considerations.  *See id.*  Moreover, despite extensive evidence showing that the Cross-Border Rule would impose significant costs on market participants, the Commission failed to collect

data that would enable it to evaluate fairly the costs of its requirements.  It failed to offer even the most general estimate of the costs of compliance for swap dealers or major swap participants and their domestic and foreign counterparties.  And it failed to consider the impact of the Rule on the public interest.

100.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT TWO:

**THE CROSS-BORDER RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT—FAILURE TO PROVIDE INTERESTED PERSONS SUFFICIENT OPPORTUNITY TO PARTICIPATE IN THE RULEMAKING**

101.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

102.    The APA provides that when an agency promulgates a rule, it "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c). This requirement prohibits an agency from, among other things, adopting a final rule that is not a "logical outgrowth" of the rule proposed during the public notice-and-comment period.

103.    The Cross-Border Rule proposal did not give fair notice of how the final Rule would dramatically expand the extraterritorial application of various Title VII Rules.  For example, the CFTC did not give notice that it would impose its requirements upon foreign swap dealers merely because one non-U.S. swap dealer uses its U.S. branch for the swap.

104.    The CFTC's intended application of certain Title VII Rules was not the "logical outgrowth" of the proposed rule, and thus deprived Plaintiffs and other members of the public of the opportunity to comment on the significant adverse consequences of the approach the Commission adopted.

105.    Further, by adopting a new approach to regulating non-U.S. swap dealers that had not been identified in the proposed rule, the Commission failed to give the public notice and an opportunity to comment on the scant benefits and significant costs of the new approach, and failed to give the public an opportunity to comment on the Commission's own cost-benefit evaluation of this hitherto undisclosed regulatory requirement.

106.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT THREE:

**THE CROSS-BORDER RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT—FAILURE TO RESPOND ADEQUATELY TO COMMENTS**

107.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

108.    The APA provides that before an agency promulgates a "rule," it must provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity to participate in the rule-making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c).   The notice-and-comment requirement is a vital part of the APA's structure because it "assures that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978).

109.    As part of the notice-and-comment process, an agency must respond to "relevant" and "significant" public comments, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977), and to those comments "which, if true, . . . would require a change in [the] proposed rule." *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003) (internal quotations and citations omitted).

110.    The Commission never adequately responded to, and simply dismissed, comments relating to the excessively broad scope of the Cross-Border Rule, its flawed definition of "U.S. person," and the arbitrary application of Transaction-Level Requirements.    The Commission also failed to conduct a cost-benefit evaluation, despite the fact that many commenters—and one dissenting Commissioner—requested such an analysis.    As a result, the CFTC issued a rule that regulates transactions with no "direct and significant" connection with or effect on U.S. commerce as expressly required by Section 2(i) of the CEA, draws arbitrary distinctions in its definition of "U.S. person," and imposes requirements that put U.S. corporations at a competitive disadvantage.    In doing so, the CFTC wholly "failed to consider an important aspect of the problem" it was undertaking to regulate, in violation of the APA. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118-19 (D.C. Cir. 2010).

111.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(D).

## COUNT FOUR:

**THE CROSS-BORDER RULE VIOLATES THE ADMINSTRATIVE PROCEDURE ACT—ARBITRARY AND CAPRICIOUS AGENCY ACTION IN DETERMINING THE ENTITIES AND TRANSACTIONS COVERED BY THE AGENCY'S REQUIREMENTS**

112.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

113.    The APA forbids an agency from acting in a manner that is "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A), and requires agencies to engage in "reasoned decisionmaking" when adopting new rules.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  This means, among other things, that an agency must treat similar cases as similar and articulate a satisfactory explanation for its actions, including a rational connection between the facts found and the decisions made.

114.    The Cross-Border Rule arbitrarily applies various Dodd-Frank swaps provisions. The Rule imposes registration requirements on non-U.S. entities even if they engage in swaps

solely with non-U.S. counterparties and thereby present no risk to U.S. commerce.  *Id.* at 45324-25.  And the adopting release to the Rule does not explain why it covers swaps between two foreign entities, with no connection to the United States other than that one happens to be a swap dealer using its U.S. branch to negotiate or execute the swap.  *Id.* at 45350 n.513; *see also* DSIO Advisory at 2.

115.   The Commission's promulgation of the Cross-Border Rule was arbitrary, capricious, and otherwise not in accordance with law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C).

### COUNT FIVE:

### THE CROSS-BORDER RULE VIOLATES THE COMMODITY EXCHANGE ACT— VIOLATION OF SECTION 2(I)'S RESTRICTION ON APPLYING TITLE VII "OUTSIDE OF THE UNITED STATES"

116.   Section 2(i) of the CEA provides that Title VII's provisions "*shall not apply to activities outside the United States*" except where—as relevant here—"those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i) (emphasis added).

