**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, and INSTITUTE OF INTERNATIONAL BANKERS, | |
| Plaintiffs, | Civil Action No. 13-CV-1916 (ESH) |
| v. | |
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | |
| Defendant. | |

**PLAINTIFFS' MOTION FOR EXPEDITED CONSIDERATION**
**OF SUMMARY JUDGMENT**

Plaintiffs Securities Industry and Financial Markets Association, International Swaps and Derivatives Association, and Institute of International Bankers ("Plaintiffs") respectfully submit this Motion seeking expedited consideration of their motion for summary judgment, and proposing a schedule for briefing and argument.

This case concerns the extraterritorial regulation of "swaps" by Defendant Commodity Futures Trading Commission ("CFTC" or "Commission"). The subject is an important one: The global swaps market is estimated at almost $700 trillion in notional value, and the Commission repeatedly has emphasized the importance of moving expeditiously to regulate swaps and to establish clarity regarding the obligations of market participants. In this litigation, Plaintiffs raise serious questions about the Commission's new regime for regulating swaps extraterritorially, which, as explained below, has proceeded by a series of unusual regulatory actions that contrast sharply with how the Securities and Exchange Commission ("SEC") has

approached the same subject.   The prompt resolution of Plaintiffs' challenge will materially advance the clarity and certainty regarding swaps regulations that the Commission has said are critically important, and will avert significant, unnecessary costs in circumstances where, by definition, the activity is outside the borders of the United States and often is already regulated by other nations.

Plaintiffs moved for summary judgment last week.   With this Motion, Plaintiffs ask that the Court enter a schedule under which summary judgment briefing would be completed by mid-March, and argument would be heard by the end of April.   Litigation regarding numerous other Dodd-Frank regulations has been expedited similarly in this Court and in the D.C. Circuit.   For the reasons set forth below, Plaintiffs respectfully submit that in this case, too, this Court should exercise its "broad discretion" over scheduling, *Florida v. United States*, 820 F. Supp. 2d 85, 89 (D.D.C. 2011), to provide for expedition.

## FACTUAL AND PROCEDURAL BACKGROUND

Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1375, 1641-1802 (2010) ("Dodd-Frank"), established a new statutory framework for the regulation of a type of derivative known as a "swap."   Following the enactment of Dodd-Frank, the Commission issued a series of rules (the "Title VII Rules") to implement the new swaps regime.   Broadly speaking, these include "Registration Requirements" that define which entities must register with the Commission; "Transaction-Level Requirements" that govern the manner in which swaps transactions must be conducted and reported; and "Entity-Level Requirements" that impose a range of obligations on entities engaged in swaps transactions.   These rules are discussed at pages 3-5 of Plaintiffs' Summary Judgment Memorandum.

The extent of the extraterritorial or "cross-border" application of U.S. swaps rules has long been recognized to be an important issue.  In Dodd-Frank itself, Congress limited the CFTC's authority to regulate swaps outside the United States, providing that Title VII's requirements "shall not apply to activities outside the United States" except where (1) "those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States"; or (2) those activities "contravene such rules or regulations as the Commission may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of" Title VII.  7 U.S.C. § 2(i).

At no point in promulgating its new regulations under Title VII, however, did the Commission indicate whether and to what extent those Title VII Rules would apply to entities or activities outside the United States.  In fact, the Commission repeatedly rebuffed requests for clarification by commenters.  *See* Plaintiffs' Summary Judgment Memorandum at 6-7, 18-20.

The Commission addressed the cross-border application of the Title VII Rules on July 26, 2013, in a document titled "Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Regulations" (78 Fed. Reg. 45292) (the "Cross-Border Rule").  The Cross-Border Rule is a lengthy, detailed document that specifies when the mandates of the Title VII Rules apply to activities and entities outside the United States.  Yet, the Commission promulgated the Cross-Border Rule without even attempting to comply with its rulemaking obligations under the Administrative Procedure Act ("APA") and the Commodity Exchange Act ("CEA"), including its obligation to conduct a cost-benefit analysis.  *See* Plaintiffs' Summary Judgment Memorandum at 7-9, 28-30.

