**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, and INSTITUTE OF INTERNATIONAL BANKERS,<br><br>              Plaintiffs,<br><br>    v.<br><br>UNITED STATES COMMODITY FUTURES TRADING COMMISSION,<br><br>              Defendant. | Civil Action No. 13-CV-1916 (PLF) |

**SUPPLEMENTAL BRIEF FOR PLAINTIFFS**

Dated:  July 18, 2014

Eugene Scalia, SBN 447524
  Counsel of Record
Jason J. Mendro, SBN 482040
Mithun Mansinghani, SBN 1010818
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page

ARGUMENT ...................................................................................................................... 1

I.    Plaintiffs' Associational Standing Is Not Affected By The
Corporate Structure Of The Regulated Financial Institutions. ............................ 1

    A.    Plaintiffs Have Article III Standing And A Right Of Action
Under The APA Based On The Direct Regulation Of Their
Members. ................................................................................................ 1

    B.    Plaintiffs Have Article III Standing And A Right Of Action
Under The APA Based On The Regulation Of Their Enrolled
Members' Affiliates. .............................................................................. 3

    C.    Plaintiffs Are The Real Parties In Interest Under Rule 17(a),
And Any Rule 17(a) Objections Have Been Waived And Can
Be Cured. ................................................................................................ 5

    D.    Shareholder Standing Doctrine Does Not Limit The Ability Of
An Association To Represent Its Members. ............................................ 6

II.    The Cross-Border Rule Cannot Be Sustained As An Interpretive
Rule. ..................................................................................................................... 7

    A.    The Cross-Border Rule Is Legislative ..................................................... 7

    B.    Treating The Cross-Border Rule As An Interpretive Rule
Would Not Cure The Fatally Flawed Procedures Followed By
The CFTC. ............................................................................................... 9

        1.    If The Cross-Border Rule Is Interpretive, The Title VII
Rules Are Still Procedurally Defective ..................................... 10

        2.    The CFTC's Obligation To Consider Costs And Benefits
Extends To Interpretive Rules. .................................................. 10

    C.    Treating The Cross-Border Rule As An Interpretive Rule
Would Not Meaningfully Change The Level Of Deference To
The Agency. ........................................................................................... 11

    D.    The Issues Raised By This Case Are Ripe, Regardless Of
Whether The Cross-Border Rule Is Interpretive Or Legislative. .............. 12

CONCLUSION ................................................................................................................. 12

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alcan Aluminum Ltd. v. Franchise Tax Bd.*,
 860 F.2d 688 (7th Cir. 1988).........................................................................................2

*Am. Hosp. Ass'n v. Bowen*,
 834 F.2d 1037 (D.C. Cir. 1987) ...................................................................................8

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
 995 F.2d 1106 (D.C. Cir. 1993) ...................................................................................8

*\*BellSouth Corp. v. FCC*,
 144 F.3d 58 (D.C. Cir. 1998) .......................................................................................2

*CA, Inc. v. AFSCME Emps. Pension Plan*,
 953 A.2d 227 (Del. 2008)..............................................................................................6

*\*Catholic Health Initiatives v. Sebelius*,
 617 F.3d 490 (D.C. Cir. 2010) .....................................................................................8

*Cent. Tex. Tel. Co-Op, Inc. v. FCC*,
 402 F.3d 205 (D.C. Cir. 2005) .........................................................................8, 9, 11

*Cherry v. FCC*,
 641 F.3d 494 (D.C. Cir. 2011) .....................................................................................2

*Ciba-Geigy Corp. v. EPA*,
 801 F.2d 430 (D.C. Cir. 1986) ...................................................................................12

*CropLife Am. v. EPA*,
 329 F.3d 876 (D.C. Cir. 2003) .....................................................................................3

*Hall v. Sebelius*,
 689 F. Supp. 2d 10 (D.D.C. 2009) ...............................................................................7

*\*Hunt v. Washington State Apple Adver. Comm'n*,
 432 U.S. 333 (1977) .................................................................................................4, 5

*In re Vitamins Antitrust Litigation*,
 2001 WL 755852 (D.D.C. 2001)...................................................................................6

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
 477 U.S. 274 (1986) ......................................................................................................4

*Interport Inc. v. Magaw*,
 135 F.3d 826 (D.C. Cir. 1998) ...................................................................................12