117.   The Cross-Border Rule violates Section 2(i) by attempting to regulate activities well beyond those exempted from Section 2(i)'s prohibition.  The Rule regulates entities and transactions that do not constitute activities with the requisite "direct and significant" connection with or effect on U.S. commerce, including but not limited to non-U.S. affiliate conduits, 78 Fed. Reg. at 45358; swap transactions between a non-U.S. person that is not guaranteed by a U.S. person and a non-U.S. person affiliate that happens to be guaranteed by a U.S. person, *id.* at 45369, App'x D; and swap transactions between a non-U.S. swap dealer executing through its U.S. branch and a non-U.S. person that is not a guaranteed affiliate or an affiliate conduit, *id.* at 45350 n.513; DSIO Advisory at 2.

118.    In adopting the Cross-Border Rule in violation of Section 2(i)'s prohibition, the Commission violated the CEA and acted in a manner that is arbitrary, capricious and otherwise not in accordance with law.

119.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT SIX:

### THE TITLE VII RULES VIOLATE THE COMMODITY EXCHANGE ACT— FAILURE TO EVALUATE COSTS AND BENEFITS

120.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

121.    For the purposes of this Complaint, the "Title VII Rules" include the aforementioned Swap Entity Registration Rule (77 Fed. Reg. 2613), Entity Definition Rule (77 Fed. Reg. 30596), Portfolio Reconciliation and Documentation Rule (77 Fed. Reg. 55904), Real-Time Reporting Rule (77 Fed. Reg. 1182), Daily Trading Records Rule (77 Fed. Reg. 20128), Trade Execution Rule (78 Fed. Reg. 33606), Straight Through Processing Rule (77 Fed. Reg. 21278), Clearing Determination Rule (77 Fed. Reg. 74284), Chief Compliance Officer Rule (77 Fed. Reg. 20128, 20200-01), Risk Management Rule (77 Fed. Reg. 20128, 20205-11), the SDR Reporting Rule (77 Fed. Reg. 2136), Historical SDR Reporting Rule (77 Fed. Reg. 35200), Large Trader Reporting Rule (76 Fed. Reg. 43851), and SEF Registration Rule (78 Fed. Reg. 33476 ).

122.    The CEA provides that before the Commission promulgates any "regulation," "[t]he costs and benefits of the proposed [rule] shall be evaluated in light of—(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery;

(D) considerations of sound risk management practices; and (E) other public interest considerations."  7 U.S.C. § 19(a)(2).

123.    In promulgating the Title VII Rules, the CFTC never defined the extraterritorial scope of the Title VII Rules, including the extent to which the Rules apply to non-U.S. entities or to the portion of the worldwide swaps business that is not transacted in the United States. Because the CFTC intends that the Title VII Rules apply to a significant portion of these entities and swaps, with significant effects on U.S. business, shareholding, investors, and international markets, its failure to consider and evaluate the costs and benefits of applying the Rules internationally constitutes a severe failure to discharge its responsibilities under the CEA.

124.    Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C) with respect to the extraterritorial application of the Title VII Rules.

## COUNT SEVEN:

### THE TITLE VII RULES VIOLATE THE ADMINISTRATIVE PROCEDURE ACT— FAILURE TO ADEQUATELY RESPOND TO COMMENTS

125.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

126.    The APA provides that before an agency promulgates a "rule," it must provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity to participate in the rule-making through submission of written data, views, or arguments."  5 U.S.C. § 553(b)-(c).  The notice-and-comment requirement is a vital part of the APA's structure because it "assures that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions."  *Guardian Fed. Sav. & Loan Ass'n*, 589 F.2d at 662.

127.    As part of the notice-and-comment process, an agency must respond to "relevant" and "significant" public comments, *Home Box Office*, 567 F.2d at 35 & n.58, and to those

comments "which, if true, . . . would require a change in [the] proposed rule," *La. Fed. Land Bank Ass'n*, 336 F.3d at 1080 (internal quotations and citations omitted).

128.    The Commission never adequately responded to the numerous comments relating to the extraterritorial scope of the Title VII Rules.  For example, commenters requested a clear limitation on the extraterritorial application of the Dealer Registration Rule, 77 Fed. Reg. 2613. *E.g.*, SIFMA Comment Letter at 4 ("[A] non-U.S. entity that conducts swaps transactions solely outside of the United States with non-U.S. persons should not fall within the definition of 'swap dealer' and should not be subject to Title VII regulation.").  Similarly, in response to the Portfolio Reconciliation and Documentation Rule, 77 Fed. Reg. 55904, commenters informed the Commission that "it is essential that market participants understand the extent to which cross border activity or entities and activity outside of the United States are viewed by the Commission as within the scope of the new regulations."  Financial Services Roundtable Comment Letter at 3.  Commenters on the Real-Time Reporting Rule requested that the Commission "explicitly require that only data relating to swap transactions involving at least one U.S.-person must be reported and publicly disseminated," urged "the Commission [to] consult with foreign regulators before establishing extraterritoriality scope," and expressed concerns about "whether the Commission has the legal authority to implement [the proposed rule] with respect to non-U.S. parties and suggested the Commission reach agreements with foreign regulators before requiring that all transactions with any U.S. person be subject to [those] requirements."  77 Fed. Reg. at 1190.