In an effort to evade these requirements, the Commission characterized the Cross-Border Rule as a mere "general statement of policy," rather than acknowledging it to be a substantive

rule.  As explained in Plaintiffs' Summary Judgment Memorandum, however, the Cross-Border

Rule unmistakably qualifies as a substantive rule that is subject to the full range of APA and

CEA rulemaking requirements.  *Id.* at 23-28.  Indeed, the plain text of the Cross-Border Rule is

replete with mandatory directives that are the hallmark of a substantive rule, and the Commission

has repeatedly confirmed the binding nature of its mandates by creating safe harbors, issuing

orders temporarily exempting market participants from compliance, and warning market

participants that they must "come into compliance" or face enforcement.  *Id.* at 9-12 (citations

omitted).

　　　　To this day, the Commission has continued to execute a series of unorthodox regulatory

actions further specifying how the Title VII Rules apply to entities and transactions outside the

United States.   In mid-November 2013, two CFTC staff divisions issued "advisory" and

"guidance" documents elaborating on how those divisions would apply the Cross-Border Rule,

and setting forth an unexpectedly broad application.  *See* CFTC Letter No. 13-69 (Nov. 14,

2013); DMO Guidance on Application of Certain Commission Regulations to Swap Execution

Facilities (Nov. 15, 2013).  After these actions provoked a firestorm of protest (*see, e.g.*, Schmidt

and Brush, *Wall Street Pushes Back on CFTC's Advisory for Overseas Swaps*, Bloomberg,

http://www.bloomberg.com/news/2013-11-18/wall-street-pushes-back-on-cftc-s-advisory-for-

overseas-swaps.html (Nov. 19, 2013)), the divisions announced temporary "no-action" relief

until January 14.  CFTC Letter No. 13-71 (Nov. 26, 2013).  All three of these actions reinforced

the Commission's clear admonition that compliance with the Cross-Border Rule is mandatory.

　　　　Most recently, on December 20, the Commission issued a set of eight "comparability

determinations" that informed market participants when the Commission will permit compliance

with certain requirements of specified foreign jurisdictions to substitute for compliance with the

Commission's regulations, including the Title VII Rules. *See, e.g.*, CFTC, *Comparability Determination for the European Union: Certain Transaction-Level Requirements* (Dec. 20, 2013), *available at* http://www.cftc.gov/ucm/groups/public/@newsroom/documents/ file/eutranreq.pdf. These determinations allowed for such substituted compliance in surprisingly few instances, given the comprehensive nature of foreign swaps regulations. These comparability determinations were not made pursuant to notice-and-comment under the APA and did not include the cost-benefit analysis required by the CEA.

On December 4, Plaintiffs filed their Complaint with this Court, and on December 27, they filed their Motion for Summary Judgment and an Amended Complaint. (The Amended Complaint changed only a handful of paragraphs of the original Complaint.) In short, Plaintiffs claim that the Commission promulgated the Title VII Rules and the Cross-Border Rule in violation of the APA's and the CEA's most fundamental requirements for rulemaking. As explained in the Amended Complaint, the Commission may not evade those requirements by characterizing its comprehensive, regulatory dictates as general statements of policy. Plaintiffs thus seek a judgment vacating the Cross-Border Rule. Plaintiffs further seek a declaration that the Title VII Rules do not apply abroad and an injunction prohibiting their application abroad, or, in the alternative, a judgment partially vacating the Title VII Rules to the extent the Commission claims they have extraterritorial application.

Plaintiffs now seek an expedited schedule for resolving their Motion.

## DISCUSSION

Plaintiffs request expedited consideration of this case because the regulations at issue are critically important to domestic and international markets, are imposing mounting costs on market participants, are the basis for continuing, significant regulatory actions, and raise serious considerations concerning international comity and the public interest. Under 28 U.S.C.

§ 1657(a), "each court of the United States . . . shall expedite the consideration of any action . . . if good cause therefor is shown."  As a result, "district courts enjoy broad discretion when deciding case management and scheduling matters." *Florida v. United States*, 820 F. Supp. 2d at 89.