*Kamen v. Kemper Fin. Servs., Inc.*,
 500 U.S. 90 (1991) ........................................................................................................6

# TABLE OF AUTHORITIES *(continued)*

Page(s)

*Kelly v. EPA,*
  15 F.3d 1100 (D.C. Cir. 1994) ............................................................... 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  134 S. Ct. 1377 (2014) ........................................................................ 3

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ........................................................................... 3

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,*
  132 S. Ct. 2199 (2012) ........................................................................ 3

*Mendoza v. Perez,*
  2014 WL 2619844 (D.C. Cir. June 13, 2014) ................................... 3, 9

*\*Nat'l Envtl. Dev. Assn's Clean Air Project v. EPA,*
  2014 WL 2219065 (D.C. Cir. May 30, 2014) ................................. 9, 12

*Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan,*
  979 F.2d 227 (D.C. Cir. 1992) ............................................................ 8

*Nebraska Dept. of Health & Human Servs. v. U.S. Dept. of Health & Human Servs.,*
  340 F. Supp. 2d 1 (D.D.C. 2004) ....................................................... 11

*\*New York State Club Ass'n, Inc. v. City of New York,*
  487 U.S. 1 (1988) ................................................................... 1, 4, 5, 6

*Paralyzed Veterans of Am. v. D.C. Arena L.P.,*
  117 F.3d 579 (D.C. Cir. 1997) ............................................................ 8

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947) ........................................................................... 7

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) .......................................................................... 12

*\*Syncor Int'l Corp. v. Shalala,*
  127 F.3d 90 (D.C. Cir. 1997) ................................................. 7, 8, 9, 10

*U.S. v. Mead Corp.,*
  533 U.S. 218 (2001) ..................................................................... 11, 12

*United Fed'n of Postal Clerks, AFL-CIO v. Watson,*
  409 F.2d 462 (D.C. Cir. 1969) ........................................................ 5, 6

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.,*
  517 U.S. 544 (1996) ........................................................................ 4, 6

*United Techs. Corp. v. EPA,*
  821 F.2d 714 (D.C. Cir. 1987) ....................................................... 7, 10

*\*Whelan v. Abell,*
  953 F.2d 663 (D.C. Cir. 1992) ........................................................ 5, 6

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

**Statutes**

7 U.S.C. § 19(a) ................................................................................................................. 10, 11

**Rules**

Fed. R. Civ. P. 17(a) ............................................................................................................... 5, 6

**Regulations**

78 Fed. Reg. 45292  (July 26, 2013).............................................................................................. 2

Plaintiffs submit this supplemental brief to address (1) whether the corporate structure of the regulated entities affects Plaintiffs' associational standing and (2) whether the Cross-Border Rule may be sustained as an interpretive rule.  The answer to both questions is no.

## ARGUMENT

I.      **Plaintiffs' Associational Standing Is Not Affected By The Corporate Structure Of The Regulated Financial Institutions.**

An association has standing to challenge government action when at least one of its members has standing, the interests it seeks to protect are germane to the organization's purpose, and the participation of its individual members in the suit is not otherwise required.  *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988).  Where associational standing exists, the association is also the real party in interest under Rule 17(a) of the Federal Rules of Civil Procedure.  *See infra* at I.C.

Plaintiffs have associational standing.  They are trade associations that represent the financial services industry.  *See* D.E. 22 at 2.  They participate directly in rulemakings that affect the industry, routinely submitting comments to the CFTC.  Hammerman Decl. ¶ 5 (SIFMA); Darras Decl. ¶ 5 (ISDA); Coffman Decl. ¶ 5 (IIB).  The interests they seek to protect here are germane to their purposes.  Hammerman Decl. ¶ 4; Darras Decl. ¶ 4; Coffman Decl. ¶ 4.  And there is no dispute that they can litigate their claims without the participation of their members.  Plaintiffs can challenge the Cross-Border Rule and the Title VII Rules because their formally enrolled members and their represented affiliates could do so individually.