129.    The CFTC did not address these comments, at times ignoring them and at other times declaring that those issues would be taken up at a later date, even though no procedurally-valid final rule addressing extraterritoriality has yet been promulgated.  *See, e.g.*, Dealer

Registration Rule, 77 Fed. Reg. at 2619-20 (concluding that extraterritoriality issues "are beyond the scope of this rulemaking"); Real-Time Reporting Rule, 77 Fed. Reg. at 1186 (responding to extraterritoriality concerns by stating that the Commission "continues to discuss with international regulators issues related to extraterritoriality"). As a result, the CFTC issued rules that have important extraterritorial effects without addressing comments relating to extraterritoriality. It has thus "failed to consider an important aspect of the problem" purportedly addressed by the rules, in violation of the APA. *Jicarilla Apache Nation*, 613 F.3d at 1118-19.

130.    The Commission's promulgation of the Title VII Rules was arbitrary, capricious, and otherwise not in accordance with law. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 553, 702, 706(2)(A), (C) with respect to the extraterritorial application of the Title VII Rules.

## COUNT EIGHT:

### THE SEF REGISTRATION RULE VIOLATES THE ADMINSTRATIVE PROCEDURE ACT—ARBITRARY AND CAPRICIOUS AGENCY ACTION IN DEFINING THE ENTITIES AND TRANSACTIONS COVERED BY AGENCY REQUIREMENTS

131.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

132.    The APA forbids an agency from acting in a manner that is "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A), and requires an agency to engage in "reasoned decisionmaking" when adopting new rules. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52.

133.    Section 2(i) of the CEA prohibits the application of Title VII's provisions "to activities outside the United States" except where—as relevant here—"those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i). The SEF Registration Rule expands the jurisdiction of the CEA far beyond any rational interpretation of Section 2(i). It regulates entities and activities that have either an indirect or insignificant connection to U.S. commerce, including swap trading platforms that

serve non-U.S. swap dealers that happen to employ U.S.-based traders.  *See* DMO Guidance at 2-3.  As a result of this unreasonable interpretation of Section 2(i), on which promulgation of the SEF Registration Rule was based, non-U.S. multilateral swaps trading platforms that would otherwise allow access to certain "U.S. persons," as defined in the Cross-Border Rule, or "U.S.-located persons," as refined by Commission staff, have been impelled to deny access to such persons, including Plaintiffs' member firms.

134.   The Commission's promulgation of the SEF Registration Rule was arbitrary, capricious, in excess of statutory jurisdiction, and otherwise not in accordance with law. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C) with respect to the extraterritorial application of the SEF Registration Rule.

## PRAYER FOR RELIEF

135.   WHEREFORE, Plaintiffs pray for an order and judgment:

a.      Declaring that the Cross-Border Rule was not promulgated in accordance with the Commodity Exchange Act within the meaning of 5 U.S.C. § 706(2)(C); that the Cross-Border Rule was not promulgated in accordance with law within the meaning of 5 U.S.C. § 706(2)(D); and that the Cross-Border Rule is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

b.      Vacating and setting aside the Cross-Border Rule in its entirety;

c.      Declaring that the Title VII Rules, as applied extraterritorially, were not promulgated in accordance with the Commodity Exchange Act within the meaning of 5 U.S.C. § 706(2)(C); that the Title VII Rules were not promulgated in accordance with law within the meaning of 5 U.S.C. § 706(2)(D); and that the Title VII Rules are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

d.       Permanently enjoining the CFTC and its officers, employees, and agents, until the CFTC promulgates a cross-border rule that is consistent with the Administrative Procedure Act and the Commodity Exchange Act, from implementing, applying, or taking any action whatsoever to enforce the Cross-Border Rule or to apply or enforce the Title VII Rules extraterritorially, including through guidance or advisory (including the Nov. 14, 2013 DSIO Advisory and Nov. 15, 2013 DMO Guidance);

e.       Permanently enjoining the CFTC and its officers, employees, and agents from implementing, applying, or taking any action whatsoever to enforce the SEF Registration Rule on trading platforms organized or incorporated under the laws of a jurisdiction outside of the United States;

f.       Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

g.       Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: December 4, 2013

By: _____

Eugene Scalia, SBN 447524
escalia@gibsondunn.com
Jason J. Mendro, SBN 482040
jmendro@gibsondunn.com
Misha Tseytlin, SBN 991031
(*motion for pro hac vice forthcoming*)
mtseytlin@gibsondunn.com
Mithun Mansinghani, SBN 1010818
mmansinghani@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of December, 2013, I caused a copy of the foregoing

COMPLAINT to be served upon the Defendant via courier.

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C.  20581


 /s/ Eugene Scalia
Eugene Scalia