In the words of the CFTC, "In light of the global nature of the swap market, the extent to which the Dodd-Frank Act's requirements will apply to cross-border activities is critically important."  Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, 77 Fed. Reg. 41214, 41216 (July 12, 2012).  CFTC Chairman Gensler has stated repeatedly that "giving clarity to markets" on cross-border issues is a "significant" component in the "urgent[]" undertaking "to rebuild and restore confidence in our financial system."  Gary Gensler, Open Meeting to Consider Cross-Border Guidance and Exemptive Order, http://www.cftc.gov/PressRoom/SpeechesTestimony/genslerstatement071213 (July 12, 2013); Gary Gensler, Testimony Before the House Financial Services Committee, http://www.cftc.gov/PressRoom/SpeechesTestimony/gensler-7 (July 22, 2009).  The prompt resolution of this case is critical to bringing this clarity and certainty to swaps regulation.

Lawsuits regarding other Dodd-Frank-related regulations have almost invariably been expedited by the D.C. Circuit and judges of this Court.  For example, a suit involving the SEC's "conflict minerals" regulation was expedited in the D.C. Circuit and, when it was transferred to this Court for jurisdictional reasons, a hearing on summary judgment was set for "the earliest available date" after briefing was complete; a decision was rendered 22 days after argument. *Nat'l Assoc. of Mfrs., et al. v. SEC*, No. 12-1422, doc. 1406805 (D.C. Cir. 2012); *Nat'l Assoc. of Mfrs., et al. v. SEC*, No. 13-cv-0635, dkt. #14, 38 (D.D.C. 2013) (Wilkins, J.).  A suit over the SEC's "extractive industries" regulation followed a similar path:  The D.C. Circuit expedited the

6

case, dismissed it for jurisdictional reasons, and briefing and argument in this Court were completed just a little over a month later. *Am. Petroleum Inst., et al. v. SEC*, No. 12-1398, doc. 1402612 (D.C. Cir. 2012); *Am. Petroleum Inst., et al. v. SEC*, No. 12-cv-1668 (D.D.C.) (Bates, J.). The ruling was issued less than a month after oral argument. *Am. Petroleum Inst.*, No. 12-cv-1668, dkt. #51 (D.D.C. 2013). In a suit challenging the CFTC's "position limits" regulation, the Court rendered judgment six months after plaintiffs moved for summary judgment. *See ISDA and SIFMA v. CFTC*, No. 11-cv-2146 (D.D.C.) (Wilkins, J.). Other comparable cases handled on an expedited basis include a challenge to a CFTC "commodity pool" regulation, which was expedited both in the District Court and by the D.C. Circuit in *Investment Co. Institute, et al. v. CFTC*, No. 12-5413, doc. 1415205 (D.C. Cir. 2013) & No. 12-cv-0612 (D.D.C. May 22, 2012) (Howell, J.), and the challenge in the D.C. Circuit to the SEC's proxy access regulations, *Business Roundtable, et al. v. SEC*, No. 10-1305, doc. 1271590 (D.C. Cir. 2010).

Expedition in this case is warranted not merely because of its importance to the U.S. financial system, as with the other Dodd-Frank-related cases that have been expedited, but also because the case concerns costly requirements being imposed across the world. Through its Cross-Border Rule, the Commission seeks to apply ***no fewer than 14 different Title VII Rules*** extraterritorially. For example, non-U.S. entities will be required to "clear" their swaps with derivative clearing organizations, and will be barred from transacting in uncleared swaps. Costly reporting and recordkeeping obligations will attach, requiring firms to set up complex systems that, for example, maintain daily trading records of each and every swap detailed enough for comprehensive trade reconstruction, including maintaining records of all related emails, instant messages, and phone call recordings. And affected firms will be required to change certain internal business practices to conform to the Commission's extensive requirements, including