A.      **Plaintiffs Have Article III Standing And A Right Of Action Under The APA Based On The Direct Regulation Of Their Members.**

Plaintiffs' formally enrolled members have Article III standing to challenge the Cross-Border Rule and Title VII Rules in their own right.  The challenged regulations directly injure those members by compelling them to comply with numerous requirements, and that "injury will

be redressed by a favorable decision from this court." *Cherry v. FCC*, 641 F.3d 494, 497 (D.C. Cir. 2011) (internal quotation marks and citation omitted).   For example, Plaintiffs' members include foreign banks that are themselves subject to extensive burdens directly as a result of the regulations at issue.  *See* D.E. 22, Barthelemy Decl. ¶¶ 1, 7-10 (Societe Generale), Lee Decl. ¶¶ 1, 7-10 (Deutsche Bank AG).   That alone establishes Plaintiffs' standing under Article III.

Moreover, Plaintiffs' enrolled members also have Article III standing because the Cross-Border Rule regulates their affiliates—*precisely because* they are related entities—and thereby burdens the entire corporate family.  *See, e.g.*, 78 Fed. Reg. 45292, 45318-19, 45355 (July 26, 2013).  It is settled that a corporation has standing to challenge regulations that affect the manner in which it conducts business through and interacts with its affiliates.  *See, e.g.*, *BellSouth Corp. v. FCC*, 144 F.3d 58, 62 (D.C. Cir. 1998) (parent company has standing to challenge regulation requiring subsidiaries to have "structural separation" from parent to engage in regulated activity); *Alcan Aluminum Ltd. v. Franchise Tax Bd.*, 860 F.2d 688, 697-98 (7th Cir. 1988), *rev'd on other grounds* 493 U.S. 331, 337-38 (1990) (parent companies have standing to challenge tax on subsidiaries because the tax affects the parents' "choices about the manner in which international trade is to be conducted").  Here, the cross-border application of the Title VII Rules dramatically affects how Plaintiffs' members must conduct business through their affiliates, including whether to guarantee foreign affiliate transactions, engage in swaps through or with their "affiliate conduits," and separately incorporate or capitalize foreign affiliates or branches.  *See* D.E. 21 at 21-22; D.E. 22 at 4-5, Thompson Decl. ¶¶ 4-6 (JPMorgan), Riggs Decl. ¶¶ 4-6 (Goldman Sachs); Peters Decl. ¶¶ 4-6 (Morgan Stanley); Weadock Decl. ¶¶ 1, 4-6 (Bank of America).  And the fact that Plaintiffs' members ultimately bear the costs imposed on their affiliates is "clearly enough to give [them] Article III standing."  *BellSouth*, 144 F.3d at 62; *see* D.E. 22, Thompson Decl. ¶ 6.

There also is no question that Plaintiffs' members fall "within the class of plaintiffs whom Congress has authorized to sue under" the APA—which is the analysis the Supreme Court has recently applied in place of what some courts had termed "prudential standing" analysis. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387-88 (2014). The Supreme Court has repeatedly confirmed that the APA provides a broad right of action, available to a wide range of plaintiffs. *See, e.g., id.* at 1389 (A "lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision[.]"). Concluding that the APA's limits on who can sue are "'not meant to be especially demanding,'" the Court has explained that "Congress's 'evident intent' when enacting the APA" was "'to make agency action presumptively reviewable.'" *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (citation omitted). Plaintiffs' members undoubtedly fall within the zone of interests protected by the APA, since they are directly regulated by the challenged rules. *See Mendoza v. Perez*, 2014 WL 2619844, *9-10 (D.C. Cir. June 13, 2014).

Importantly, "[o]nly one" association need satisfy the requirements for asserting claims. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). And Plaintiffs need not demonstrate injury from every provision of the Cross-Border Rule; so long as Plaintiffs' members are injured by *part* of the Cross-Border Rule, their injury "can be redressed if the court vacates the . . . rule," and Plaintiffs accordingly have standing to raise procedural challenges that implicate the *entire* Rule. *CropLife Am. v. EPA*, 329 F.3d 876, 884 (D.C. Cir. 2003). Because at least one enrolled member of at least one association has standing, Plaintiffs have standing to pursue this lawsuit.