developing a comprehensive risk management program to the Commission's specifications and hiring an independent "Chief Compliance Officer" with certain qualifications, duties, and authorities.  Many market participants covered by the Cross-Border Rule will be required to comply with the Title VII Rules and the derivatives rules of one or more foreign jurisdictions. The costs of doing business for affected firms will increase significantly, and other non-U.S. firms will avoid doing business with U.S.-related firms (including their independent foreign affiliates) to avert becoming enmeshed in the CFTC's comprehensive regulatory regime.  For example, U.S.-persons are already being barred from some European trading platforms for this very reason.  *See* Tom Braithwaite et al., *U.S. Rules 'Endanger' Derivatives Reforms*, FINANCIAL TIMES (Sep. 26, 2013), *available at* http://www.ft.com/intl/cms/s/0/dda5f480-26c4-11e3-bbeb-00144feab7de.html?siteedition=intl#axzz2ozmYS8yF.  And non-U.S. entities may lay off U.S.-based personnel, or transfer them overseas, to avoid the requirements imposed in the Cross-Border Rule (and elaborated in the November 14 "Advisory").  Importantly, the Commission *never* conducted an analysis of these cross-border costs in adopting the Title VII Rules or the Cross-Border Rule, despite the CEA's unambiguous requirement that it "evaluate[]" the costs and benefits of any regulation it promulgates.  7 U.S.C. § 19(a).  A prompt decision from this Court has the potential to mitigate the high, unrecoverable costs associated with compliance.

Considerations of international comity also favor expedition.  The challenged regulations extend the Commission's authority around the globe, potentially affecting every major swaps market participant, foreign and domestic.  The broad and unexpected reach of the Commission's actions has already strained relations with foreign regulators.  For example, European Union regulators reportedly were "very surprised" at the Commission's actions in November in connection with the Cross-Border Rule, which they said "go against both the letter and spirit of"

8

international agreements and "are another step away from the kind of inter-operable global system that [they] want to build."  Jim Brunsden, *EU Says Gensler Swaps Rule Clashes With Trans-Atlantic Pact*, BLOOMBERG (Nov. 21, 2013), *available at* http://www.bloomberg.com/news/2013-11-21/eu-says-gensler-swaps-rule-clashes-with-trans-atlantic-pact.html.  In December, the Commission's unexpectedly narrow determinations regarding the sufficiency of other nations' laws for "substituted compliance" were said to "put the United States on a collision course with other regulators."  *U.S. Commission Allows Some Foreign Rules for Cross-Border Swaps*, REUTERS (Dec. 20, 2013), *available at* http://www.reuters.com/article/2013/12/20/derivatives-rules-eu-idUSL2N0JZ22H20131220. Moreover, other nations are presently in the process of making similar decisions regarding whether their regulations are satisfied by complying with the CFTC's regime.  A prompt resolution of this case could advance the interest international comity by providing foreign regulators with the benefit of this Court's rulings while their analysis is ongoing.

Expedition is also warranted by the nature of the regulatory failure at issue in this case. As explained in Plaintiffs' Summary Judgment Memorandum, the Commission is attempting to regulate through "guidance" documents that are intended to skirt the requirements of the APA and CEA and evade judicial review.  Entities are, in effect, being regulated through *ad hoc* bulletins and threats of enforcement action, rather than by the rulemaking process prescribed by Congress.  Absent prompt judicial review, the Commission will continue to seek to remake the global swaps markets without complying with the restrictions on regulatory action set down by Congress.

Significantly, the Commission itself stands to benefit from prompt judicial guidance on its approach to cross-border regulation, which remains an important focus of its continued

regulatory actions.  A decision in this case will facilitate the promulgation of lawful regulations and may enable the Commission to avoid incurring unnecessary expenses and burdens in reliance on activities that are likely to be invalidated.  The Commission should therefore share Plaintiffs' interest in resolving this matter expeditiously.[1]

For all the reasons identified above, expedited consideration is in the public interest and will cause no harm.  The costs imposed by the Cross-Border Rule and its extraterritorial application of the Title VII Rules are often passed on to end-users and consumers, resulting in higher prices.  Moreover, as long as the Commission's Cross-Border Rule remains in place, global markets will continue to fragment, decreasing liquidity and increasing risk.  On the other hand, provided this Court's schedule permits expedition, there can be no harm in promptly determining the procedures the CFTC must follow to properly regulate swaps transactions extraterritorially.

Finally, the questions presented in this case are legal, not factual.  Thus, expedited consideration will not unduly burden the parties or the Court.  Additionally, expedited consideration of the case will help to avoid litigation that might otherwise occur regarding the propriety of a stay or preliminary injunction.