**B.    Plaintiffs Have Article III Standing And A Right Of Action Under The APA Based On The Regulation Of Their Enrolled Members' Affiliates.**

Companies affiliated with Plaintiffs' formally enrolled members also have Article III standing and the right to sue under the APA for the reasons discussed above, and Plaintiffs

3

possess associational standing to redress their injuries as well.   Associational standing is a functional doctrine, which recognizes that, "when people pool their capital, their interests, or their activities under a name and form that will identify collective interests," the association may "vindicate the interests of all."  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986) (internal quotation marks omitted).  "Membership" for the purposes of associational standing is a contextual inquiry that does not turn upon an organization's formal membership rolls.  For example, in *New York State Club*, the Supreme Court upheld the standing of an "association of associations," even though the plaintiff's formally enrolled members were not directly affected by the challenged action and could not sue "on behalf of themselves."   487 U.S. at 9.   It was sufficient, the Court reasoned, that the "member associations would have standing to bring this same suit on behalf of their own individual members."   *Id.* at 9-10.   And in *Hunt*, the Supreme Court allowed suit by an organization that lacked *any* formal "members" because, rather than "exalt form over substance," the Court determined that the affected entities possessed "the indicia of membership," and the plaintiff "perform[ed] the functions of a traditional trade association."  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 344-45 (1977).  Thus, the question is not whether affiliates are formally enrolled as members, but rather whether the relationship between Plaintiffs and those affiliates is "sufficient to rebut the background presumption . . . that litigants may not assert the rights of absent third parties."  *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 556 (1996).

Plaintiffs represent the interests of their enrolled members' affiliates.   As a matter of convenience, one member of a corporate family may be designated to manage the relationship with the association.   But Plaintiffs also represent the interests of those affiliates in a variety of

ways—including by advocating the policy positions of those affiliates before the CFTC.  *See* Hammerman Decl. ¶¶ 7-11; Darras Decl. ¶¶ 7-11; Coffman Decl. ¶¶ 7-12.  Affiliates themselves directly provide input into the associations' comment letters to the CFTC, participate in association meetings with the CFTC, assist in litigation, serve and vote in association committees, and help steer the associations' activities.  *Id.*  These relationships bear the functional "indicia of membership," and are sufficient to sustain Plaintiffs' associational standing because they are, "[i]n a very real sense," "the means by which" the members "express their collective views and protect their collective interests."  *Hunt*, 432 U.S. at 344-45.

Furthermore, Plaintiffs' members join the associations to secure the benefits of membership for both themselves *and* their affiliates.  A member "represents the interests of its parent . . . and affiliated entities" within the association.  D.E. 22, Riggs Decl. ¶ 3; *see also id.* Peters Decl. ¶ 1.  In that respect, this case is analogous to *New York State Club*, where the association's members represented the interests of the directly regulated entities.  No end would be served by requiring all of these associations to revise their formal membership rolls to encompass the myriad affiliates whose interests they are already widely understood to represent.

### C.    Plaintiffs Are The Real Parties In Interest Under Rule 17(a), And Any Rule 17(a) Objections Have Been Waived And Can Be Cured.

Plaintiffs are the real parties in interest under Rule 17(a) because, as just illustrated, they have associational standing.  *United Fed'n of Postal Clerks, AFL-CIO v. Watson*, 409 F.2d 462, 470-71 (D.C. Cir. 1969).  They therefore act as "bona fide representative[s] on behalf of real parties in interest."  *Id.*  Moreover, the CFTC has waived any objection under Rule 17 by failing to assert it with "reasonable promptness."  *Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992).

Even if this Court had Rule 17 concerns, Plaintiffs would be entitled to cure the perceived deficiency.  A court "may not dismiss" based on Rule 17 "until, after an objection, a reasonable

time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3).  It would be a simple matter for the regulated affiliates to ratify this action by confirming their consent to Plaintiffs' claims on their behalf.  *See In re Vitamins Antitrust Litigation*, 2001 WL 755852, *3-4 & n.6 (D.D.C. 2001).

### D.  Shareholder Standing Doctrine Does Not Limit The Ability Of An Association To Represent Its Members.

Shareholder standing limits the ability of a shareholder to control a corporation's litigation activity, a power that is generally vested with the board of directors.  *See CA, Inc. v. AFSCME Emps. Pension Plan*, 953 A.2d 227, 232 n.6 (Del. 2008) ("[D]irectors, rather than shareholders, manage the business and affairs of the corporation.") (citation omitted).  Those "considerations and conventions of corporate law" do not implicate Article III standing, but rather are "brought into play under Rule 17(a)" of the Federal Rules of Civil Procedure, which requires that an action be prosecuted "by the person entitled under the governing substantive law to enforce the asserted right."  *Whelan*, 953 F.2d at 672.