---

[1]  The Commission's regulatory errors are particularly apparent when compared to the course followed by the SEC, which has regulatory responsibilities over security-based swaps and, like the CFTC, is required to conduct a cost-benefit analysis of new regulations.  The SEC has undertaken to address the extraterritorial application of its regulations in a substantive rulemaking, which—in the proposal alone—included a preliminary cost-benefit analysis of more than 85 pages, and reopened the comment periods for all rules affected by its cross-border proposal so that the rules' requirements could be considered in conjunction with one another. *See* Cross-Border Security-Based Swap Activities; Re-Proposal of Regulation SBSR and Certain Rules and Forms Relating to the Registration of Security-Based Swap Dealers and Major Security-Based Swap Participants, 78 Fed. Reg. 30968 (May 23, 2013).

**CONCLUSION**

For the foregoing reasons, Plaintiffs propose that the schedule set forth below be adopted in this case.  Plaintiffs believe that this schedule would provide sufficient opportunity for the parties and any *amici* to brief the case expeditiously and comprehensively, taking account of the number of legal issues presented and the importance of the regulations at issue.  Plaintiffs also believe that oral argument would assist this Court's resolution of the case, and respectfully request that a hearing be scheduled in late March or April 2014.

Accordingly, Plaintiffs propose the following schedule (and page limits):

| | |
|---|---|
| Dec. 27, 2013 | Plaintiffs' Motion for Summary Judgment (45 pages) |
| Jan. 15, 2014 | *Amicus* Briefs in Support of Plaintiffs (25 pages) |
| Jan. 31, 2014 | Defendant's Response and Cross-Motion for Summary Judgment (65 pages) |
| Feb. 10, 2014 | *Amicus* Briefs in Support of Defendant (25 pages) |
| Feb. 21, 2014 | Plaintiffs' Summary Judgment Reply and Cross-Response (45 pages) |
| Mar. 7, 2014 | Defendant's Cross-Reply (25 pages) |
| Mar. 14, 2014 | Filing of Joint Appendix |
| Late March or April 2014 | The Court will hear argument on the parties' summary judgment motions on a date to be set by the Court. |

The foregoing schedule presumes that the Commission will file a cross-motion for summary judgment and maintain that it is entitled to file a reply brief in support of its cross-motion, as it has in other recent cases concerning its rulemakings.  If the Commission declines to file a cross-motion, or if the Court should determine that additional briefing would be unwarranted given that the Commission's cross-motion would only duplicate the arguments raised in response to Plaintiffs' Motion for Summary Judgment, then the joint appendix could be

11

due on February 28, allowing for the possibility of an earlier argument if the Court's schedule should permit.

Pursuant to Local Rule 7(m), Plaintiffs' counsel conferred in good faith with the Commission regarding its intention to file this motion for expedition.  The Commission advised Plaintiffs' counsel that it will oppose this motion.[2]

For the foregoing reasons and good cause shown, Plaintiffs request that consideration of this matter be expedited and that this Court enter an order adopting the schedule set forth above.

Respectfully submitted,

/s/ Eugene Scalia

Eugene Scalia, SBN 447524
escalia@gibsondunn.com
Jason J. Mendro, SBN 482040
jmendro@gibsondunn.com
Mithun Mansinghani, SBN 1010818
mmansinghani@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Counsel for Plaintiffs*

Dated: December 30, 2013

---

[2] Earlier today, the Commission filed a motion seeking to delay any further briefing on summary judgment until the Court decides a motion to dismiss that the CFTC has not filed and does not intend to file until February 3, 2014.  *See* Motion to Hold in Abeyance Plaintiffs' Motion for Summary Judgment Pending Disposition of the Commission's Forthcoming Motion to Dismiss, Dkt. #13 at 8.  In the alternative, the Commission urges the Court to grant it ninety days (*i.e.*, until March 27, 2014) to respond to Plaintiffs' Motion for Summary Judgment—more than six times the amount of time provided for by Local Rule 7(b).  *See id.* at 13.  Plaintiffs will further respond to the CFTC's motion in a separate filing.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of December, 2013, I caused the foregoing Motion for Summary Judgment and accompanying memorandum to be filed and served via the Court's CM/ECF filing system.

/s/ Eugene Scalia
Eugene Scalia