Shareholder standing is not relevant to the standing of an *association* to protect the interests of those whom it represents.  Whereas the doctrine of shareholder standing allocates the power to control corporate action and rights (in the corporation's name or derivatively), *see Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991), the doctrine of associational standing serves "simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation," *New York State Club*, 487 U.S. at 9.  Having associational standing resolves both Article III *and* Rule 17(a) concerns.  *See Watson*, 409 F.2d at 470 (presence of associational standing is "dispositive of an objection under 17(a)"); *cf. United Food*, 517 U.S. at 554-55 (associational standing addresses Article III and "prudential" concerns).

## II.     The Cross-Border Rule Cannot Be Sustained As An Interpretive Rule.

As a threshold matter, the Cross-Border Rule cannot be upheld as interpretive, because the CFTC labeled the Rule a policy statement, and courts may "judge the propriety of [agency] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  This claim has also been waived, as the CFTC has consistently maintained in this litigation that the Cross-Border Rule was promulgated as a "general statement of policy," not an interpretive rule.  *See, e.g.*, D.E. 28 at 24; *cf. Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 96 (D.C. Cir. 1997).  In any event, the Cross-Border Rule is properly understood as a legislative rule and treating it as interpretive would not cure the CFTC's procedural errors.

### A.     The Cross-Border Rule Is Legislative.

As the Court's June 23 Order suggests, "interpretative rules and policy statements are quite different agency instruments," because with interpretive rules, as with legislative rules, the "agency intends to bind itself to a particular legal position."  *Syncor*, 127 F.3d at 94.  That plainly is what the CFTC has done here, as reflected in various ways including its claim that courts owe deference to the Cross-Border Rule.  It is absurd for the CFTC to contend that regulated entities will not consider themselves bound by interpretations that—in enforcement actions—federal courts will be obligated to apply.  *See Hall v. Sebelius*, 689 F. Supp. 2d 10, 21 (D.D.C. 2009).  Thus, the Cross-Border Rule is a binding *rule*, not a policy statement.

The Cross-Border Rule also is plainly legislative rather than interpretative.  Whether a rule is *interpretive* or *legislative* turns upon the "legal base upon which the rule rests"; an interpretive rule rests on some other legal provision, whereas a legislative rule "is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate."  *United Techs. Corp. v. EPA*, 821 F.2d 714, 719-20 (D.C. Cir. 1987).  The difference ultimately lies in the comparative generality of the statutory mandate and implementing rule:

Where a rule articulates "specific applications" of "vague or vacuous terms," the rule "is not ordinarily interpret[ive], because those [general] terms in themselves do not supply substance from which the propositions can be derived." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494-95 (D.C. Cir. 2010) (citation omitted).   The Cross-Border Rule cannot be merely interpretive because it sets forth specific rules for the global swaps market that build expansively upon the "very general" provision of Section 2(i).  *See Syncor*, 127 F.3d at 94 n.6.  Indeed, the CFTC was clear in the Cross-Border Rule that it was exercising policymaking discretion apart from any mere act of interpretation.  *See* D.E. 37 at 22.

The Cross-Border Rule is not an interpretive rule merely because it interprets Section 2(i) in the process of constructing the Commission's elaborate cross-border regulatory architecture. "[A]ll types of rules, legislative and interpretive alike, may interpret 'law.'" *Cent. Tex. Tel. Co-Op, Inc. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005).  Were it otherwise, an agency could impermissibly "circumvent" rulemaking procedures by "promulgat[ing] mush and then giv[ing] it concrete form only through subsequent less formal 'interpretations.'" *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 584 (D.C. Cir. 1997).  Moreover, because interpretive rules are exempt from notice-and-comment procedures, courts are "wary not to accord [the] elevated status [of an interpretive rule] too easily." *Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 240 (D.C. Cir. 1992).  The category of interpretive rules is "narrow."  *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987).

A legislative rule has "legal effect," which may be discerned in at least four ways, including where a rule provides a "basis" for agency action to "confer benefits or ensure the performance of duties."  *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).  Just like an EPA "directive" recently vacated by the D.C. Circuit, the

Cross-Border Rule "immediately affects the rights and obligations of regulated parties" and "provides firm guidance" to agency staff, notwithstanding purported agency plans to regulate on a "case-by-case basis." *Nat'l Envtl. Dev. Assn's Clean Air Project v. EPA*, 2014 WL 2219065, *4-7 (D.C. Cir. May 30, 2014) ("*NEDA*"); *Syncor*, 127 F.3d at 94-96.   The Cross-Border Rule exercises the CFTC's authority to "devise[] a comprehensive regulatory regimen" for the global swaps market, *Kelly v. EPA*, 15 F.3d 1100, 1108 (D.C. Cir. 1994), including a complex system of safe harbors called "substituted compliance"; the determination of what entities are subject to registration requirements; and the determination of what transactions are subject to regulation. *See* D.E. 37 at 20-25.   The Cross-Border Rule introduces (among other things) a three-pronged test to determine if an entity qualifies as an "affiliate conduit"; a complex matrix of rules to govern "guaranteed affiliates"; and an eight-pronged definition of "U.S. person."  *Id.* at 23-24. These defined terms are cornerstones of the Commission's cross-border regulatory structure and were introduced in the Cross-Border Rule itself; they do not appear in the statute.   It simply is not possible to find these elaborate requirements in the broad command of Section 2(i) that the Commission's rules "shall not" apply absent a "direct and significant connection" to United States commerce.   *Id.* at 23.   Instead, the Cross-Border Rule "supplement[s] the statute by imposing specific duties" on regulated entities. *Mendoza*, 2014 WL 2619844 at *14.[1]

## B.     Treating The Cross-Border Rule As An Interpretive Rule Would Not Cure The Fatally Flawed Procedures Followed By The CFTC.

Even if the Cross-Border Rule were an interpretive rule, it would still be subject to review.  *See Cent. Tex. Tel. Co-Op*, 402 F.3d at 214-15 (reviewing interpretive rule).   And the

---

[1]  Plaintiffs have identified no case that treats some portions of a single agency release as a policy statement and other portions as an interpretative rule.   Rather, when a release has "characteristics of both," it is a legislative rule.  *Syncor*, 127 F.3d at 95.   Accordingly, to the extent the Cross-Border Rule appears to the Court to possess some characteristics of an interpretative rule while also establishing a policy framework, that is further powerful evidence it is a legislative rule.

CFTC *still* would have erred in excluding consideration of cross-border issues from the Title VII rulemakings and by failing to conduct a cost-benefit analysis in the Cross-Border Rule.

1.   <u>If The Cross-Border Rule Is Interpretive, The Title VII Rules Are Still Procedurally Defective.</u>

Treating the Cross-Border Rule as interpretive would not cure the CFTC's errors in promulgating the Title VII Rules.  If this Court were to conclude that the Cross-Border Rule merely interprets Section 2(i), then Section 2(i) would still be the "legal base," *United Techs.*, 821 F.2d at 719, for the global regulatory regime in the Cross-Border Rule, and it still would have been plain error for the CFTC to announce that issues of cross-border application were "beyond the scope" of the Title VII rulemakings and that the agency would "separately address issues related to the application of these definitions to non-U.S. persons."  *See* D.E. 21 at 7 (quoting Title VII rulemakings); *id.* at 16-21; D.E. 37 at 28-34.  In either case, it would be the CFTC's (mistaken) position that the extent of the Title VII Rules' cross-border application was statutorily-determined and embedded in those Rules from the start; that being the case, it had to be addressed in those rulemakings, particularly once raised by commenters.  *See Syncor*, 127 F.3d at 94 (an interpretive rule "does not claim to be exercising authority to itself make positive law," but rather is only "construing the product of congressional lawmaking").

2.   <u>The CFTC's Obligation To Consider Costs And Benefits Extends To Interpretive Rules.</u>

Treating the Cross-Border Rule as interpretive also would not change the fact that the CFTC was required to conduct a cost-benefit analysis.  The CEA states that the agency is required to "consider the costs and benefits" before "promulgating a regulation," and nowhere suggests that this command excludes interpretive rules.  7 U.S.C. § 19(a).  To the contrary, Congress specifically provided that this obligation "does not apply" to three types of agency

actions, *none* of which encompasses an interpretive rule (or even a policy statement).[2]   By providing these exceptions, but no parallel exception for interpretive regulations, Congress plainly mandated cost-benefit analysis for interpretive rules.

Cost-benefit analysis for interpretive rules is not only mandated by the CEA, but also makes good sense.  That a rule is interpretive does not mean that an agency does not exercise policy discretion; after all, "an agency's choice among plausible meanings of a statute may be influenced by considerations of policy."  *Cent. Tex. Tel. Co-Op*, 402 F.3d at 212.  Certainly, the Cross-Border Rule—however it is viewed—constituted a significant exercise of discretion with regard to major regulatory matters.  Plainly, moreover, the CFTC cannot evade its cost-benefit responsibilities by promulgating legislative rules and carving off from them important matters that it deems "interpretive" and resolves in separate releases that conduct no cost-benefit analysis.  And the Commission's argument that performing a cost-benefit analysis would have "second-guess[ed] Congressional judgments" (D.E. 40 at 23-24 n.15) rests, again, on the fiction that this highly-reticulated regulatory framework sprang fully-formed from Section 2(i) itself.

### C.   Treating The Cross-Border Rule As An Interpretive Rule Would Not Meaningfully Change The Level Of Deference To The Agency.

Treating the Cross-Border Rule as an interpretive rule also would not entitle the agency to *Chevron* deference.  This suit primarily challenges the agency's course of procedure, which courts review "de novo."  *Nebraska Dept. of Health & Human Servs. v. U.S. Dept. of Health & Human Servs.*, 340 F. Supp. 2d 1, 18 (D.D.C. 2004).

As to the Rule itself, "interpretive rules . . . enjoy no *Chevron* status as a class."  *U.S. v. Mead Corp.*, 533 U.S. 218, 232 (2001).  *Chevron* deference is appropriate only when a release is

---

[2]   The obligation to conduct a cost-benefit analysis does not apply to (1) an order that is "part of" an "adjudicatory or investigative process," (2) an "emergency action," or (3) a "finding of fact regarding compliance with a requirement of the Commission."  7 U.S.C. § 19(a).

"promulgated in exercise of" an agency's authority "to make rules carrying the force of law," *id.* at 227-28, and the CFTC disclaims having exercised that authority here.   D.E. 28 at 24-26.   It therefore forfeited any entitlement to *Chevron* deference when it promulgated the Cross-Border Rule as a policy statement.   *See Interport Inc. v. Magaw*, 135 F.3d 826, 829 (D.C. Cir. 1998). Accordingly, if it were an interpretative rule the Cross-Border Rule would be "entitled to respect" only to the extent that it has the "power to persuade," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but as an illegally adopted legislative rule it garners no deference at all.

### D.   The Issues Raised By This Case Are Ripe, Regardless Of Whether The Cross-Border Rule Is Interpretive Or Legislative.

To determine if a case is ripe, courts ask "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final."   *NEDA*, 2014 WL 2219065 at *7 (internal quotation marks omitted). Treating the Cross-Border Rule as interpretive would not render the issues presented—including the CFTC's failure to follow proper procedures—any less "legal."   Nor would it change the fact that these claims would "not benefit from further factual development."   *Id.* at *2.   Lastly, treating the Cross-Border Rule as interpretive would not render it any less "final."   The Cross-Border Rule adopts a "definitive" agency position that "admit[s] no ambiguity," "[gives] no indication that it was subject to further agency consideration," and "has a significant legal . . . effect" on regulated entities.   *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436-37 (D.C. Cir. 1986) (internal quotation marks omitted) (finding agency interpretation, conveyed in letter to regulated entity, ripe for review).   Whether treated as a product of "interpretation" or of legislative policymaking, the obligations imposed by the Cross-Border Rule are ripe for this Court's review.

### CONCLUSION

Plaintiffs' motion for summary judgment should be granted.

Dated:  July 18, 2014                     Respectfully submitted,

                                          /s/ Eugene Scalia
                                          Eugene Scalia, SBN 447524
                                              *Counsel of Record*
                                          Jason J. Mendro, SBN 482040
                                          Mithun Mansinghani, SBN 1010818
                                          GIBSON, DUNN & CRUTCHER LLP
                                          1050 Connecticut Avenue, N.W.
                                          Washington, D.C.  20036
                                          Telephone: (202) 955-8500
                                          Facsimile: (202) 467-0539

                                          *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of July, 2014, I caused the foregoing supplemental brief to be filed and served via the Court's CM/ECF filing system.


_____/s/ Eugene Scalia_____
Eugene Scalia