UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 13-1916 (PLF) |
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Defendant. | ) ) ) |

## <u>OPINION</u>

In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer

Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376, as a legislative

response to the 2008 financial crisis. Title VII of the Dodd-Frank Act provided the United States

Commodity Futures Trading Commission ("CFTC") with jurisdiction over the previously

unregulated derivative swaps market. Congress provided that the provisions of Title VII, as well

as any rules or regulations issued by the CFTC, "shall not apply to activities outside the United

States unless those activities . . . have a direct and significant connection with activities in, or

effect on, commerce of the United States." 7 U.S.C. § 2(i). Over the next three years, the CFTC

promulgated over a dozen regulations under its Title VII authority, but did not address in those

regulations the scope of their extraterritorial application under Section 2(i). On July 26, 2013,

the CFTC promulgated its Interpretive Guidance and Policy Statement Regarding Compliance

with Certain Swap Regulations, 78 Fed. Reg. 45292 (July 26, 2013) (the "Cross-Border

Action"), in which it announced its policy regarding the scope of the extraterritorial applications

of its so-called "Title VII Rules" pursuant to Section 2(i).

On December 4, 2013, plaintiffs Securities Industry and Financial Markets Association ("SIFMA"), International Swaps and Derivatives Association ("ISDA"), and the Institute of International Bankers ("IIB")—all trade associations representing financial institutions involved in swaps dealing and trading—filed this lawsuit against the CFTC. Plaintiffs seek vacatur of the Cross-Border Action on procedural and substantive grounds, partial vacatur of the Title VII Rules, and an injunction to prevent the CFTC from applying the Title VII Rules extraterritorially in the absence of a properly promulgated regulation addressing the Rules' extraterritorial applications.

Now pending before the Court are the CFTC's partial motion to dismiss and the parties' cross-motions for summary judgment. Having considered the briefs and other filings of the parties and *amici*, the administrative record, the oral arguments presented by counsel for the parties on July 30, 2014, and the controlling law, the Court will: (1) grant the CFTC's motion to dismiss as to the Trade Execution Rule; (2) grant the CFTC's motion for summary judgment as to the Cross-Border Action and the Large Trader Reporting, Straight-Through Processing, and Clearing Determination Rules; (3) grant plaintiffs' motion for summary judgment as to the other challenged Title VII Rules; and (4) remand those Rules to the CFTC for its consideration of the costs and benefits of their extraterritorial applications.

## PART ONE:  BACKGROUND

I.      DERIVATIVE SWAPS MARKETS AND THE 2008 FINANCIAL CRISIS

The Commodity Exchange Act ("CEA") regulates the trading of commodity futures, including derivatives. Derivatives are types of "contracts deriving their value from underlying assets." *Inv. Co. Inst. v. CFTC* ("*ICI*"), 720 F.3d 370, 372 (D.C. Cir. 2013). Derivative swaps are a particular type of derivative "in which two counterparties agree to

exchange or 'swap' payments with each other as a result of such things as changes in a stock price, interest rate or commodity price." U.S. Sec. Exchange Comm'n, The Regulatory Regime for Security–Based Swaps 3 (2012), *available at* http://www.sec.gov/swaps-chart/swaps-chart.pdf; *see also* 7 U.S.C. § 1a(47)(A)(ii).

The use of over-the-counter derivative swaps—swaps executed bilaterally rather than over an exchange—boomed in the 1980s and 1990s. This unprecedented growth prompted a debate over whether swaps should be regulated like other derivatives, such as futures contracts and stock options. *See Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 171 (D.D.C. 2012), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013).[1] In passing the Commodity Futures Modernization Act ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763, in 2000, Congress sided with the proponents of deregulation and barred the CFTC and the United States Securities and Exchange Commission ("SEC") from regulating most derivative swaps markets. *See* 7 U.S.C. § 2(g) (2002).

The CFMA left the markets for most derivate swaps "essentially unregulated and unmonitored—effectively dark—in most respects," and those markets flourished until the 2008 financial crisis. *Inv. Co. Inst.*, 891 F. Supp. 2d at 171 (internal quotation marks omitted). The lack of transparency in over-the-counter derivative markets, which contained millions of contracts between systemically important financial institutions, "contributed significantly to th[e] crisis." Final Report of the Nat'l Comm'n on the Causes of the Fin. and Econ. Crisis in the United States at xxiv-xxv (2011), *available at* http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf. While up until the mid-2000s derivatives were "generally regarded as a beneficial financial innovation that distributed financial risk more efficiently and made the

---

[1]       Futures contracts are traded on exchanges regulated by the CFTC. *See* 7 U.S.C. § 2(a)(1)(A). Stock options are traded on exchanges regulated by the United States Securities and Exchange Commission. *See* 15 U.S.C. § 77b(a)(1).

financial system more stable, resilient, and resistant to shock . . . [t]he [financial] crisis essentially reversed this view." *Inv. Co. Inst.*, 891 F. Supp. 2d at 173 (citation omitted) (internal quotation marks omitted).

Prior to the crisis, firms had used derivatives "to construct highly leveraged speculative positions, which generated enormous losses that threatened to bankrupt not only the firms themselves, but also their creditors and trading partners." RENA S. MILLER & KATHLEEN ANN RUANE, CONG. RESEARCH SERV., R41398, THE DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT: TITLE VII, DERIVATIVES 1 (2012). That the over-the-counter derivative markets "depended on the financial stability of a dozen or so major dealers" only compounded the problem: "[f]ailure of a dealer would have resulted in the nullification of trillions of dollars' worth of contracts and would have exposed derivatives counterparties to sudden risk and loss, exacerbating the cycle of deleveraging and withholding of credit that characterized the [financial] crisis." *Id.* Although derivative dealing "was not generally the direct source of financial weakness, a collapse of the $600 trillion dollar . . . derivatives market was imminent absent" the injection of "[h]undreds of billions of dollars in government credit." *Id.*

The over-the-counter derivative markets' contributions to the 2008 financial crisis were not limited to swaps executed on U.S. soil between U.S. counterparties. As plaintiffs recognize, "[t]he swaps market is truly global: a single swap may be negotiated and executed between counterparties located in two different countries, booked in a third country and risk-managed in a fourth country." Comment from SIFMA on Swap Entity Registration Rule, Feb. 3, 2011, at 2 (footnote omitted) (Joint Appendix ("JA") at 1144).

4

U.S.-based financial services conglomerates—like many of plaintiffs' members—operate in global swaps markets not only as direct counterparties, but also through relationships with their foreign branches, affiliates, and subsidiaries. "The modern U.S. financial services conglomerate is a U.S. parent holding company comprised of hundreds, if not thousands, of U.S. and foreign branches, affiliates, and subsidiaries." Declaration of Sayee Srinivasan, Chief Economist, CFTC ("Srinivasan Decl."), Mar. 14, 2014 [Dkt. No. 28-2] ¶ 5. These multinational firms operate "though complex legal and operational structures . . . created and maintained to efficiently serve particular purposes as part [of] the firms' overall profit-making business." *Id.* ¶ 16. The firms' operations through foreign subsidiaries and affiliates balance "legal, operational, tax, and accounting considerations and facilitate the [firms'] ability to serve clients in various markets around the world." *Id.*

Although legally distinct from their affiliates and subsidiaries, the U.S.-parent firms "routinely commingle losses and gains from U.S. and non-U.S. affiliates, subsidiaries and branches on their consolidated financial statements." Srinivasan Decl. ¶ 5. As a result, "risks taken by foreign affiliates, subsidiaries, and branches of U.S. parent companies are usually borne by the U.S. parent." *Id.*; *see also, e.g.*, Declaration of Don Thompson, Managing Director & Associate General Counsel, JPMorgan Chase & Co. ("JPMorgan Decl."), Jan. 27, 2014 [Dkt. No. 22-1] ¶ 6 ("[C]osts incurred by JPMorgan's affiliates and branches are ultimately borne by JPMorgan itself, because all are part of the same corporate group."). Indeed, U.S. parent corporations often expressly "guarantee" the swap obligations of their foreign affiliates and subsidiaries through contracts. Srinivasan Decl. ¶ 6; *see also* JPMorgan Decl. ¶ 4. Under these "guarantee" provisions, the U.S. parent must step in and fulfill the swap obligations if the relevant foreign affiliate or subsidiary defaults on its obligations. Srinivasan Decl. ¶ 6;

JPMorgan Decl. ¶ 4. These guarantees are an "integral part of the swap" because they assuage counterparty concerns that the foreign affiliate or subsidiary will be unable to meet its swap obligations. Srinivasan Decl. ¶ 6.

Several poster children for the 2008 financial crisis demonstrate the impact that overseas over-the-counter derivative swaps trading can have on a U.S. parent corporation. American International Group ("AIG") nearly failed because of risks incurred by the swaps trading operations in the London branch of its subsidiary, AIG Financial Products ("AIGFP"). Srinivasan Decl. ¶ 9. Significant losses on credit default swaps entered into by AIGFP, and "guaranteed" by AIG, triggered collateral calls the companies could not meet and a liquidity crisis for both companies. Id. Similarly, Lehman Brothers Holding Inc.—a corporation that had over 3000 corporate affiliates worldwide—guaranteed the nearly 130,000 derivative contracts held by one of its London-based subsidiaries. Id. ¶¶ 10-11. When Lehman Brothers filed for bankruptcy in September 2008—at that time the largest bankruptcy in history with claims exceeding $300 billion—its derivative book lost over $50 billion in value. Id. ¶ 11.

While Lehman Brothers' collapse ended in bankruptcy, AIG avoided default through over $180 billion in support from the federal government. Srinivasan Decl. ¶ 9. Tens of billions of dollars of that bailout money flowed to AIG's derivative counterparties, MILLER & RUANE at 5, including many of plaintiffs' members. See Brief of Better Markets, Inc. as *Amicus Curiae* in Support of Defendant CFTC, Mar. 19, 2014 [Dkt. No. 33] at 2 n.3 (noting that Goldman Sachs, Deutsche Bank, Société Générale, Barclays, Merrill Lynch, and Bank of America indirectly received approximately $10.4, 9.2, 7.8, 7.0, 5.0, and 5.0 billion in payments, respectively, through the AIG bailout).

Although the global notional value of over-the counter derivatives decreased following the 2008 financial crisis, that value has crept up in the past six years and now exceeds its pre-crisis total. MILLER & RUANE at 2. As of the end of 2013, the global market for over-the-counter derivatives totals over $710 trillion in notional value. BANK FOR INT'L SETTLEMENTS, STATISTICAL RELEASE: OTC DERIVATIVES STATISTICS AT END-DECEMBER 2013, at 1 (May 2014), *available at* http://www.bis.org/publ/otc_hy1405.pdf.

## II.    THE DODD-FRANK ACT

Congress responded to the 2008 financial crisis by passing the Dodd-Frank Act in 2010. Title VII of the Dodd-Frank Act gave the CFTC jurisdiction to regulate the markets for most swaps, *see* 7 U.S.C. § 2(a)(1)(A), and established a swaps regulatory framework intended to "reduce systemic risk . . . increase transparency, and promote market integrity within the financial system." Cross-Border Action, 78 Fed. Reg. at 45293. This framework requires entities qualifying as "swap dealers" and "major swap participants" to register with the CFTC and comply with certain statutory risk management controls. *See* 7 U.S.C. §§ 6s(a), 6s(g), 6s(j)(2), 6s(j)(5), 6s(k). Title VII also requires the "clearing" of certain swaps through a "derivative clearing organization" to reduce the risk that a counterparty fails to honor its swap obligations. *See id.* § 1a(15)(A). Finally, Title VII imposed a multitude of information reporting requirements on swap market participants. *See, e.g., id.* §§ 2(a)(13), 7b-3(f)(9).

Recognizing the interconnected nature of domestic and international swaps trading, Congress in the Dodd-Frank Act also provided for the extraterritorial application of the Title VII provisions in certain circumstances:

> The provisions of this chapter relating to swaps that were enacted by the [Dodd-Frank Act] (including any rule prescribed or regulation promulgated under that Act), shall not apply to activities outside the United States unless those activities—(1) have a direct and significant connection with activities in, or effect

7

> on, commerce of the United States; or (2) contravene such rules or regulations as the [CFTC] may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of this chapter that was enacted by the [Dodd-Frank Act].

7 U.S.C. § 2(i). One of the questions posed in this case is the scope of this provision's extraterritorial reach.

In furtherance of its swaps regulation framework, Congress in the Dodd-Frank Act also directed the CFTC to issue a large number of implementing regulations. *See, e.g.*, 7 U.S.C. § 6s(d)(1) ("The [CFTC] shall adopt rules for persons that are registered as swap dealers or major swap participants under this section."); *id.* § 6s(e)(2)(A) (providing that the CFTC and SEC "shall jointly adopt rules for swap dealers and major swap participants" relating to capital and margin requirements); *id.* § 6(f)(2) ("The [CFTC] shall adopt rules governing reporting and recordkeepking for swap dealers and major swap participants."); *id.* § 6s(i)(2) ("The [CFTC] shall adopt rules governing documentation standards for swap dealers and major swap participants."); *id.* § 7a-1(k)(2) ("The [CFTC] shall adopt data collection and maintenance requirements for swaps cleared by derivatives clearing organizations."). In addition to the typical requirements of notice-and-comment rulemaking, the Commodity Exchange Act requires the CFTC to "consider the costs and benefits of [its] action" when "promulgating a regulation" pursuant to its Title VII authority. *Id.* § 19(a)(1).

## III.   THE TITLE VII RULES

The CFTC has engaged in a significant series of rulemakings pursuant to its authority to regulate derivative swaps under Title VII of the Dodd-Frank Act. In this action, plaintiffs challenge fourteen of these rules (collectively, the "Title VII Rules"). The Title VII Rules can be grouped into five categories according to their purposes and functions.

8

First, the *clearing* rules require or promote clearing of certain swaps through central organizations to reduce the credit risk posed by bilateral swaps. Srinivasan Decl. ¶ 4(a). The Clearing Determination Rule requires swaps participants to clear certain swaps through central organizations that guarantee payments to all parties involved. *See* 77 Fed. Reg. 74284 (Dec. 13, 2012) (codified at 17 C.F.R. Part 50). The Straight-Through Processing Rule requires, *inter alia*, swap dealers and clearing organizations to process swaps in ways that increase customer access to clearing, facilitate timely trading, and strengthen risk management. *See* 77 Fed. Reg. 21278 (April 9, 2012) (codified in scattered sections of 17 C.F.R.)

Second, the *transparency and competition* rules "promot[e] the use of competitive markets and regulated exchanges, rather than closed private deals, for swap transactions." Srinivasan Decl. ¶ 4(b). The Real-Time Reporting Rule establishes a framework under which regulated entities must publicly report price and volume information for swap transactions in real-time. *See* 77 Fed. Reg. 1182 (Jan. 9, 2012) (codified at 17 C.F.R. Part 43). The SEF Registration Rule requires that swap execution facilities ("SEFs")—trading platforms on which market participants can execute certain swaps—register with the CFTC and follow certain operational principles. *See* 78 Fed. Reg. 33476 (June 4, 2013) (codified at 17 C.F.R. Part 37). The Trade Execution Rule establishes the procedure by which SEFs and designated contract markets ("DCMs") determine that certain swaps are "available to trade" and thus may only be executed on an SEF or DCM. *See* 78 Fed. Reg. 33606 (June 4, 2013) (codified at 17 C.F.R. §§ 37.12, 38.11-12).

Third, the *registration and compliance* rules define who must register with the CFTC and how they must do so. Srinivasan Decl. ¶ 4(c). The Entity Definition Rule, jointly promulgated by the CFTC and the SEC, supplements key statutory definitions, including "swap

dealer." *See* 77 Fed. Reg. 30596 (May 23, 2012) (codified in scattered sections of 17 C.F.R.). Relatedly, the Swap Entity Registration Rule sets the procedures for swap dealers and major swap participants to register with the CFTC. *See* 77 Fed. Reg. 2613 (Jan. 19, 2012) (codified at 17 C.F.R. §§ 23.21-22).

Fourth, the *risk control* rules "impos[e] requirements on swap dealers and other market participants to reduce risk and unlawful conduct and facilitate resolution of disputes." Srinivasan Decl. ¶ 4(d). The Daily Trading Records Rule requires swap dealers and major swap participants to maintain daily trading records of all swap activities sufficient to permit after-the-fact reconstruction of the transactions. *See* 77 Fed. Reg. 20128, 20133 (Apr. 3, 2012) (codified at 17 C.F.R. § 23.202). The Risk Management Rule requires swap dealers and major swap participants to take measures to monitor and manage financial risks. *See id.* at 20205-11 (codified at 17 C.F.R. §§ 23.600-606). The Chief Compliance Officer Rule requires swap dealers and major swap participants to designate a corporate official responsible for monitoring compliance with the CEA. *See id.* at 20200-01 (codified at 17 C.F.R. § 3.3). The Portfolio Reconciliation and Documentation Rule requires swap dealers and major swap participants to document swap terms and valuation, confirm this documentation after swap execution, and reconcile any discrepancies. *See* 77 Fed. Reg. 55904 (Sept. 11, 2012) (codified at 17 C.F.R. §§ 23.500-506).

Finally, the *reporting* rules "foster market transparency" and support the CFTC's market surveillance program. Srinivasan Decl. ¶ 4(e). The SDR Reporting Rule requires swap market participants to report transaction information to swap data repositories ("SDRs"). *See* 77 Fed. Reg. 2136 (Jan. 13, 2012) (codified at 17 C.F.R. Part 45). The Historical SDR Reporting Rule requires similar reporting for certain past transactions. *See* 77 Fed. Reg. 35200 (June 12,

2012) (codified at 17 C.F.R. Part 46).  The Large Trader Reporting Rule requires clearing

organizations and swap dealers to report large market positions so that the CFTC can detect

market manipulation.  *See* 76 Fed. Reg. 43851 (July 22, 2011) (codified at 17 C.F.R. Part 20).

During the comment periods for most of the Title VII Rules, plaintiffs and their

members sought clarification as to the Rules' extraterritorial applications under 7 U.S.C. § 2(i)—

*e.g.*, which foreign entities were required to register as swap dealers and what types of swaps

needed to be "cleared" and reported to the CFTC.  *See, e.g.*, Comment from IIB on Swap Entity

Registration Rule, Jan. 10, 2011, at 3 (JA at 1125); Comment from SIFMA on Swap Entity

Registration Rule, Feb. 3, 2011, at 4 (JA at 1146); Comments from SIFMA and ISDA on Real-

Time Reporting Rule, Feb. 7, 2011, at 27-29 (JA at 1222-24); Comments from Barclays Bank

PLC et al. on Various Title VII Rules, Feb. 17, 2011 (JA at 1302); Comment from Cleary

Gottlieb Steen & Hamilton LLP on SEF Registration Rule, Apr. 5, 2011, at 21-22 (JA at 1289-

90).  Commenters generally requested that the CFTC "narrowly construe[]" its authority to apply

the Title VII Rules extraterritorially, *see* Comment from SIFMA on Swap Entity Registration

Rule, Feb. 3, 2011, at 5 (JA at 1147), in order to "avoid regulatory uncertainty and ambiguity . . .

that will ensue if [foreign] market participants are required to comply with inconsistent or

redundant regulations" under U.S. and foreign law.  *See* Comments from SIFMA and ISDA on

Real-Time Reporting Rule at 27 (JA at 1222).[2]

Notwithstanding those comments, the CFTC did not address the extraterritoriality

of the Title VII Rules in those rulemakings.  Nor did the CFTC explicitly address the costs and

benefits of the Rules' extraterritorial application in those Rules' Section 19(a)(1) cost-benefit

---

[2]     Plaintiffs have not, however, identified comments for the Trade Execution, Large
Trader Reporting, Straight-Through Processing, and Clearing Determination Rules that raised the
issue of the scope of those Rules' extraterritorial applications.

analyses. *See* 7 U.S.C. § 19(a)(1). Instead, the CFTC "limit[ed]" its final rulemakings to the substantive requirements of the Title VII Rules, describing those Rules' extraterritorial applications as "beyond the scope of this rulemaking," *see* Swap Entity Registration Rule, 77 Fed. Reg. at 2619-20, and stating that it "intend[ed] to separately address" issues of extraterritorial application in "separate releases." *See* Entity Definition Rule, 77 Fed. Reg. at 30605, 30688 n.1119. That separate "release" came in the form of the Cross-Border Action also challenged by plaintiffs in this case.

## IV.    THE CROSS-BORDER ACTION

On July 12, 2012, the CFTC released for public comment a proposed "interpretive guidance and policy statement" addressing the "cross-border application" of the Title VII Rules. *See* Cross-Border Application of Certain Swaps of the Commodity Exchange Act, 77 Fed. Reg. 41214 (July 12, 2012). On January 7, 2013, after receiving approximately 290 comments on the initial proposed "guidance," *see* Cross-Border Action, 78 Fed. Reg. at 45295, the CFTC issued further proposed "guidance" on specific elements of its proposed cross-border application policies. *See* Further Proposed Guidance Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 909 (Jan. 7, 2013). The CFTC received approximately two dozen additional comments on the further proposed "guidance." Cross-Border Action, 78 Fed. Reg. at 45295.

On July 22, 2013, the CFTC issued an "Exemptive Order" that provided certain entities temporary "transitional relief" from the Title VII Rules "in order to avoid unnecessary market disruptions and to facilitate market participants' transition to the new Dodd-Frank swaps regime," including policies in the forthcoming Cross-Border Action. *See* Exemptive Order Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 43785, 43786 (July 22, 2013). On July 26, 2013, over a dissent from Commissioner Scott D. O'Malia, the CFTC

promulgated its final Cross-Border Action.  78 Fed. Reg. at 45292.  The final document, including appendices, encompasses seventy-eight pages in the Federal Register and does not contain a cost-benefit analysis.  The Court addresses only those portions of the Cross-Border Action relevant to plaintiffs' amended complaint.

A.      "Scope" of the Cross-Border Action

Formally titled "Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations," the Cross-Border Action contains a section devoted to its "scope."  *See* 78 Fed. Reg. at 45293, 45297.  According to that section, the Cross-Border Action

> sets forth the general policy of the [CFTC] in interpreting how section 2(i) of the CEA provides for the application of the swaps provisions of the CEA and [CFTC] regulations to cross-border activities when such activities have a "direct and significant connection with activities in, or effect on, commerce of the United States" or when they contravene [CFTC] rulemaking.

*Id.* at 45297.  Because of the "complex and dynamic nature of the global swap market and the need to take an adaptable approach to cross-border issues," the Cross-Border Action states that the CFTC will "periodically review" the Cross-Border Action as "foreign regulatory regimes and the global swaps market continue to evolve."  *Id.*

The Cross-Border Action distinguishes itself from a "binding rule" that "would state with precision when particular requirements do and do not apply to particular situations." 78 Fed. Reg. at 45297.  Instead, the Cross-Border Action is "a statement of the [CFTC]'s general policy regarding cross-border swap activities and allows for flexibility in application to various situations, including consideration of all relevant facts and circumstances that are not explicitly discussed" within the Cross-Border Action itself.  *Id.* (footnote omitted).  The Cross-Border Action further emphasizes that while it "is intended to inform the public of the [CFTC's] views

13

on how it ordinarily expects to apply existing law and regulations in the cross-border context,"

the CFTC will apply the relevant statutory provisions and regulations on a case-by-case basis

according to "the particular facts and circumstances" of the cross-border conduct. *Id.*

The Cross-Border Action's positions on its "scope" are carried out through its

more substantive portions.  In those sections, the Cross-Border Action conditions its statements

with the modifier "generally" nearly 200 times, *see* Brief of the Chamber of Commerce of the

United States of America as *Amicus Curiae* in Support of Plaintiffs' Motion for Summary

Judgment, Feb. 3, 2014 [Dkt. No. 25] at 2; reiterates the CFTC's case-by-case approach on

multiple occasions, *e.g.*, Cross-Border Action, 78 Fed. Reg. at 45308-09, 45316, 45320, 45348;

and encourages market participants to consult CFTC staff regarding individual circumstances.

*See, e.g., id.* at 45326, 45345, 45349.

> B.    *"Interpretation" of 7 U.S.C. § 2(i)*

The Cross-Border Action's interpretation of 7 U.S.C. § 2(i) immediately follows

the section defining the Action's "scope."  *See* 78 Fed. Reg. at 45297-300.  The interpretation

focuses on Section 2(i)'s statutory language providing that the Title VII statutory provisions and

regulations "shall not apply to activities outside the United States unless those activities . . . have

a direct and significant connection with activities in, or effect on, commerce of the United

States."  7 U.S.C. § 2(i); *see* Cross-Border Action, 78 Fed. Reg. at 45298.  Relying on the

Supreme Court's interpretation of similar language in *F. Hoffmann-La Roche Ltd. v. Empagran

S.A.*, 542 U.S. 155 (2004), the Cross-Border Action reads Section 2(i) as a "clear expression of

congressional intent that the swaps provisions of Title VII of the Dodd-Frank Act apply to

activities beyond the borders of the United States when certain circumstances are present."

Cross-Border Action, 78 Fed. Reg. at 45298.

The Cross-Border Action goes on to construe the word "direct" in Section 2(i)(1) to require only "a reasonably proximate causal nexus," and not "foreseeability, substantiality, or immediacy." 78 Fed. Reg. at 45300.   In making this determination, the Cross-Border Action adopts the position of the Department of Justice Antitrust Division with respect to the meaning of the same term in the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, which had been recently adopted by the Seventh Circuit, sitting *en banc*, in *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012).  Cross-Border Action, 78 Fed. Reg. at 45299-300.

The Cross-Border Action also rejects any interpretation of Section 2(i)(1) that would "require a transaction-by-transaction basis determination that a specific swap outside the United States" has the jurisdictionally requisite "'connection with activities in, or effect on, commerce in the United States.'"  Cross-Border Action, 78 Fed. Reg. at 45300 (quoting 7 U.S.C. § 2(i)(1)).  Instead, the Cross-Border Action concludes that "it is the connection of swap activities, viewed as a class or in the aggregate, to activities in commerce of the United States that must be assessed to determine whether [extraterritorial] application of the [Title VII] swaps provisions is warranted."  *Id.*

### C.    Interpretation of the Term "U.S. person"

Having interpreted the scope of Section 2(i)(1)'s jurisdictional nexus, the Cross-Border Action uses the term "U.S. person" to "generally encompass[] those persons whose activities—either individually or in the aggregate—have the requisite 'direct and significant' connection with activities in, or effect on, U.S. commerce" to satisfy Section 2(i)'s jurisdictional nexus and therefore to be subject to the Title VII provisions and regulations.  Cross Border Action, 78 Fed. Reg. at 45308; *see also id.* at 45301 ("[T]he term 'U.S. person' identifies those persons who, under the [CFTC]'s interpretation, could be expected to satisfy the jurisdictional

nexus under section 2(i) of the CEA based on their swap activities either individually or in the aggregate."). The Cross-Border Action thereafter provides an eight-pronged "interpretation" of the term "U.S. person." *Id.* at 45316-17. The interpretation expands beyond "[a]ny natural person who is a resident of the United States" and "any corporation . . . that is organized or incorporated under the laws of a state or other jurisdiction in the United States or having its principal place of business in the United States" to include, *inter alia*, other entities based on their legal and financial relationships with the aforementioned types of U.S. persons. *Id.* The Cross-Border Action explains that

> the various prongs of the [CFTC]'s interpretation are intended to identify persons for which, in practice, the connection or effects required by section 2(i) are likely to exist and thereby inform the public of circumstances in which the [CFTC] expects that the swaps provisions of the CEA and the [CFTC]'s regulations would apply pursuant to the statute. In this respect, the [CFTC] will consider not only a person's legal form and its domicile (or location of operation), but also the economic reality of a particular structure or arrangement, along with all other relevant facts and circumstances, in order to identify those persons whose activities meet the "direct and significant" jurisdictional nexus.

*Id.* at 45308-09. For the purposes of this lawsuit, the most relevant of the Cross-Border Action's interpretations of the term "U.S. person" are those relating to (1) foreign branches of U.S. persons, and (2) foreign guaranteed affiliates of U.S. persons.

In both its proposed and final forms, the Cross-Border Action interprets the term "U.S. person" to include "a foreign branch of a U.S. person." Cross-Border Action, 78 Fed. Reg. at 45315; *id.* at 45317. The Cross-Border Action explains that "a branch does not have a legal identity separate from that of its principal entity" and thus "branches are neither separately incorporated nor separately capitalized and, more generally, the rights and obligations of a branch are the rights and obligations of its principal entity (and vice versa)." *Id.* at 45315. Therefore, the Cross-Border Action expresses the CFTC's general view that "the activities of a

16

foreign branch as the activities of the principal entity, and thus a foreign branch of a U.S. person is a U.S. person." *Id.*; *see also id.* at 45317 ("[T]he term 'U.S. person' generally means that a foreign branch of a U.S. person would be covered by virtue of the fact that it is a part, or an extension, of a U.S. person.").

In contrast to foreign branches of U.S. persons, the Cross-Border Action emphasizes that the CFTC "does not interpret section 2(i) to require that it treat a non-U.S. person as a 'U.S. person' solely because it is controlled by or under common control with a U.S. person." Cross-Border Action, 78 Fed. Reg. at 45312 n.215. Instead, the Cross-Border Action expresses CFTC's view that "where one or more U.S. owners has unlimited responsibility for losses or nonperformance by its majority-owned affiliate"—a so-called "guaranteed affiliate"— "there is generally a direct and significant connection with activities in, or effect on, commerce of the United States within the meaning of section 2(i)," *id.* at 45312, because the "guarantee creates a significant risk transfer into the United States." *Id.* at 45313.[3] Therefore, the Cross-Border Action concludes that a guaranteed affiliate of a U.S. person would itself "appropriately be considered a 'U.S. person'" subject to applicable Title VII rules and regulations. *Id.* at 45312.

### D.    Aggregation

The Cross-Border Action also addresses the aggregation requirement for the *de minimis* exception to Dodd-Frank's "swap dealer" designation. *See* 78 Fed. Reg. at 45320-27. The Dodd-Frank Act exempted from its definition of "swap dealer" those swap dealers who "engage[] in a de minimis quantity of security-based swap dealing in connection with transactions with or on behalf of [their] customers." 7 U.S.C. § 1a(49)(D).  The Act also

---

[3]    In a joint final rule with the SEC, the CFTC concluded that "when a swap has a benefit of a guarantee, the guarantee is an integral part of that swap" because it "affects the price or pricing attributes of that swap." Entity Definition Rule, 77 Fed. Reg. 48208, 48225-26 (Aug. 13, 2012) (footnote omitted); *see also* Cross-Border Action, 78 Fed. Reg. at 45319 & n.260.

required the CFTC to "promulgate regulations to establish factors with respect to the making of any determination to exempt." *Id.*

On May 23, 2012, the CFTC and the SEC promulgated such regulations in their joint Entity Definition Rule. *See* 77 Fed. Reg. at 30626-35 (codified at 17 C.F.R. § 1.3(ggg)(4)). The regulations, *inter alia*, exempt a person otherwise meeting the "swap dealer" definition from registration requirements

> so long as the swap positions connected with those dealing activities into which the person—or any other entity controlling, controlled by or under common control with the person—enters over the course of the immediately preceding 12 months . . . have an *aggregate* gross notional amount of no more than $3 billion . . . .

17 C.F.R. § 1.3(ggg)(4)(i) (emphasis added).

The Cross-Border Action construes "any other entity controlling, controlled by or under common control with," *see* 17 C.F.R. § 1.3(ggg)(4), to generally include foreign affiliates. *See* Cross Border Action, 78 Fed. Reg. at 45326. As a result, when aggregating swaps positions to determine whether to register as a swap dealer, "a person (whether U.S. or non-U.S.) should generally include all relevant dealing swaps of all its U.S. and non-U.S. affiliates under common control, except that swaps of an affiliate (either U.S. or non-U.S.) that is a registered swap dealer are excluded." *Id.* The Cross-Border Action explains:

> Stated in general terms, the [CFTC]'s interpretation allows both U.S. persons and non-U.S. persons in an affiliated group to engage in swap dealing activity up to the de minimis threshold. When the affiliated group meets the de minimis threshold in the aggregate, one or more affiliate(s) (inside or outside the United States) would generally have to register as swap dealer(s) so that the relevant swap dealing activity of the unregistered affiliates remains below the threshold.

*Id.* at 45323.

18

E.    *Categorization of Certain Title VII Rules as "Entity-" or "Transaction-level"*

The Cross-Border Action also categorizes certain Title VII Rules as either

"entity-" or "transaction-level," to distinguish when those Rules apply extraterritorially.  "Entity-

level" requirements define the general obligations of regulated market participants irrespective of

the characteristics of individual swaps transactions.  Thus, under the Cross-Border Action,

entity-level requirements generally apply to "registered swap dealers . . . across *all their swaps*

without distinction as to counterparty or the location of the swap."  78 Fed. Reg. at 45331

(emphasis added).  The entity-level requirements include Risk Management, Chief Compliance

Officer, SDR Reporting, Historical SDR Reporting, and Large Trader Reporting Rules.  *See id.*

at 45364-66.

In contrast, the "transaction-level" requirements impose transaction-specific

obligations on swap market participants.  Under the Cross-Border Action, the identity of the

counterparty is significant in determining whether a foreign registered swap dealer must comply

with transaction-level requirements *for that swap*:  if the counterparty is not a U.S.-person, the

transaction-level requirements generally would not apply.  78 Fed. Reg. at 45333.  The

"transaction-level" requirements include the Real-Time Reporting, Daily Trading Records,

Clearing Determination, Straight-Through Processing, Portfolio Reconciliation and

Documentation, and Trade Execution Rules.  *See id.* at 45366-68.

F.    *Application of Transaction-level Requirements to Certain "Foreign Affiliate Conduits"*

The Cross-Border Action extends transaction-level requirements to certain so-

called "foreign affiliate conduits."  *See* 78 Fed. Reg. at 45357-59.  As described by the Cross-

Border Action:

> [I]t is common for large global companies to centralize their hedging or risk-
> management activities in one or more affiliates (informally referred to as a

"treasury conduit" or "conduit"). Under this structure, the conduit may enter into swaps with its affiliates and then enter into offsetting swaps with third-parties. In other cases, the conduit may enter into swaps with third-parties as agent for its affiliates. In either case, the conduit functions as a vehicle by which various affiliates engage in swaps with third-parties (i.e., the market).

*Id.* at 45358.[4]

The Cross-Border Action acknowledges that conduit arrangements are beneficial in that they "promote[] operational efficiency and prudent risk management by enabling a company to manage its risks on a consolidated basis at a group level." 78 Fed. Reg. at 45358. The Cross-Border Action also opines, however, that "the risks resulting from swaps of the entity that faces the market as a conduit on behalf of its affiliates in fact reside with those affiliates; that is, while the swaps are entered into by the conduit, through back-to-back swaps or other arrangements the conduit passes the risks and benefits of those swaps to its affiliates." *Id.* Thus, "where the conduit is located outside the United States, but is owned and controlled by a U.S. person," the Cross-Border Action concludes that "to recognize the economic reality of the

---

[4]     The Cross-Border Action provides a non-exclusive list of "certain factors" the CFTC "believes . . . are relevant to considering whether a non-U.S. person is a [foreign] 'affiliate conduit.'" 78 Fed. Reg. at 45359. Those factors include whether

(i) the non-U.S. person is a majority-owned affiliate of a U.S. person;
(ii) the non-U.S. person is controlling, controlled by or under common control with the U.S. person;
(iii) the financial results of the non-U.S. person are included in the consolidated financial statements of the U.S. person; and
(iv) the non-U.S. person, in the regular course of business, engages in swaps with non-U.S. third-party(ies) for the purpose of hedging or mitigating risks faced by, or to take positions on behalf of, its U.S. affiliate(s), and enters into offsetting swaps or other arrangements with its U.S. affiliate(s) in order to transfer the risks and benefits of such swaps with third-party(ies) to its U.S. affiliates.

*Id.* (footnotes omitted). The Cross-Border Action, however, notes that "[o]ther facts and circumstances also may be relevant." *Id.*

situation, the conduit's swaps should be attributed to the U.S. affiliate(s)" and transaction-level requirements should apply to the conduit's swaps with non-U.S. persons. *Id.*[5]

### G.   Substituted Compliance

As a general rule, the Title VII Rules apply to all "registered" swap dealers and major swap participants, "irrespective of where they are based." Cross-Border Action, 78 Fed. Reg. at 45342. The Cross-Border Action announces the CFTC's planned policy for "substituted compliance," whereby certain foreign entities operating in compliance with the home jurisdiction's swaps regulations would be considered in compliance with the Title VII Rules as well. 78 Fed. Reg. at 45340-46.

Grounded in principles of "international comity," *see* Cross-Border Action, 78 Fed. Reg. at 45342, the premise of "substituted compliance" is simple. The CFTC "may determine that certain laws and regulations of a foreign jurisdiction are comparable to and as comprehensive as a corresponding category of" Title VII laws and regulations. *Id.* at 45340. If it does so, then an entity or transaction in that foreign jurisdiction "will be deemed to be in compliance" with the relevant category of Title VII laws and regulations through compliance with the corresponding and comparable foreign laws and regulations. *Id.* The Cross-Border Action explains that "substituted compliance" would serve the purpose of "avoiding potential conflicts between U.S. regulations and foreign law" while still "ensuring the high level of regulation contemplated by the Dodd-Frank Act." *Id.* Even with these purposes in mind, however, the Cross-Border Action concludes that substituted compliance would not be available

---

[5]     The Cross-Border Action emphasizes that, unlike a guaranteed affiliate, "an affiliate conduit would not necessarily be guaranteed by its parent," and thus "the jurisdictional nexus is met by reason of the trading relationship between the conduit and the affiliated U.S. persons," not the whole or partial transfer of risk to the affiliated U.S. persons. 78 Fed. Reg. at 45359 & n.588.

for transaction-level requirements applying to (1) swaps between non-U.S. swap dealers and U.S. persons and (2) swaps involving U.S. branches and U.S. personnel of foreign entities.

The Cross-Border Action clarifies, *inter alia*, that substituted compliance "would generally not be available for [certain] Transaction-Level Requirements" for swaps between a foreign registered swap dealer or major swap participant and a U.S. person (other than a foreign branch of a U.S. swap dealer or major swap participant). 78 Fed. Reg. at 45353. The Cross-Border Action notes the CFTC's "strong interest in ensuring that the swap fully complies with the . . . Transaction Level Requirements, without substituted compliance," because "swaps between U.S. persons and non-U.S. persons inherently raise the possibility of" risk magnification and transfer that Title VII was meant to control. *Id.*

In footnote 513, the Cross-Border Action adopts the "view" that "a U.S. branch of a non-U.S. swap dealer or [major swap participant] would be subject to [certain] Transaction-Level requirements, without substituted compliance available." 78 Fed. Reg. at 45350 n.513. The Cross-Border Action explains—as it previously had done with respect to foreign branches of U.S. persons—that "a branch does not have a separate legal identity apart from its principal entity," and thus the CFTC "considers a U.S. branch of a non-U.S. swap dealer or non-U.S. [major swap participant] to be a non-U.S. person." *Id.* Nonetheless, the Cross-Border Action concludes that transaction-level requirements apply to U.S. branches of non-U.S. persons— without substituted compliance available—because the CFTC has a "strong supervisory interest in regulating the dealing activities that occur with[in] the United States, irrespective of the counterparty (just as the [CFTC] allows for substituted compliance for foreign branches in certain instances to take into account the strong supervisory interest of local regulators)." *Id.*

Following the promulgation of the Cross-Border Action, some financial institutions believed that footnote 513 contained a loophole to compliance with transaction-level requirements:  that non-U.S. swap dealers—including affiliates of U.S. persons—could completely avoid transaction-level requirements by arranging swaps with non-U.S. counterparties using traders or brokers working for U.S. persons within the United States, but then "booking" the swaps with an overseas affiliate.[6]  U.S.-based firms that lacked the corporate family structure necessary to take advantage of this supposed "loophole" sought input from the CFTC as to whether the strategy actually shielded the swaps from transaction-level requirements. *See* Defendant CFTC's Cross-Motion for Summary Judgment, Opposition to Plaintiffs' Motion for Summary Judgment, and Motion to Dismiss in Part ("CFTC Mot."), Mar. 14, 2014 [Dkt. No. 28] at 13.

On November 14, 2013, the CFTC Division of Swap Dealer and Intermediary Oversight ("DSIO") published an advisory stating that, in its view—"which do[es] not necessarily represent the position or view of the Commission"—transaction-level requirements could not be so easily avoided:

> DSIO believes that persons regularly arranging, negotiating, or executing swaps for or on behalf of [a swap dealer] are performing core, front-office activities of that [swap dealer]'s dealing business. Thus, DSIO is of the view that a non-U.S. [swap dealer] (whether an affiliate or not of a U.S. person) regularly using personnel or agents located in the U.S. to arrange, negotiate, or execute a swap with a non-U.S. person generally would be required to comply with the Transaction-Level Requirements.

Applicability of Transaction-Level Requirements to Activity in the United States, CFTC Letter No. 13-69, 2013 WL 6056614, at *1 (Nov. 14, 2013) (JA at 791).  According to ISDA chairman

---

[6]     *See* Robert Schmidt & Silla Brush, *Banks Said to Seize 'Footnote 513' to Keep Swaps Private*, BLOOMBERG NEWS, Oct. 23, 2013, http://www.bloomberg.com/news/2013-10-23/banks-said-to-seize-footnote-513-to-keep-swaps-private.html.

Stephen O'Connor, DSIO's advisory "was the straw that broke the camel's back" that ultimately led to this lawsuit.[7]

## V.   PROCEDURAL HISTORY

On December 4, 2013, plaintiffs—three trade associations that represent the interests of the financial industry and count as their members some of the world's largest securities firms, banks and asset managers—filed this action. The case was initially assigned to Judge Ellen Segal Huvelle, but was later transferred by consent to the undersigned pursuant to Local Civil Rule 40.6(a). Plaintiffs' amended complaint challenges the Cross-Border Action and the Title VII Rules on several bases. Plaintiffs allege that the Cross-Border Action was promulgated in violation of the APA's notice-and-comment requirements, 5 U.S.C. § 553(b)-(c), and the CEA's cost-benefit analysis requirements, 7 U.S.C. § 19(a)(2), and is an arbitrary and capricious substantive interpretation of 7 U.S.C. § 2(i). Amended Complaint ("Amd. Compl."), Dec. 27, 2013 [Dkt. No. 11] ¶¶ 96-119. Plaintiffs similarly allege that the challenged Title VII Rules on their face lack independent extraterritorial effect and were promulgated in violation of the APA's notice-and-comment requirements and CEA's cost-benefit analysis requirements. *Id.* ¶¶ 120-33. Finally, plaintiffs allege that the extraterritorial scope of the SEF Registration Rule is an arbitrary and capricious interpretation of 7 U.S.C. § 2(i). *Id.* ¶¶ 134-37.

Plaintiffs seek, *inter alia*, (1) a declaratory judgment that the Cross-Border Action and the Title VII Rules (as applied extraterritorially) are procedurally and substantively infirm; (2) vacatur of the Cross-Border Action in its entirety; (3) partial vacatur of the Title VII Rules to the extent that they purport to have extraterritorial application; (4) an injunction enjoining the

---

[7]   Gina Chon & Philip Stafford, *CFTC Sued by Trade Groups over Swaps Rules*, FIN. TIMES, Dec. 4, 2013, http://www.ft.com/cms/s/0/0f998b74-5d1a-11e3-a558-00144feabdc0.html [Dkt. No. 28-1 Ex. F].

CFTC from enforcing most of the Title VII Rules extraterritorially until the agency promulgates a procedurally valid legislative rule regarding extraterritoriality; and (5) a permanent injunction enjoining the CFTC (with no apparent conditional end-date) "from implementing, applying, or taking any action whatsoever to enforce the SEF Registration Rule on trading platforms organized or incorporated under the laws of a jurisdiction outside of the United States." Amd. Compl. ¶ 143.

On December 27, 2013, plaintiffs moved for summary judgment. Plaintiffs sought expedited consideration of their motion, while the CFTC sought to hold plaintiffs' motion in abeyance pending the filing of a planned motion to dismiss.[8] Judge Huvelle denied the motion to expedite and the motion to hold the case in abeyance, set a briefing schedule, granted *amici* leave to file briefs in support of the parties, and ordered plaintiffs to produce declarations from their members substantiating their standing to challenge the Cross-Border Action and the Title VII Rules. Order, Jan. 14, 2014 [Dkt. No. 20].

Plaintiffs produced their member declarations on January 27, 2014, and the parties completed the briefing on the CFTC's motion to dismiss and the parties' cross-motions for summary judgment on May 2, 2014.[9] The parties have filed an administrative record, a joint

---

[8]    Motion of CFTC to Hold in Abeyance Plaintiffs' Motion for Summary Judgment Pending Disposition of the Commission's Forthcoming Motion to Dismiss, Dec. 30, 2013 [Dkt. No. 13]; Plaintiffs' Motion for Expedited Consideration of Summary Judgment, Dec. 30, 2013 [Dkt. No. 14].

[9]    *See* Plaintiffs' (Corrected) Motion for Summary Judgment ("Pls.' Mot."), Jan. 23, 2014 [Dkt. No. 21]; Plaintiffs' Statement Accompanying Declarations Regarding Standing ("Pls.' Standing Br."), Jan. 27, 2014 [Dkt. No. 22]; Defendant CFTC's Cross-Motion for Summary Judgment, Opposition to Plaintiffs' Motion for Summary Judgment, and Motion to Dismiss in Part ("CFTC Mot."), Mar. 14, 2014 [Dkt. No. 28]; Plaintiffs' Consolidated Reply in Support of their Motion for Summary Judgment and Response to Defendant's Cross-Motion for Summary Judgment and Motion to Dismiss in Part ("Pls.' Reply"), April 8, 2014 [Dkt. No. 37]; Defendant CFTC's Consolidated Reply in Support of its Cross-Motion for Summary Judgment,

appendix, and several notices of supplemental regulatory and legal authorities.  The Chamber of

Commerce filed an *amicus* brief in support of plaintiffs, while nineteen current and former

members of Congress, as well as the non-profit group Better Markets, Inc., filed *amicus* briefs in

support of the CFTC.[10]

The case was reassigned to the undersigned on June 18, 2014.  On June 23, 2014,

the Court ordered the parties to submit supplemental briefs regarding whether plaintiffs lacked

standing under the shareholder standing rule and whether the Cross-Border Action was an

interpretive rule.  Order, June 23, 2014 [Dkt. No. 48].  The parties completed their supplemental

briefing on July 18, 2014.[11]  The parties presented oral arguments on the dispositive motions

now pending before the Court on July 30, 2014.

## PART TWO:  STANDARDS OF REVIEW

### I.       MOTION TO DISMISS

The CFTC moves to dismiss plaintiffs' complaint under Rule 12(b)(1) of the

Federal Rules of Civil Procedure for lack of standing and, as to the Cross-Border Action,

ripeness.  CFTC Mot. at 15.  "On a motion to dismiss for lack of subject matter jurisdiction, the

plaintiff bears the burden of establishing that the Court has jurisdiction."  *Sierra Club v. Jackson*,

813 F. Supp. 2d 149, 154 (D.D.C. 2011).  At the same time, the Court "'must accept as true all

---

Opposition to Plaintiffs' Motion for Summary Judgment, and Motion to Dismiss in Part
("CFTC's Reply"), May 2, 2014 [Dkt. No. 40].

[10]      *See* Brief of the Chamber of Commerce of the United States of America as
*Amicus Curiae* in Support of Plaintiffs' Motion for Summary Judgment, Feb. 3, 2014 [Dkt. No.
25]; Brief of Better Markets, Inc. as *Amicus Curiae* in Support of Defendant CFTC, Mar. 19,
2014 [Dkt. No. 33]; Brief of Current and Former Members of Congress as *Amicus Curiae* in
Support of Defendant CFTC, Mar. 21, 2014 [Dkt. No. 46].

[11]      *See* CFTC's Supplemental Brief Filed Pursuant to Order Dated June 23, 2014
("CFTC Suppl. Br."), July 18, 2014 [Dkt. No. 53]; Supplemental Brief for Plaintiffs ("Pls.'
Suppl. Br."), July 18, 2014 [Dkt. No. 54].

material allegations of the complaint, and must construe the complaint in favor of the

complaining party.'" *Ord v. Dist. of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting

*Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

The Court "may consider documents outside the pleadings to assure itself that it

has jurisdiction." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003); *accord Haase v.*

*Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("In 12(b)(1) proceedings, it has been long

accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself

on authority to entertain the case.'" (quoting *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356,

362-63 (D.C. Cir. 1982))). Moreover, the Court's consideration of supplemental materials—

such as plaintiffs' declarations in this case—does not convert the CFTC's motion to dismiss into

one for summary judgment. *See Ord*, 587 F.3d at 1140; *see also Haase*, 835 F.2d at 905 ("[T]he

plain language of Rule 12(b) permits *only* a 12(b)(6) motion to be converted into a motion for

summary judgment."); *Gordon*, 675 F.2d at 363 n.18 ("[T]he impropriety of transforming Rule

12(b)(1) motions into summary-judgment motions is well-settled."). Instead, if the Court's

jurisdiction "does not adequately appear from all materials of record, the complaint must be

dismissed." *Warth*, 422 U.S. at 502.

## II.   MOTION FOR SUMMARY JUDGMENT

The parties have also filed cross-motions for summary judgment. "[W]hen an

agency action is challenged[, t]he entire case on review is a question of law, and only a question

of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

While the general standard for summary judgment set forth in Rule 56 of the Federal Rules of

Civil Procedure does not apply to a review of agency actions, summary judgment nonetheless

"serves as the mechanism for deciding, as a matter of law, whether the agency action is

27

supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)); *accord UPMC Braddock v. Harris*, 934 F. Supp. 2d 238, 245 (D.D.C. 2013); *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 89-90 (D.D.C. 2009).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This is a 'deferential standard' that 'presume[s] the validity of agency action.'" *WorldCom, Inc. v. FCC*, 238 F.3d 449, 457 (D.C. Cir. 2001) (alteration in original) (quoting *Sw. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999)).

"An agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *accord Agape Church, Inc. v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013). The Court's "limited" review "focuses on the reasonableness of the agency's decisionmaking process" and is "particularly deferential" where the agency's decision is "primarily predictive" and the agency has "acknowledge[d] factual uncertainties and identif[ied] the considerations it found persuasive." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). Just as the Court may not "substitute [its] judgment for that of the agency" to set aside an agency action, *id.*, it also may

not "affirm an agency decision on a ground other than that relied upon by the agency." *Manin v.*

*Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## PART THREE: ANALYSIS

### I.    STANDING

The Court must first address the "'threshold jurisdictional question'" of plaintiffs'

Article III standing to challenge the Cross-Border Action and the Title VII Rules. *See Holistic*

*Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (internal quotation

marks omitted). The "irreducible constitutional minimum of [Article III] standing," *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992), requires that a plaintiff "show (1) it has

suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167,

180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61). Although plaintiffs must prove separate

standing as to each agency action challenged, *see Am. Trucking Ass'ns v. Fed. Motor Carrier*

*Safety Admin.*, 724 F.3d 243, 248 (D.C. Cir. 2013), "only one plaintiff must have standing" for

each claim to survive. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012); *accord*

*Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012).

Because plaintiffs are trade associations and do not assert standing "on their own

behalf," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 & n.19 (1982), they must satisfy

the standard for associational standing established in *Hunt v. Washington State Apple Advertising*

*Commission*, 432 U.S. 333 (1977). Under *Hunt*, an association has Article III standing "'only if

(1) at least one of its members would have standing to sue in his own right; (2) the interest it

seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit.'" *Am. Trucking Ass'ns*, 724 F.3d at 247 (quoting *Rainbow/PUSH Coalition v. FCC*, 330 F.3d 539, 542 (D.C. Cir. 2003)); *accord Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011). Plaintiffs bear the burden of specifically identifying at least one "member [who] had or would suffer harm" from each challenged agency action. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

There is no dispute that the plaintiff associations in this case satisfy the second and third *Hunt* prongs. *Cf. Am. Trucking Ass'ns*, 724 F.3d at 247 (describing a national trade association's interest in challenging a rule regulating its industry as "obvious"). The CFTC questions only whether any of plaintiffs' members would have standing to challenge the Cross-Border Action or the Title VII Rules in their own right. *See* CFTC Mot. at 56-59; CFTC Suppl. Br. at 2-8.

The D.C. Circuit has noted that standing often will be "self-evident" where an association's member is "'an object of the [agency] action (or foregone action) at issue' . . . as is the case usually in review of a rulemaking." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561-62). Where the asserted injury "is based on governmental regulation of a third party, [however,] proof of standing may be problematic." *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1228 (D.C. Cir. 2013). And it is "the burden of the plaintiff to adduce facts showing that those [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. Relatedly, "[n]o shareholder—not even a sole shareholder—has standing in the usual case to bring suit in his individual capacity on a claim that belongs to the

corporation." *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 n.14 (D.C. Cir. 1984); *accord Schenley Distillers Corp. v. United States*, 326 U.S. 432, 435 (1946).[12]

To establish standing pursuant to these established principles, the plaintiff associations must identify for each challenged Title VII Rule at least one member of one of their associations that is regulated or directly harmed by that Rule's extraterritorial application. For the limited purposes of its standing analysis, the Court must assume that plaintiffs are correct that the Cross-Border Action is a binding legislative rule carrying the force of law. *See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."). Under this assumption, the Cross-Border Action defines the scope of the Title VII Rules' extraterritorial applications under 7 U.S.C. § 2(i). Thus, plaintiffs' standing to challenge the extraterritorial application of *any* Title VII Rule will establish their standing to challenge the Cross-Border Action.

---

[12]     In this Circuit, the shareholder standing rule has both jurisdictional and prudential underpinnings. *See Cherry v. FCC*, 641 F.3d 494, 497 (D.C. Cir. 2011). *But see Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990) (describing the shareholder standing rule as "prudential"). But whether the shareholder standing rule is jurisdictional or prudential is functionally irrelevant in this case. For associational standing requires that plaintiffs rely on their members to establish both Article III and prudential standing. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1287-89 (D.C. Cir. 2005) (analyzing and denying associational prudential standing based on interests of members rather than general interests of association); *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 927 (D.C. Cir. 1989) ("Because none of HWTC's members would have prudential standing to pursue this action in its own right, HWTC does not have standing to sue on their behalf."); *see also MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 745-46 (7th Cir. 2007) (considering whether association's members—who had Article III standing—also had prudential third-party standing); *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 287 (3d Cir. 2002) (same).

A.      *Declarations in Support of the Plaintiff Associations' Standing*

Based on the declarations the plaintiff associations filed in support of their

standing, plaintiffs' members may be classified as either foreign- or U.S.-based.[13]  Plaintiffs'

foreign-based members—Société Générale ("SG") (a French company and member of IIB,

ISDA, and SIFMA) and Deutsche Bank AG (a German company and member of IIB and

ISDA)—share key characteristics.  Both registered as swap dealers prior to the CFTC's

promulgation of the Cross-Border Action.  Declaration of Francois Barthelemy, Managing

Director, SG ("SG Decl."), Jan. 27, 2014 [Dkt. No. 22-5] ¶ 6; Declaration of Robert C. Lee,

Director, Deutsche Bank AG ("Deutsche Bank Decl."), Jan. 27, 2014 [Dkt. No. 22-6] ¶ 6.  Both

now rely on the Cross-Border Action to determine whether foreign entities with which they

execute swaps are "U.S. persons."  And both must comply with the challenged transaction-level

requirements in the Real-Time Reporting, Daily Trading Records, Clearing Determination,

Straight-Through Processing, and Portfolio Reconciliation and Documentation Rules when

trading with a foreign counterparty that is a "U.S. person" under the Cross-Border Action.  SG

Decl. ¶ 8; Deutsche Bank Decl. ¶ 8.  Finally, declarants for SG and Deutsche Bank AG state that

the companies are economically harmed by the CFTC's extraterritorial regulation of SEFs under

---

[13]      The Court accepts the statements within plaintiffs' members' declarations for
three reasons.  First, and most importantly, the statements are largely undisputed.  Second, at the
motion to dismiss stage, the Court must accept as true the statements set forth in plaintiffs'
members' declarations in support of standing.  *See Sissel v. U.S. Dep't of Health & Human
Servs.*, -- F.3d ---, 2014 WL 3714701, at *3 (D.C. Cir. July 29, 2014).  And third, at the summary
judgment stage, the Court must view the evidence in the light most favorable to the non-moving
party.  *See Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012); *see also Lujan*, 504 U.S.
at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on
which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence
required at the successive stages of the litigation.");  *Pinson v. Samuels*, -- F.3d ---, 2014 WL
3824223, at *4-5 (D.C. Cir. Aug. 5, 2014).

the SEF Registration and Trade Execution Rules.  SG Decl. ¶¶ 8, 10; Deutsche Bank Decl. ¶¶ 8, 10.

Plaintiffs' U.S.-based members collectively address each of the challenged Title VII Rules.  *See, e.g.*, JPMorgan Decl. ¶¶ 7-8, 10-20; Declaration of Thomas Riggs, Managing Director, Goldman, Sachs & Co. ("Goldman Decl."), Jan. 27, 2014 [Dkt. No. 22-2] ¶¶ 8-9.  The U.S.-based members, however, are not themselves subject to the extraterritorial application of the Title VII Rules, as a result of the Cross-Border Action or otherwise.  Instead, it is the U.S.-based members' legally distinct foreign affiliates that are subject to the Rules' extraterritorial applications.  For example, J.P. Morgan Securities LLC and JPMorgan Chase & Co.—members of SIFMA and ISDA, respectively—are not regulated extraterritorially by the Title VII Rules pursuant to the Cross-Border Action.  JPMorgan Decl. ¶¶ 1, 7-8.  Rather, their foreign guaranteed affiliate, J.P. Morgan Securities plc, *is* regulated extraterritorially by many of the Title VII Rules pursuant to the Cross-Border Action, but *is not* a formal member listed on the membership rolls of the plaintiff associations.  JPMorgan Decl. ¶¶ 7, 9-18.  Similarly, while Goldman, Sachs & Co.—a member of ISDA and SIFMA—is not regulated extraterritorially by the Title VII Rules pursuant to the Cross-Border Action, several of its foreign affiliates—including affiliates that act as conduits—are.  Goldman Decl. ¶¶ 4, 7.

On July 18, 2014, in support of their supplemental brief on shareholder standing, the plaintiff associations also submitted declarations of corporate counsel regarding their organizational structures and operations.  *See* Declaration of Ira D. Hammerman, Executive Vice President & General Counsel, SIFMA ("SIFMA Decl."), July 18, 2014 [Dkt. No. 54-1]; Declaration of Katherine Tew Darris, General Counsel, ISDA ("ISDA Decl."), July 18, 2014 [Dkt. No. 54-2]; Declaration of Richard Coffman, General Counsel, IIB ("IIB Decl."), July 18,

2014 [Dkt. No. 54-3]. Plaintiffs maintain formal association membership rolls only for "administrative purposes." SIFMA Decl. ¶ 7; ISDA Decl. ¶ 7; IIB Decl. ¶ 7. Because of the complexity of the multinational financial institutions they represent, the plaintiff associations "do[] not require that each . . . affiliate[] enroll separately as a member." ISDA Decl. ¶¶ 6-7; *accord* SIFMA Decl. ¶¶ 6-7; IIB Decl. ¶¶ 6-7. As the ISDA declarant explained, "[r]equiring separate, formal membership [for] each [affiliated] entity would be cumbersome, expensive and confusing." ISDA Decl. ¶ 7; *accord* SIFMA Decl. ¶ 7; IIB Decl. ¶ 7. Instead, the formal member corporations represent their corporate family "as a whole, including . . . related affiliates" within the associations. ISDA Decl. ¶ 7; *accord* SIFMA Decl. ¶ 7; IIB Decl. ¶ 7. Accordingly, the plaintiff associations represent the interests of both their formal members and those members' affiliates before regulatory agencies and Congress, as well as in the courts. SIFMA Decl. ¶ 8; ISDA Decl. ¶¶ 8, 10; IIB Decl. ¶¶ 8, 10. Plaintiffs also provide their formal members' affiliates the same privileges and benefits available to the formal members. SIFMA Decl. ¶ 10; ISDA Decl. ¶ 9; IIB Decl. ¶ 11. Finally, plaintiffs allow affiliates of their formal members to participate in organizational decision-making processes. SIFMA Decl. ¶ 9; ISDA Decl. ¶ 9; IIB Decl. ¶ 9.

      B.    *Plaintiffs' Standing Based on Their Formal Foreign-based Members*

Having considered the declarations submitted by SG and Deutsche Bank AG, the Court concludes that plaintiffs have standing to challenge the extraterritorial application of many of the transaction-level Title VII Rules—specifically, the Real-Time Reporting, Daily Trading Records, Clearing Determination, Straight-Through Processing, and Portfolio Reconciliation and Documentation Rules—as well as the Cross-Border Action. In the event that SG or Deutsche Bank AG (as non-U.S. swap dealers) engages in a swaps transaction with a foreign entity

classified as a "U.S. person" under the Cross-Border Action, the firm must comply with the

transaction-level requirements in those Rules. *See Cross-Border Action*, 78 Fed. Reg. at 45369

apps. D-E. As the "object" of these Title VII Rules' extraterritorial applications, SG's and

Deutsche Bank AG's standing to challenge them—as well as the Cross-Border Action—is "self-

evident." *See Sierra Club*, 292 F.3d at 900.[14] Therefore, the Court concludes that plaintiffs have

associational standing to challenge the Cross-Border Action and the transaction-level Title VII

Rules through their members SG and Deutsche Bank AG.

Although the SEF Registration and Trade Execution Rules do not directly

regulate SG or Deutsche Bank AG, plaintiffs seek to challenge the extraterritorial application of

those Title VII Rules as well. As to the SEF Registration Rule, certain foreign SEFs have denied

SG and Deutsche Bank AG personnel located in the United States access to their platforms to

avoid triggering registration requirements under the Rule. SG Decl. ¶ 10(c); Deutsche Bank

Decl. ¶ 10(c).[15] SG and Deutsche Bank AG personnel in the United States maintain that they are

---

[14]     The Court rejects the CFTC's argument that plaintiffs cannot demonstrate traceability or redressabilty as to the Cross-Border Action because the Title VII Rules apply extraterritorially, with or without the Cross-Border Action, through 7 U.S.C. § 2(i). CFTC Reply at 27. While Section 2(i) unambiguously establishes that the Title VII Rules apply extraterritorially, *see infra* Section III.A, the CFTC exercised its discretion to promulgate the Cross-Border Action to further define the scope of Section 2(i). The CFTC cannot insulate the Cross-Border Action from judicial review by stating that it would enforce its Title VII Rules in the same manner even if the Court were to vacate the Cross-Border Action. *Cf. Mendoza v. Perez*, 754 F.3d 1002, 1012 (D.C. Cir. 2014) ("Plaintiffs asserting a procedural rights challenge need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume this portion of the causal link."); *Bennett v. Donovan*, 703 F.3d 582, 590 (D.C. Cir. 2013) ("HUD is the government actor alleged to have caused appellants' injury, and HUD is the actor that can provide relief—that arrangement is sufficient to establish that relief is likely.").

[15]     The CFTC argues that the declarants lack personal knowledge of *why* the SEFs excluded plaintiffs' members from the platforms and that the best evidence adduced is "'sheer hearsay' which 'counts for nothing on summary judgment.'" CFTC Mot. at 57 (quoting *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)). Of course, affidavits or declarations submitted

burdened by this "denial of access to market liquidity," which "complicate[s their] ability to seek the best prices in the market." SG Decl. ¶ 10(c); Deutsche Bank Decl. ¶ 10(c).

While the SEF Registration Rule does not require foreign SEFs to deny U.S.-based entities or personnel access to their platforms, it creates incentives for foreign SEFs to do so in order to avoid having to register (and thus be regulated) under the Rule. *See* Guidance on Application of Certain Commission Regulations to Swap Execution Facilities, CFTC Division of Market Oversight, Nov. 15, 2013, at 1-2 (JA at 792-93) ("The Division expects that [an SEF] located outside the U.S. that provides U.S. persons or persons located in the U.S. (including personnel or agents of non-U.S. persons located in the United States) . . . with the ability to trade or execute swaps . . . will register."). The D.C. Circuit has long recognized "the incentives that [regulated] third parties often have to minimize their expenditure of money and effort," *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 443 (D.C. Cir. 1998), and thus, to establish standing, have required only that plaintiffs show that the challenged "agency action is at least a substantial factor motivating the third parties' actions." *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987); *see also Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 309 (D.C. Cir. 2001) (PVC manufacturer had standing to challenge HHS rule listing dioxin as a "known carcinogen" because the rule would be a "substantial factor" in healthcare companies' decisions to stop purchasing PVC products); *Permapost Prods., Inc. v.*

---

in connection with a summary judgment motion "must be made on personal knowledge" and "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). But the foreign SEFs' rationales for denying SG's and Deutsche Bank AG's U.S.-based personnel access to their platforms fits squarely within the then-existing state of mind exception to hearsay, which applies to statements of "motive, intent, or plan" by an out-of-court declarant, whether or not that declarant is available as a witness. *See* Fed. R. Evid. 803(3); *cf. Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." (emphasis in original)).

*McHugh*, -- F. Supp. 2d ---, 2014 WL 3056506, at *5 (D.D.C. July 7, 2014) (treated wood

producer had standing to challenge agency action increasing cost of installing treated wood

products vis-à-vis non-treated wood products, thus decreasing likelihood that third-parties would

use treated wood in the future).

Based on the record in this case, it is clear that the extraterritorial application of

the SEF Registration Rule represents a "substantial factor"—indeed, the *only* identified factor—

in the decisions of the foreign SEFs to deny platform access to SG's and Deutsche Bank AG's

U.S.-based personnel.  Were the Court to enjoin the CFTC from applying the SEF Registration

Rule extraterritorially, these foreign SEFs likely would make their platforms available to SG's

and Deutsche Bank AG's U.S.-based personnel.  Accordingly, the Court concludes that plaintiffs

have demonstrated standing to challenge the extraterritorial application of the SEF Registration

Rule through their members SG and Deutsche Bank AG.

Like the SEF Registration Rule, the Trade Execution Rule also regulates SEFs,

not swap dealers.  The Trade Execution Rule established, *inter alia*, a six-factor framework

under which registered SEFs and DCMs determine whether certain types of swaps are "available

to trade." *See* 78 Fed. Reg. at 33612-13; *accord* 17 C.F.R. § 37.10.  A determination by an SEF

or DCM that a type of swap is "available to trade" triggers the *statutory* requirement that

registered swap dealers like SG and Deutsche Bank AG generally must execute that type of swap

on registered SEF or DCM platforms. *See* 7 U.S.C. § 2(h)(8)(A)-(B) (requiring "swaps subject

to the clearing requirement" of Section 2(h)(1) to be executed on SEFs or DCMs unless the

swaps are not "available to trade"); 17 C.F.R. § 37.10(c) (triggering Section 2(h)(8)(A) "[u]pon a

determination that a swap is available to trade").  Executing swaps on SEFs registered with the

CFTC costs more than trading swaps bilaterally.  Pls.' Standing Br. at 10; *see also* JPMorgan Decl. ¶ 19(b).

But unlike with the SEF Registration Rule, SG and Deutsche Bank AG have failed to demonstrate how the extraterritorial application of the Trade Execution Rule injures them at all.  Plaintiffs generally complain that the extraterritorial application of the Trade Execution Rule requires SG and Deutsche Bank AG to execute on SEF or DCM platforms any swaps that are "available to trade."  *See* Pls.' Standing Br. at 9; *cf.* JPMorgan Decl. ¶ 19.  But this is not the case.  The Trade Execution Rule merely prescribes the factors that SEFs and DCMs must consider when determining that a type of swap is "available to trade"—it does not directly regulate swap dealers.  *See* 78 Fed. Reg. at 33613.  Instead, it is the extraterritorial application of the *statutory* trade execution requirement—not the Trade Execution Rule—that requires foreign swap dealers like SG and Deutsche Bank AG to execute "available to trade" swaps on SEF or DCM platforms.  *See* 7 U.S.C. § 2(h)(8)(A)-(B).  Thus, it is Section 2(h)(8), not the Trade Execution Rule, that directly burdens SG and Deutsche Bank AG.

Of course, it is possible that the application of the Trade Execution Rule to foreign SEFs and DCMs might result in more "available to trade" determinations than if the Rule applied only to U.S.-based SEFs and DCMs.  As a result, swap dealers like SG and Deutsche Bank AG would be required, under Section 2(h)(8), to execute more types of swaps on SEF and DCM platforms.  Were this the case, the Trade Execution Rule would constitute a "substantial factor" in foreign SEFs' and DCMs' "available to trade" determinations that, in turn, would trigger the statutory trade execution requirement that burdens SG and Deutsche Bank AG.  But plaintiffs do not allege—nor is there any evidence in the record—that the extraterritorial

application of the Trade Execution Rule results in more "available to trade" determinations.[16] Thus, while it is certainly possible that the extraterritorial application of the Trade Execution Rule will result in more "available to trade" determinations, the Court cannot equate this unsupported conjecture with the actual imminence required to establish standing. *See DEK Energy Co. v. FERC*, 248 F.3d 1192, 1195 (D.C. Cir. 2001) ("There is quite a gulf between the antipodes of standing doctrine—the 'imminent' injury that suffices and the merely 'conjectural' one that does not."); *see also La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1383 (D.C. Cir. 1996) (finding that alleged injury was not imminent when it required "multi-tiered speculation"). Because plaintiffs bear the burden of adducing facts that demonstrate standing, *see Lujan*, 504 U.S. at 562, and have failed to do so here, the Court concludes that SG and Deutsche Bank AG lack standing to challenge the extraterritorial application of the Trade Execution Rule.[17]

### C.    *Plaintiffs' Standing Based on Their Formal U.S.-based Members*

Plaintiffs' standing to challenge the entity-level Title VII Rules—the Entity Definition, Swap Entity Registration, Risk Management, Chief Compliance Officer, SDR Reporting, Historical SDR Reporting, and Large Trader Reporting Rules—is not immediately apparent. This is so because plaintiffs' formal U.S.-based members are not themselves subject to

---

[16]    Indeed, to date it appears that U.S.-based SEFs and DCMs have made all of the "available to trade" determinations. *See Swaps Made Available to Trade Determination*, CFTC, http://sirt.cftc.gov/sirt/sirt.aspx?Topic=SwapsMadeAvailableToTradeDetermination (listing five "available to trade" determinations, all of which were made by U.S.-based SEFs or DCMs) (last visited Sept. 16, 2014).

[17]    Even assuming plaintiffs had standing to challenge the Trade Execution Rule through SG and Deutsche Bank AG—or any other member—all of plaintiffs' claims regarding the Trade Execution Rule would fail on the merits. Plaintiffs' failure to identify comments for the Trade Execution Rule that addressed the scope of the Rule's extraterritorial application, *see supra* note 2, is fatal to their claims. *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002); *see also infra* note 30.

the extraterritorial application of those Rules pursuant to the Cross-Border Action.  Instead, the

entity-level Rules apply extraterritorially to the formal members' legally distinct foreign

affiliates.  *See, e.g.*, JPMorgan Decl. ¶¶ 7-8; Goldman Decl. ¶¶ 4, 7.

      "As a general rule, two separate corporations are regarded as distinct legal entities

even if the stock of one is owned wholly or partly by the other."  1 WILLIAM MEADE FLETCHER

ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 43 (perm. ed., rev. vol. 2013);

*see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("A basic tenet of American

corporate law is that the corporation and its shareholders are distinct entities.").  On this basis,

the shareholder standing rule generally precludes a parent corporation—indeed, any sole

shareholder—from having standing to bring an action on behalf of its subsidiary (foreign or

domestic).  *See Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990); *Am.

Airways Charters*, 746 F.2d at 873 n.14.  The rule serves the noble function of preventing parent

corporations from having their cake and eating it too:

> Where a parent corporation desires the legal benefits to be derived from
> organization of a subsidiary that will function separately and autonomously in the
> conduct of its own distinct business, the parent must accept the legal
> consequences, including its inability later to treat the subsidiary as its alter ego
> because of certain advantages that might thereby be gained.

*In re Beck Indus., Inc.*, 479 F.2d 410, 418 (2d Cir. 1973); *see also Schenley Distillers Corp.*, 326

U.S. at 437 ("While corporate entities may be disregarded where they are made the implement

for avoiding a clear legislative purpose, they will not be disregarded where those in control have

deliberately adopted the corporate form in order to secure its advantages . . . ."); *Williams v.

Mordkofsky*, 901 F.2d 158, 164 (D.C. Cir. 1990) ("Had [the corporation] declared bankruptcy, it

is certain that the [plaintiffs] would not be so quick to request that we disregard the corporate

form."); *USA Interactive v. Dow Lohnes & Albertson, PLLC*, 328 F. Supp. 2d 1294, 1310-11

(M.D. Fla. 2004) ("[I]t seems inequitable to allow [the parent] to consciously cloak itself in the corporate veil as a shield to the liabilities of its subsidiaries only to allow it to voluntarily disregard that separateness when it serves its interest."); *Pa. Eng'g Corp. v. Islip Res. Recovery Agency*, 710 F. Supp. 456, 465 (E.D.N.Y. 1989) ("[A] parent corporation cannot create a subsidiary and then ignore [its] separate corporate existence whenever it would be advantageous to the parent." (second alteration in original) (internal quotation marks omitted)); *Bross Utilities Serv. Corp. v. Aboubshait*, 618 F. Supp. 1442, 1445 (S.D.N.Y. 1985) ("[T]he courts will not allow a *parent* to pierce the corporate veil it created for its own benefit, so as to assert the claims of its subsidiary." (emphasis in original)).[18]

Under these same principles, a subsidiary cannot bring a suit on behalf of its parent, let alone other members of its extended corporate family. *See Construtodo, S.A. De C.V. v. Conficasa Holdings, Inc.*, 2014 WL 427114, at *4 (S.D. Tex. Jan. 31, 2014) ("A sister corporation cannot sue on behalf of another sister corporation."); *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) ("It is black-letter law that one corporation cannot assert an affiliate's legal rights."); *Mitchell Co. v. Campus*, 2009 WL 1758835, at *5 (S.D. Ala. June 17, 2009) ("[A] corporation does not have standing to assert claims belonging to a related or closely affiliated corporation simply because their businesses are intertwined."); *R & B Realty Grp. v. Heiser*, 322 F. Supp. 2d 206, 210 (D. Conn. 2004) ("The mere relation of entities is not shown to confer standing upon all."); *Diesel Sys., Ltd. v. Yip Shing*

---

[18]     The shareholder standing rule is "[r]elated to" the rule against third-party standing. *See Franchise Tax Bd.*, 493 U.S. at 336. Under the third-party standing rule, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. "A plaintiff may assert the rights of a third party only when there is 'some hindrance to the third party's ability to protect his or her own interests.'" *Goodman v. FCC*, 182 F.3d 987, 992 (D.C. Cir. 1999) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

*Diesel Eng'g Co.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994) ("A corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined."); *Picture Lake Campground, Inc. v. Holiday Inns, Inc.*, 497 F. Supp. 858, 863 (E.D. Va. 1980) (concluding that the shareholder standing rule "applies with equal force to a sister corporation"). Thus, in this case, the shareholder standing rule would seem to preclude plaintiffs' formal U.S.-based members from asserting standing based on the extraterritorial regulation of their legally distinct foreign affiliates.

The plaintiff associations argue, however, that the shareholder standing rule does not apply here for several different reasons. The Court is not persuaded by any of them. First, the plaintiff associations contend that the shareholder standing rule does not apply because the extraterritorial application of the Title VII Rules to their formal U.S.-based members' foreign affiliates "burdens the entire corporation family," including the U.S.-based members. Pls.' Suppl. Br. at 2. The Supreme Court has endorsed an exception to the shareholder standing rule "allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." *Franchise Tax Bd.*, 493 U.S. at 336. Under this exception, however, the plaintiff's injury must be distinct from and cannot be "derivative" of injuries sustained by the affiliated corporation. *See Labovitz v. Washington Times Corp.*, 172 F.3d 897, 901 (D.C. Cir. 1999) (guarantee of corporation's debt obligations does not overcome general shareholder standing rule); *Williams*, 901 F.2d at 164 (lost business opportunity belongs to corporation, not shareholder). Here, the financial injuries to plaintiffs' formal U.S.-based members and their "entire corporate famil[ies]" are purely "derivative" of the costs incurred by the legally distinct foreign affiliates when complying with the Title VII Rules abroad.

Second, the plaintiff associations aver that their formal U.S.-based members have standing because the "cross-border application of the Title VII rules dramatically affects how [their] members must conduct business through their affiliates, including whether to guarantee foreign affiliate transactions, engage in swaps through or with their 'affiliate conduits,' and separately incorporate or capitalize foreign affiliates or branches." Pls.' Suppl. Br. at 2. For this argument, plaintiffs rely on *BellSouth Corp. v. FCC*, 144 F.3d 58 (D.C. Cir. 1998). In that case, the D.C. Circuit held that BellSouth had Article III standing to challenge a regulation of two of its subsidiaries on two bases: (1) because BellSouth was the "sole shareholder of [the] two affected corporations," and (2) because, under the regulation, "BellSouth [was] itself affected; it c[ould] engage in electronic publishing *only* by maintaining structural separation from its [subsidiaries]." *BellSouth*, 144 F.3d at 62 (emphasis added). This case is distinguishable from *BellSouth*, however, because the challenged regulations have no direct extraterritorial effect on the plaintiff associations' formal U.S.-based members.

Although the Title VII Rules undoubtedly may affect how the formal U.S.-based members *choose* to structure their corporate families and engage in swaps transactions with foreign affiliates, the Rules—unlike those in *BellSouth*—*neither mandate nor forbid* any particular corporate structure or relationship. And although the formal U.S.-based members may dictate the actions of their legally distinct foreign affiliates, the primary burdens of the Title VII Rules' extraterritorial applications fall squarely on the legally distinct foreign affiliates. Any harm to the formal U.S.-based members, or the corporate family as a whole, is thus purely derivative of the burden on the foreign affiliates. These derivative injuries are precisely the type that the shareholder standing rule precludes. *See, e.g.*, *Cheeks v. Fort Myer Constr. Co.*, 722 F. Supp. 2d 93, 109-10 (D.D.C. 2010) (no standing where plaintiff-shareholder "failed to allege any

harms that are independent of the injuries" to the company); *Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87, 92 (D.D.C. 2006) (no standing where parent corporation's injuries arose from lost profits of its subsidiary corporation). When a corporate family chooses to use the corporate form to its advantage for some purpose—*e.g.*, operational efficiency, tax or regulation avoidance, or limited liability—it cannot then disavow that form when it becomes inconvenient during litigation. *See Schenley Distillers Corp.*, 326 U.S. at 437; *In re Beck Indus.*, 479 F.2d at 418; *USA Interactive*, 328 F. Supp. 2d at 1310-11.

Third, the plaintiff associations argue that their formal U.S.-based members have standing because the members represent the interests of their entire corporate families, including the regulated foreign affiliates, within the plaintiff associations. Pls.' Suppl. Br. at 5. The Supreme Court established over a quarter century ago that an "association of associations" will have "standing to sue on behalf of its member associations as long as those [member] associations would have standing to bring the same challenge" through their individual members. *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988); *accord Basel Action Network v. Mar. Admin.*, 370 F. Supp. 2d 57, 69 (D.D.C. 2005) ("[A] plaintiff association can be made up of other associations who, in turn, have individual members, and still meet the standing requirements articulated in *Hunt.*"). Relying on *New York State Club Ass'n*, the plaintiff associations urge the Court to find that their formal U.S.-based members are themselves *associations* who can claim standing based on their legally distinct foreign affiliates, who are like *members*. Pls.' Suppl. Br. at 5.

The problem is that the plaintiff associations' formal U.S.-based members are *not* "membership associations" formed to represent the interests of their entire corporate families. They are not "associations" at all. *Cf. APCC Servs., Inc. v. Sprint Commc'ns Co.*, 418 F.3d

1238, 1253 (D.C. Cir. 2005) (Sentelle, J., concurring in part and dissenting in part) (concluding that plaintiff corporations were "in no sense 'membership organizations.' They are not even 'organizations.' They are incorporated entities—legal persons—and their clients are no more their 'members' than a law firm's clients are the firm's members."), *judgment vacated*, 550 U.S. 901 (2007).  Indeed, endorsing plaintiffs' view that a single, for-profit corporation can act as an "association" representing the legal interests of each of member of its corporate family would completely contradict the shareholder (and third-party) standing rules as well as the fundamental principles of corporate law.

Thus, the Court concludes that, under the shareholder standing rule, the plaintiff associations' formal U.S.-based members cannot demonstrate standing based on the fact that their legally distinct foreign affiliates are subject to extraterritorial regulation under the entity-level Title VII Rules.  And because the plaintiff associations' formal U.S.-based members are not themselves subject to extraterritorial regulation under the entity-level Title VII Rules, those members lack standing in their own right to challenge those Rules' extraterritorial applications. The plaintiff associations accordingly cannot rely on their formal U.S.-based members to establish their associational standing to challenge the entity-level Title VII Rules.

D.    *Plaintiffs' Standing Based on Their Formal U.S.-based Members' Foreign Affiliates*

The fact that the plaintiff associations cannot establish standing to challenge the entity-level Title VII Rules through their formal U.S.-based members does not, however, end the inquiry.  For the plaintiff associations also argue that their formal U.S.-based members' foreign affiliates—who are not listed on the associations' membership rolls—are *functionally* members of the associations for purposes of an associational standing analysis. Pls.' Suppl. Br. at 4-5. And, the argument continues, because the foreign affiliates—unlike the formal U.S.-based

members—are directly regulated by the extraterritorial application of the entity-level Title VII

Rules, their *functional* membership in the plaintiff associations would provide the plaintiff

associations standing to challenge the entity-level Title VII Rules.  *Id.*

Plaintiffs are correct that the associational standing doctrine does not

formalistically limit an association's membership to those listed on its membership rolls.  *Hunt*,

432 U.S. at 344-45; *accord Am. Legal Found. v. FCC*, 808 F.2d 84, 89-90 (D.C. Cir. 1987).

Instead, membership extends to those who "possess all of the indicia of membership in an

organization." *Hunt*, 432 U.S. at 344-45.  This Circuit has identified three indicia of

membership:  "(i) electing the entity's leadership[,] (ii) serving in the entity, and (iii) financing

the entity's activities." *Basel Action Network*, 370 F. Supp. 2d at 69 (citing *Fund Democracy,*

*LLC v. SEC*, 278 F.3d 21, 26 (D.C. Cir. 2002)).[19]

Although *Hunt* applied its "indicia of membership" test to a non-traditional

organization that lacked formal members, *see* 432 U.S. at 344-45, the Court can divine no reason

why the test should not also apply to traditional trade associations that purport to represent, in

addition to their formal members, the interests of informal members as well.  As plaintiffs'

declarants stated, the plaintiff associations "maintain[] formal membership rolls for

administrative purposes." ISDA Decl. ¶ 7; *accord* SIFMA Decl. ¶ 7; IIB Decl. ¶ 7.  "Requiring

separate, formal memberships [for] each [affiliated] entity would be cumbersome and confusing,

as many of [their] members have complex corporate structures, which are subject to change."

ISDA Decl. ¶ 7; *accord* SIFMA Decl. ¶ 7; IIB Decl. ¶ 7.  The Court concludes that "[u]nder the

---

[19]     Organizations purporting to represent informal members must also "serve a
specialized segment of the community" and have "fortunes . . . tied closely to those of its
constituency." *Basel Action Network*, 370 F. Supp. 2d at 69.  As trade associations representing
swaps-trading financial institutions, plaintiffs easily satisfy those requirements. *See* SIFMA
Decl. ¶¶ 1,4; ISDA Decl. ¶¶ 1, 4; IIB Decl. ¶¶ 1, 4.

circumstances presented here, it would exalt form over substance," *Hunt*, 432 U.S. at 345, to deny plaintiffs the advantages of the "indicia of membership" test simply because they maintain limited, formal membership rolls "for administrative purposes."

The question presented, then, is whether any of plaintiffs' U.S.-based members' foreign affiliates—who CFTC acknowledges are directly affected by the extraterritorial application of the entity-level Title VII Rules, CFTC Suppl. Br. at 3—"possess all of the indicia of membership" in the plaintiff associations. *Hunt*, 432 U.S. at 344-45. Applying *Hunt*, the Court finds that plaintiffs have demonstrated that the British firm J.P. Morgan Securities plc ("PLC") possesses "all of the indicia of membership" necessary to be considered a *functional* member of SIFMA and ISDA for purposes of the associational standing analysis. SIFMA and ISDA extend to PLC all of the benefits incidental to formal membership because PLC is affiliated with a formal member of each association—J.P. Morgan Securities LLC (SIFMA) and JPMorgan Chase & Co. (ISDA). SIFMA Decl. ¶ 10; ISDA Decl. ¶ 9; *see also* JPMorgan Decl. ¶ 1. In their regulatory, legislative, and litigation roles, SIFMA and ISDA advocate on behalf of the interests of both formal members as well affiliated entities like PLC. SIFMA Decl. ¶¶ 7, 9; ISDA Decl. ¶¶ 8, 10. Likewise, PLC can participate in the associations' decision-making processes by providing input on formal regulatory or legal filings, attending associational meetings with regulatory officials and legislators, SIFMA Decl. ¶ 9, and sitting on and voting in association working groups, committees, and task forces. ISDA Decl. ¶ 9. It appears to the Court that the only distinction between PLC and the *formal* members of SIFMA and ISDA is that PLC is not listed on the associations' membership rolls. PLC otherwise possesses all of the rights and obligations of formal membership within the associations. Thus, "for all practical purposes" SIFMA and ISDA "perform[] the functions of . . . traditional trade association[s]" as

47

to PLC. *Hunt*, 432 U.S. at 344. This is sufficient to demonstrate that PLC is functionally a member of SIFMA and ISDA for purposes of the associational standing analysis.

PLC—as a foreign guaranteed affiliate of a U.S. person that qualifies as a "swap dealer," JPMorgan Decl. ¶¶ 5, 7(b)—is the "object" of the extraterritorial application of the entity-level Title VII Rules. *See* Cross-Border Action, 78 Fed. Reg. at 45312, 45368. app. C. PLC's standing to challenge the extraterritorial application of those Rules is accordingly "self-evident." *See Sierra Club*, 292 F.3d at 900.[20] Thus, the Court concludes that SIFMA and ISDA have associational standing to challenge the Entity Definition, Swap Entity Registration, Risk Management, Chief Compliance Officer, SDR Reporting, Historical SDR Reporting, and Large Trader Reporting Rules on behalf of their functional member PLC.

### E.    *Summary*

All three plaintiff associations have demonstrated that they have associational standing to challenge the extraterritorial application of the transaction-level Real-Time Reporting, Daily Trading Records, Clearing Determination, Straight-Through Processing, and Portfolio Reconciliation and Documentation Rules, as well as the SEF Registration Rule and the Cross-Border Action, through their formal members SG and Deutsche Bank AG. Plaintiffs SIFMA and ISDA have also demonstrated associational standing to challenge the extraterritorial application of the entity-level Entity Definition, Swap Entity Registration, Risk Management, Chief Compliance Officer, SDR Reporting, Historical SDR Reporting, and Large Trader Reporting Rules through their functional member PLC. Plaintiffs have failed, however, to demonstrate their standing to challenge the extraterritorial application of the Trade Execution

---

[20]    By contrast, plaintiffs' functional members (like PLC) lack standing to challenge the Trade Execution Rule for the same reasons as SG and Deutsche Bank AG. *See supra* Section I.B. Plaintiffs have failed to adduce facts showing that the CFTC's extraterritorial application of the Trade Execution Rule is a "substantial factor" in the injuries they allege.

Rule.  Accordingly, the Court will dismiss without prejudice plaintiffs' claims based on the

Trade Execution Rule.

II.    CHALLENGES TO THE CROSS-BORDER ACTION

Plaintiffs raise both procedural and substantive challenges to the Cross-Border

Action.  Plaintiffs first aver that the CFTC, when promulgating the Cross-Border Action, failed

to comply with the APA's notice-and-comment rulemaking requirements and the CEA's cost-

benefit analysis requirement.  Pls.' Mot. at 23-30.  As to the substance of the Cross-Border

Action, plaintiffs argue, *inter alia*, that the CFTC exceeded its authority to regulate

extraterritorially under 7 U.S.C. § 2(i).  They also argue that the CFTC failed to provide

satisfactory and consistent explanations for its choices as to the Title VII Rules' extraterritorial

applications to certain foreign entities or transactions including, *inter alia*, guaranteed foreign

affiliates, foreign branches of U.S. persons, foreign affiliate conduits, and U.S. branches and

personnel of foreign entities.  Pls.' Mot. at 30-42.

Plaintiffs' claims turn, to a significant extent, on whether the Cross-Border Action

is a legislative rule (as plaintiffs argue), a policy statement (as the CFTC argues), or an

interpretive rule (as the CFTC now concedes some parts may be).  Pls.' Mot. at 23-28; CFTC

Mot. at 24-34; CFTC Suppl. Br. at 10.  As the D.C. Circuit has recently noted, "[a] lot can turn

on which box an agency action falls into."  *Nat'l Mining Ass'n v. McCarthy* ("*NMA*"), 758 F.3d

243, 251 (D.C. Cir. 2014).  For example,

> [i]n terms of reviewability, legislative rules and sometimes even interpretive rules
> may be subject to pre-enforcement judicial review, but general statements of
> policy are not.  Legislative rules generally require notice and comment, but
> interpretive rules and general statements of policy do not.  Legislative rules
> generally receive *Chevron* deference, but interpretive rules and general statements
> of policy often do not.

*Id.* (citations omitted).  In this action, the parties also dispute whether the cost-benefit analysis requirement in 7 U.S.C. § 19(a) applies only to legislative rules, or also extends to interpretive rules and policy statements.  CFTC Mot. at 45-46; Pls.' Reply at 27 & n.13; CFTC Reply at 12 n.6, 23 n.15.  Before turning to these important questions, however, the Court must address the "threshold inquiry" of whether plaintiffs' challenges to the Cross-Border Action are prudentially ripe for review.  *See In re Aiken Cnty.*, 645 F.3d 428, 434 (D.C. Cir. 2011) ("The ripeness doctrine, even in its prudential aspect, is a threshold inquiry that does not involve adjudication on the merits and which may be addressed prior to consideration of other Article III justiciability doctrines.").

### A.    Prudential Ripeness

The CFTC contends that the Cross-Border Action is not prudentially ripe for review because plaintiffs' challenges "involve hypothetical scenarios in which they speculate the [Cross-Border Action]'s application might not be reasonable."  CFTC Mot. at 35.  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).

The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).  "[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once."  *Am. Petroleum*

*Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012).  In assessing the prudential ripeness of an

action, "courts consider 'both the fitness of the issues for judicial decision and the hardship to the

parties of withholding court consideration.'"  *Am. Tort Reform Ass'n v. Occupational Safety &*

*Health Admin.*, 738 F.3d 387, 396 (D.C. Cir. 2013) (quoting *Abbott Labs.*, 387 U.S. at 149).

      "The fitness requirement is primarily meant to protect 'the agency's interest in

crystallizing its policy before that policy is subjected to judicial review and the court's interests

in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'"  *Am.*

*Petroleum Inst.*, 683 F.3d at 387 (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d

43, 49 (D.C. Cir. 1999)).  "Among other things . . . the fitness of an issue 'depends on whether it

is purely legal, whether consideration of the issue would benefit from a more concrete setting,

and whether the agency's action is sufficiently final.'"  *Id.* (quoting *Atl. States Legal Found. v.*

*EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)); *see also Nat'l Ass'n of Home Builders v. U.S. Army*

*Corps of Eng'rs*, 417 F.3d 1272, 1281-82 (D.C. Cir. 2005).  "A claim is not ripe for adjudication

if it rests upon contingent future events that may not occur as anticipated, or indeed may not

occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations omitted) (internal

quotation marks omitted).  "Although both the fitness and hardship prongs encompass a number

of considerations, a dispute is not ripe if it is not fit."  *Holistic Candlers & Consumers Ass'n v.*

*FDA*, 664 F.3d 940, 943 n.4 (D.C. Cir. 2012).

      Under the "hardship prong," a court must consider a plaintiff's interests in

securing immediate review.  *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164-65 (1967).

"'In order to outweigh institutional interests in the deferral of review'" addressed under the

fitness prong, "'the hardship to those affected by the agency's action must be immediate and

significant.'"  *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 427 (D.C. Cir. 2007)

(quoting *Action Alliance of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986)). An undifferentiated "uncertainty as to the validity" of an agency action does not alone constitute hardship. *Id.* at 427; *accord Nat'l Park Hospitality Ass'n*, 538 U.S. at 811.

In this case, plaintiffs' procedural challenges to the Cross-Border Action are "clearly ripe for review." *See Air Transp. Ass'n v. Dep't of Transp.*, 900 F.2d 369, 374 (D.C. Cir. 1990), *vacated on other grounds*, 498 U.S. 1077 (1991). The D.C. Circuit has often observed that "a purely legal claim in the context of a facial challenge . . . is 'presumptively reviewable.'" *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282 (quoting *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003)). Plaintiffs' procedural challenges here turn on the legal question, requiring no further factual or contextual development, of whether the Cross-Border Action is a legislative rule, interpretive rule, or statement of policy. *See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002) ("[W]hether the Guidance Document is a legislative rule is largely a legal, not a factual, question, turning as it does in this case primarily upon the text of the Document."). These challenges, which can largely be "resolved on the face of the document," *Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207, 216 (D.C. Cir. 2007), would not "benefit from a more concrete setting." *Atl. States Legal Found.*, 325 F.3d at 284; *see also Arden Wood, Inc. v. U.S. Citizenship & Immigration Servs.*, 480 F. Supp. 2d 141, 146-47 (D.D.C. 2007). Thus, plaintiffs' procedural challenges to the Cross-Border Action are prudentially ripe for review.

In contrast to their procedural claims, many of plaintiffs' substantive claims hinge on the CFTC's potential future application of the Cross-Border Action to a variety of factual scenarios. Although plaintiffs' substantive claims also present purely legal questions—whether the agency acted arbitrarily, capriciously, or contrary to law—the CFTC has yet to apply the

Cross-Border Action in an enforcement proceeding, *see* CFTC Mot. at 27, and the issues

presented would benefit from a more concrete setting. *See Atl. States Legal Found.*, 325 F.3d at

284 ("In short, we have 'the classic institutional reason to postpone review: we need to wait for

a rule to be applied [to see] what its effect will be.'" (alteration in original) (quoting *La. Envtl.*

*Action Network*, 87 F.3d at 1385)).  For this reason, the Court very much doubts that plaintiffs'

substantive claims are ripe. *See Am. Tort Reform Ass'n*, 738 F.3d at 396 ("A ripeness issue

normally arises in cases in which a regulated party faces the *threat* of future agency enforcement

action." (emphasis in original) (internal quotation marks omitted)); *see also Texas*, 523 U.S. at

300.[21]

        The Court need not ultimately address this "difficult question[] of its jurisdiction."

*Sherrod v. Breitbart*, 720 F.3d 932, 937 (D.C. Cir. 2013).  Under a long-standing exception to

the rule that "a merits question cannot be given priority over an Article III question," *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998), a court may avoid "'difficult and perhaps

---

[21]        Had the parties been in agreement, as the Court concludes *infra* Section II.B.2,
that the Cross-Border Action is part interpretive rule and part policy statement, plaintiffs'
substantive challenges to the Cross-Border Action certainly would not be ripe for review.
Although the issues presented would remain, for the most part, purely legal, "even purely legal
issues may be unfit for review." *Atl. States Legal Found.*, 325 F.3d at 284; *accord Toilet Goods*,
387 U.S. at 162-64; *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 167 (D.C. Cir.
1997).  This is particularly the case when parties seek judicial review of "tentative," non-binding
agency positions, such as those found in interpretive rules and policy statements. *See Abbott*
*Labs.*, 387 U.S. at 151 (distinguishing "definitive" agency pronouncements from "tentative"
agency positions); *Am. Tort Reform Ass'n*, 738 F.3d at 396-97; *Truckers United for Safety v.*
*Fed. Highway Admin.*, 139 F.3d 934, 937-38 (D.C. Cir. 1998); *ACLU v. FCC*, 823 F.2d 1554,
1576-80 (D.C. Cir. 1987).  Pre-enforcement review of agency positions taken in non-binding
interpretive rules and policy statements "'severely compromises the interests' the ripeness
doctrine protects:  'The agency is denied full opportunity to apply its expertise and to correct
errors or modify positions in the course of a proceeding, the integrity of the administrative
process is threatened by piecemeal review of the substantive underpinnings of a rule, and judicial
economy is disserved because judicial review might prove unnecessary if persons seeking such
review are able to convince the agency to alter a tentative position.'" *Am. Petroleum Inst.*, 683
F.3d at 387 (quoting *Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 31 (D.C. Cir.
1984)).

close jurisdictional arguments' by assuming . . . jurisdiction when precedent ha[s] rendered the 'merits . . . plainly insubstantial.'" *Sherrod*, 720 F.3d at 936-37 (quoting *Norton v. Mathews*, 427 U.S. 524, 530, 532 (1976)).[22] For instance, where "'the merits question [is] decided in a companion case, with the consequence that the jurisdictional question could have no effect on the outcome,' courts are free to 'decline[ ] to decide th[e] jurisdictional question.'" *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 920 (D.C. Cir. 2013) (alterations in original) (quoting *Steel Co.*, 523 U.S. at 98).

Here, the Court need not look so far away as a companion case or even consult Circuit precedent. For the Court's consideration of plaintiffs' ripe procedural claims reveals that the Cross-Border Action is not a "final agency action" subject to review under the APA. *See infra* Section II.C. This conclusion requires judgment for the CFTC as to all of plaintiffs' pre-enforcement challenges to the Cross-Border Action—both procedural and substantive. Thus, a definite determination on whether plaintiffs' substantive claims are prudentially ripe would be inconsequential to the outcome of the case. Accordingly, the Court exercises its discretion to avoid deciding the jurisdictional question. *See Emory*, 720 F.3d at 920 (bypassing difficult mootness issue as to some claims when the court's merits determination as to other non-moot claims squarely determined the merits as to the potentially moot claims).

---

[22]    Although this rule has its genesis in doctrines involving appellate jurisdiction, *see Norton*, 427 U.S. at 530, courts have since applied it to jurisdictional questions more generally. *See, e.g., Emory v. United Air Lines, Inc.*, 720 F.3d 915, 920 (D.C. Cir. 2013) (bypassing mootness inquiry where companion case squarely addressed merits); *Nabaya v. Dudeck*, -- F. Supp. 2d ---, 2014 WL 1664964, at *6 (D.D.C. Apr. 28, 2014) (bypassing personal jurisdiction inquiry where established Circuit precedent dictated dismissal on the merits). Moreover, the rule seems particularly applicable to the prudential ripeness doctrine, which seeks to avoid "devot[ing] judicial resources when it might not be necessary." *Town of Stratford v. FAA*, 292 F.3d 251, 253 (D.C. Cir. 2002).

*B.      Type of Agency Action*

1.      Distinctions Among Legislative Rules, Interpretive Rules, and Policy Statements

As discussed above, many issues in this case turn on whether the Cross-Border Action is a legislative rule, an interpretive rule, or a policy statement. *See supra* pp. 49-50. "The distinction between legislative rules and interpretative rules or policy statements has been described at various times as 'tenuous,' 'fuzzy,' 'blurred,' and, perhaps most picturesquely, 'enshrouded in considerable smog.'" *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (citations omitted). To be sure, the distinctions between legislative rules, interpretive rules, and policy statements may be stated simply and in general terms:

> An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule. . . . (As to interpretive rules, an agency action that merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties, is an interpretive rule.) An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy.

*NMA*, 758 F.3d at 251-52.[23] "But those general descriptions do not describe tidy categories and are often of little help in particular cases." *Id.* Indeed, because each agency action is unique, determining whether a given agency action is a legislative rule, interpretive rule, or policy statement "is an extraordinarily case-specific endeavor." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987).

---

[23]      The D.C. Circuit decided *NMA* on July 11, 2014, months after the parties completed briefing and only weeks before oral argument. Both parties filed notices of supplemental authority with the Court prior to oral argument. CFTC's Second Notice of Supplemental Authority, July 18, 2014 [Dkt. No. 52]; Plaintiffs' Response to CFTC's Second Notice of Supplemental Authority, July 28, 2014 [Dkt. No. 57].

Courts, however, are not without some guidance.  In distinguishing between legislative rules and general statements of policy, the D.C. Circuit has long been guided by two important factors: "the actual legal effect (or lack thereof) of the agency action in question on regulated entities," and the "agency's characterization" of the agency action.  *NMA*, 758 F.3d at 252; *see also Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006) ("[W]e are guided by two lines of inquiry.").  The first "'focuses on the effects of the agency action,' asking whether the agency has '(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion.'" *Wilderness Soc'y*, 434 F.3d at 595 (alterations in original) (quoting *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003)).  The second looks to the agency's expressed intentions: "'(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency.'" *Id.* (alteration in original) (quoting *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)). Both factors ultimately cut to whether "the agency action binds private parties or the agency itself with the 'force of law.'" *CropLife Am.*, 329 F.3d at 883 (quoting *Gen. Elec.*, 290 F.3d at 382).  Thus, "an agency pronouncement will be considered binding as a practical matter"—and thus a legislative rule—"if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Gen. Elec.*, 290 F.3d at 383 (citations omitted).

In distinguishing between legislative and interpretive rules, "[t]he practical question inherent in the distinction . . . is whether the new rule effects 'a substantive regulatory change' to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6-7 (D.C. Cir. 2011) (quoting *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005)).  If so, it is a legislative rule. *See U.S. Telecom Ass'n*, 400 F.3d at

34-35.  To determine whether such a "substantive regulatory change" has occurred, this Circuit

applies a four-factor test that considers

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, [and] (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

Generally, if any one of these prongs is satisfied, the rule is legislative rather than interpretive.

*Id.*  On the margins, the distinction between legislative and interpretive rules "likely turns on

how tightly the agency's interpretation is drawn linguistically from the actual language of the

statute or rule."  *Paralyzed Veterans v. D.C. Arena L.P.*, 117 F.3d 579, 588 (D.C. Cir. 1997).

Finally, the distinction between interpretive rules and policy statements "defies

easy explanation."  HARRY T. EDWARDS, LINDA A. ELLIOTT & MARIN K. LEVY, FEDERAL

STANDARDS OF REVIEW 162 (2d ed. 2013).  The D.C. Circuit has lamented the unfortunate

"tendency of courts and litigants to lump interpretative rules and policy statements together in

contrast to [legislative] rules."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93-94 (D.C. Cir.

1997).  Although "[n]ot much turns on the distinction between policy statements and

interpretative rules," EDWARDS, ELLIOTT & LEVY, FEDERAL STANDARDS OF REVIEW, at 162, they

"are quite different agency instruments."  *Syncor*, 127 F.3d at 94.  "An agency policy statement

does not seek to impose or elaborate or interpret a legal norm.  It merely represents an agency

position with respect to how it will treat—typically enforce—the governing legal norm."  *Id.*  In

contrast, "[a]n interpretative rule . . . typically reflects an agency's construction" of a governing

legal norm within "a statute that has been entrusted to the agency to administer.  The legal norm

is one that Congress has devised; the agency does not purport to modify that norm, in other words, to engage in lawmaking." *Id.*

2.      Is the Cross-Border Action a Legislative Rule, Interpretive Rule, or Policy Statement?

Plaintiffs argue that the Cross-Border Action is a legislative rule because—both on its face and in practice—it is binding upon the CFTC and market participants. Pls.' Mot. at 23-28. The CFTC counters that the Cross-Border Action—as the agency has proclaimed since its promulgation—is a non-binding general statement of policy intended to "communicate its views and intentions" to the regulated community regarding the scope of the Title VII Rules' extraterritorial applications. CFTC Mot. at 11, 24-34. Having considered the parties arguments, the controlling case law, the record before the Court, and—most importantly—the Cross-Border Action itself, the Court agrees with the CFTC that—save for a four-page portion of the Cross-Border Action addressed later in this section—the Cross-Border Action is a policy statement.

For starters, the Cross-Border Action on its face is binding on neither the CFTC nor swaps market participants. The Cross-Border Action, when read in its entirety, does not "purport to carry the force of law." *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006). It "does not 'command[,]' does not 'require[,]' does not 'order[,]' and does not 'dictate[.]'" *Cement Kiln*, 493 F.3d at 228 (alterations in original) (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000)). Indeed, from its first pages, the Cross-Border Action explicitly distinguishes itself from a "binding rule." 78 Fed. Reg. at 45297. Instead of "stat[ing] with precision when particular requirements do and do not apply to particular situations," it announces the CFTC's "general policy regarding cross-border swap activities and allows for flexibility in application to various situations, including consideration of all relevant facts and circumstances that are not explicitly

58

discussed in the guidance." *Id.* (footnote omitted).  Although the Cross-Border Action does

convey to market participants "how [the CFTC] ordinarily expects to apply existing law and

regulations in the cross-border context," it also makes clear that when determining whether to

apply the Title VII Rules extraterritorially, the CFTC "will apply the relevant statutory

provisions, including CEA section 2(i), and regulations to the particular facts and circumstances"

and parties may "present facts and circumstances that would inform the application of the

substantive policy positions set forth in this release." *Id.*  The Cross-Border Action further

emphasizes that the CFTC's policy positions are tentative and subject to change as "foreign

regulatory regimes and the global swaps market continue to evolve." *Id.*

       This flexible, non-binding approach continues throughout the substantive portions

of the Cross-Border Action.  In those sections, the CFTC qualifies its policy positions with the

conditional terms "generally" and "ordinarily," *see, e.g.*, 78 Fed. Reg. at 45326, 45345, 45349;

emphasizes on multiple occasions that it will take a case-by-case approach to enforcement, *see,*

*e.g.*, *id.* at 45316, 45320, 45348; and encourages market participants to consult CFTC staff

regarding their individual circumstances. *See, e.g.*, *id.* at 45326, 45345, 45349.  The Court

therefore is satisfied that no CFTC staff member or market participant could, after consulting the

Cross-Border Action in its entirety, reasonably construe it as setting forth binding norms. *See*

*ICI*, 720 F.3d at 381 (seven-factor standard is guidance where rule explained that the CFTC "will

determine whether a violation of the marketing restriction exists on a case by case basis through

examination of the relevant facts"); *Catawba Cnty. v. EPA*, 571 F.3d 20, 33-34 (D.C. Cir. 2009)

(guidance was not binding where it (1) explicitly stated it was "not binding," (2) merely

represented the agency's "current views" on a regulatory process, (3) created only "rebuttable

presumption[s]," and (4) only "clarifie[d]" existing statutory duties); *Cement Kiln*, 493 F.3d at

227-28 (guidance document was not binding where (1) "nothing on the face" of the document suggested it was binding, (2) the document declared that it "d[id] not impose legally binding requirements," and (3) the document stated that regulators retained discretion to rely on its policies "on a case-by-case basis"); *Ctr. for Auto Safety*, 452 F.3d at 808-09 (guidance documents were not binding where they (1) were labeled "'guidelines,' not rules," (2) were not published in the Code of Federal Regulations; (3) couched obligations in conditional language including "in general" and "normally," and (4) made clear that the agency retained discretion); *Molycorp*, 197 F.3d at 546 (guidance was not binding where it stated it was "intended solely to provide information to the public and the regulated community regarding the wastes that are potentially subject" to statutory and regulatory requirements, and that it was "not a substitute for those legal requirements; nor . . . a regulation itself"); *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538 (D.C. Cir. 1986) (guidance not binding when "replete with indications that the Secretary retained his discretion," including qualifications that certain standards would be applied "as a general rule" and "ordinarily").[24]

Plaintiffs attempt to obfuscate the non-binding character of the Cross-Border Action in several ways. First, plaintiffs cherry pick phrases within the Cross-Border Action that contain the words "will" and "must" to suggest that they create binding norms. *See* Pls.' Mot. at 25. Although the "use of mandatory language suggests the 'rigor of a rule, not the pliancy of a policy,'" the Cross-Border Action's "use of these words cannot be read in isolation." *Ctr. for*

---

[24]     While the Cross-Border Action *does* address legally binding norms, it does not establish them. *See* 78 Fed. Reg. at 45297 (indicating "how [the CFTC] ordinarily expects to apply *existing law and regulations*" (emphasis added)). Instead, it merely "clarifies" the CFTC's position as to the market participants' "existing duties" pursuant to 7 U.S.C. § 2(i) and the Title VII Rules. *See Catawba Cnty.*, 571 F.3d at 34. Such "clarification" and advance notice is a core function (and benefit) of a policy statement. *See Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974).

*Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 18 (D.D.C. 2004)

(citation omitted) (quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320-21

(D.C. Cir. 1988)), *aff'd*, 452 F.3d 798 (D.C. Cir. 2006); *see also Guardian Fed. Sav. & Loan*

*Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978) ("The form of a

regulation is obviously not controlling; substance and effect will determine whether a rule is a

'general statement of policy.'"). When placed within the broader context of the Cross-Border

Action, "it is clear that [the CFTC's] apparently mandatory word choices were not intended to

bind the agency." *Ctr. for Auto Safety*, 342 F. Supp. 2d at 18. For instance, the CFTC's

description of what it "will consider" when determining whether an entity is a "U.S. person" is,

in that same paragraph, qualified both by the phrase "generally" and by the flexible, catch-all

factor including "all other relevant facts and circumstances." Cross-Border Action, 78 Fed. Reg.

at 45308-09.

 Plaintiffs further argue that the CFTC's policy of substituted compliance, as

introduced in the Cross-Border Action, is a "safe harbor" indicative of a legislative rule. *See*

Pls.' Reply at 11 & n.4. As the D.C. Circuit has recognized, "if the language of the document is

such that private parties can rely on it as a . . . safe harbor by which to shape their actions, it can

be binding as a practical matter." *Gen. Elec.*, 290 F.3d at 383 (internal quotation marks omitted).

The Cross-Border Action's explanation of the CFTC's policy of substituted compliance,

however, falls short of establishing a "safe harbor" because there is nothing within that

announcement on which market participants could "rely." *See Ctr. for Auto Safety*, 452 F.3d at

809. The Cross-Border Action itself did not actually establish substituted compliance for entities

operating in specific foreign jurisdictions. *See* 78 Fed. Reg. at 45340-346. Instead, it merely

announced the agency's "general framework for substituted compliance," *id.* at 45340, and

established a procedure by which market participants could petition the CFTC for a determination of substituted compliance *in the future*. *Id.* at 45344-45. While future "safe harbors" may have resulted from the CFTC's announcement of its substituted compliance policy in the Cross-Border Action, *see, e.g.*, Comparability Determination for the European Union: Certain Entity-Level Requirements, 78 Fed. Reg. 78923 (Dec. 27, 2013), the Cross-Border Action itself *does not* provide that safe harbor.

Finally, plaintiffs contend that the Cross-Border Action cannot be a policy statement because the document is too long and too detailed in its elaboration of complex standards for when extraterritorial activities will generally be covered under Section 2(i). Pls.' Mot. at 25. Policy statements, however, often announce standards that the agency intends to apply in future enforcement actions. *See ICI*, 720 F.3d at 381 ("seven-factor marketing test"); *Ctr. for Auto Safety*, 452 F.3d at 811 ("standard for how to conduct regional recalls"); *Molycorp*, 197 F.3d at 546 (factors for classifying mining waste). Likewise, neither length nor complexity are foreign to policy statements. While the Cross-Border Action comprises almost eighty pages in the Federal Register, it is not nearly as long other agency documents that the court of appeals has concluded were no more than policy statements. *See, e.g.*, *Cement Kiln*, 493 F.3d at 226 (over 300 pages); *Molycorp*, 197 F.3d at 545 (over 1000 pages). And the Cross-Border Action's complexity merely reflects the complexity of swaps markets, swaps transactions, and the corporate structures of the market participants that the CFTC regulates. Indeed, the complexity of a regulatory issue is one reason an agency might choose to issue a non-binding policy statement rather than a rigid "hard and fast rule." *See SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947). The important question, therefore, is not whether the Cross-Border Action is long, complex, or announces standards, but whether it "binds private parties or the agency itself

with the force of law." *Cement Kiln*, 493 F.3d at 216 (internal quotation marks omitted).  The

Court concludes that, on its face, the Cross-Border Action does not.

Although far less important than "the language used in the [document] itself," an

agency's characterization of a challenged agency action is also accorded "some weight." *Brock*,

796 F.2d at 537-38; *accord Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 14 (D.C. Cir.

2005) ("An agency's past characterization of its own action, while not decisive, is entitled to

respect in a finality analysis.").  The CFTC has consistently characterized the Cross-Border

Action as a non-binding policy statement.  The CFTC classified both the proposed and final

versions of the Cross-Border Action as "interpretive guidance and policy statement[s]" in the

Federal Register, *see* Cross-Border Action, 78 Fed. Reg. at 45292; Proposed Cross-Border

Action, 77 Fed. Reg. at 41214, and did not publish the final version in the Code of Federal

Regulations. *See Ctr. for Auto Safety*, 452 F.3d at 808 (considering relevant the fact that an

agency action had "not been published in the Code of Federal Regulations").[25]  At the public

meeting where the Commissioners voted to adopt the Cross-Border Action, the CFTC's General

Counsel informed the Commissioners, as well as the public, that the Cross-Border Action was

guidance and, thus, unenforceable. *See* CFTC, Transcript of Open Meeting to Consider Cross-

Border Final Guidance & Cross-Border Phase-In Exemptive Order (July 12, 2013) (JA at

1553-54).  And during the course of this litigation, the CFTC has consistently referred to the

Cross-Border Action as "guidance" or a "general statement of policy" that binds neither the

---

[25]      The Cross-Border Action's publication in the Federal Register does not signal that
the CFTC meant it to be a legislative rule. *See Brock*, 796 F.2d at 539 ("*Publication* in the
Federal Register does *not* suggest that the matter published *was* meant to be a regulation, since
the APA requires general statements of policy to be published as well." (emphases in original)
(citing 5 U.S.C. § 552(a)(1)(D))).  Nor is the fact that the Cross-Border Action was issued by a
vote of the CFTC's commissioners, and over a dissent, of any significance. *See Batterton v.
Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980) ("[A]n agency empowered to enact legislative
rules may choose to issue non-legislative statements.").

CFTC nor plaintiffs' members, *see, e.g.*, CFTC Mot. at 4, 10-12, 25; CFTC Reply at 1; Hearing

Transcript, Jan. 14, 2014 [Dkt. No. 23] at 34-35, and has conceded that "any enforcement action

would have to be based on section 2(i) and violations of the statute or legislative rules,

independent of the [Cross-Border Action]." CFTC Reply at 16.

Plaintiffs counter that the Cross-Border Action's text and the CFTC's

characterization of the action are a carefully orchestrated charade intended to insulate the Cross-

Border Action from judicial review. Pls.' Mot. at 28 (citing *Appalachian Power*, 208 F.3d at

1023); Pls.' Reply at 10 (citing *Gen. Elec.*, 290 F.3d at 384). But there is no evidence in the

record to support plaintiffs' claim. Unlike the EPA in *General Electric* and *Appalachian Power*,

the CFTC does not rely upon mere "boilerplate" language in the Cross-Border Action "to keep

the proceduralizing courts at bay." *Appalachian Power*, 208 F.3d at 1023 (internal quotation

marks omitted) (concluding that EPA "guidance" was actually a legislative rule because "from

beginning to end" it "read[] like a ukase," and included only a "boilerplate" stating that it was

non-binding guidance); *see also Gen. Elec.*, 290 F.3d at 384 (concluding that, even though EPA

"guidance" briefly "anticipate[d] and acknowledge[d]" flexibility in the application of its

policies, "that d[id] not undermine the binding force of the Guidance Document in standard

cases"). Instead, the CFTC's non-binding, case-by-case approach to the extraterritorial

applications of the Title VII Rules is apparent "throughout the document." *NMA*, 758 F.3d at

253; *see also Cement Kiln*, 493 F.3d at 228 ("[W]e have previously relied on similar disclaimers

as relevant to the conclusion that a guidance document is non-binding." (collecting cases)).

Moreover, plaintiffs can point to no evidence that the CFTC has applied the

Cross-Border Action as binding in practice. *See NMA*, 758 F.3d at 253 ("Our cases also have

looked to post-guidance events to determine whether the agency has applied the guidance as if it

were binding on regulated parties."); *Appalachian Power*, 208 F.3d at 1021 ("[I]f [the agency] treats the document in the same manner as it treats a legislative rule . . . then the agency's document is for all practical purposes 'binding.'"). The CFTC has yet to rely on the Cross-Border Action in a single enforcement action, let alone in enough enforcement actions and with enough consistency to signal that the agency considers it a binding rule. *See Gen. Elec.*, 290 F.3d at 385 (EPA did not claim "that it ha[d] accepted any applications that" deviated from the alleged guidance); *U.S. Tel. Ass'n v. FCC*, 28 F.3d 1232, 1234 (D.C. Cir. 1994) (deviating from the policy statement only eight times in over three hundred cases); *McLouth Steel Prods.*, 838 F.2d at 1321 (deviating from the policy statement only four times out of approximately one hundred cases). Indeed, even after promulgating the Cross-Border Action, the CFTC has relied *solely* on its statutory authority in Section 2(i) when bringing enforcement actions that apply the Title VII Rules extraterritorially. *See, e.g., In re: JPMorgan Chase Bank, N.A.*, CFTC Dkt. No. 14-01, 2013 WL 6057042, at *8 & n.14 (October 16, 2013).

The CFTC's decisions to issue the exemptive orders and "no action" letters in response to plaintiffs' requests also do not indicate that the CFTC considers the Cross-Border Action to be binding. A policy statement "simply lets the public know [an agency's] current enforcement or adjudicatory approach." *Syncor*, 127 F.3d at 94. An agency's later announcement that, for a time certain, it would *not* implement the previously announced policy does not suddenly render the policy binding. In this case, the CFTC's decisions to grant plaintiffs the precise relief they requested, and therefore temporarily abstain from applying its Cross-Border Action policies, even on a case-by-case basis, merely signals—if anything—that the CFTC approaches the Cross-Border Action with the flexibility indicative of a policy statement. *See, e.g.*, Exemptive Order, 78 Fed. Reg. at 43786; No-Action Relief:  Certain

Transaction-Level Requirements for Non-U.S. Swap Dealers, CFTC Letter No. 13-71, 2013 WL 6221689 (Nov. 26, 2013) (JA at 797-99).[26]

      Nor is it significant that CFTC Chairman Gary Gensler counseled market participants that the "best thing [for them] to do is to come into compliance with all of the CFTC's rules and guidance." Gary Gensler, Chairman, CFTC, Speech, CME Global Fin. Leadership Conference (Nov. 19, 2013), *available at* http://www.cftc.gov/PressRoom/Speeches Testimony/opagensler-153 (JA at 1600). Such encouragement merely conveys the CFTC's understandable desire that market participants voluntarily comply with the otherwise non-binding policies within the Cross-Border Action. *See Ctr. for Auto Safety*, 452 F.3d at 809 ("[I]t does not matter that agency officials have *encouraged* automakers to comply with the guidelines." (emphasis in original)).

      To be sure, the Cross-Border Action may signal potential future enforcement trends within the CFTC. Plaintiffs' members therefore understandably "may feel pressure to voluntarily conform their behavior because the writing is on the wall" about which entities and activities the CFTC expects to be subject to extraterritorial regulation under 7 U.S.C. § 2(i). *See NMA*, 758 F.3d at 253. But the industry's apparent *de facto* compliance with the Cross-Border Action is insufficient to convert the guidance into a binding rule. *See Ctr. for Auto Safety*, 452 F.3d at 811; *Nat'l Ass'n of Home Builders*, 415 F.3d at 15. Indeed, the "pressure to voluntarily

---

[26]     Similarly, the fact that the CFTC briefly references the Cross-Border Action, or even adopts its language, in some of its non-binding "no action" letters, *see, e.g.*, CFTC Letter No. 13-71, 2013 WL 6221689 at *1 n.2 (JA at 797), does not indicate that the CFTC treats the Cross-Border Action as binding. An agency is permitted to reference a policy statement without converting it into a rule, so long as the agency maintains the discretion to deviate. *See Cmty. Nutrition Inst.*, 818 F.2d at 949 (describing the policy statement's "not inconsiderable benefits" of "informing the exercise of discretion by agents and officers in the field"); *see also Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987). Were it otherwise, as the CFTC cogently notes, "there would be no point in issuing" policy statements. CFTC Mot. at 27.

conform," *NMA*, 758 F.3d at 253, is part and parcel of many policy statements.  Policy

statements provide a "formal method by which an agency can express its views" about its

"policies prior to their actual application in particular circumstances." *Pac. Gas & Elec. Co. v.*

*Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974); *accord Syncor*, 127 F.3d at 94.  This

advance-notice function "facilitates long range planning within the regulated industry," *Pac.*

*Gas*, 506 F.2d at 38, and allows "the public a chance to contemplate an agency's views before

those views are applied to particular factual circumstances." *Panhandle E. Pipe Line Co. v.*

*FERC*, 198 F.3d 266, 269 (D.C. Cir. 1999); *see also Cmty. Nutrition Inst.*, 818 F.2d at 949

(noting the "not inconsiderable benefits of apprising the regulated community of the agency's

intentions").  "[T]he case law is clear that [courts] lack authority to review claims under the APA

'where an agency merely expresses its view of what the law requires of a party, even if that view

is adverse to the party.'" *Ctr. for Auto Safety*, 452 F.3d at 808 (quoting *Indep. Equip. Dealers*

*Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004)).

      The important fact in this case is that plaintiffs' members remain completely "free

to ignore" the Cross-Border Action's "writing . . . on the wall," *NMA*, 758 F.3d at 253, or—as

they have to date—to comply voluntarily.  "'[P]ractical consequences,' such as the threat of

'having to defend itself in an administrative hearing should the agency actually decide to pursue

enforcement'" pursuant to the policies within the Cross-Border Action "are insufficient to bring

an agency's conduct under [the Court's] purview." *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427

(first alteration in original) (quoting *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety*

*Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003)).  As a trade-off, plaintiffs' members may take

solace in the fact that if and when the CFTC does apply a policy within the Cross-Border Action

"'in a particular situation, it must be prepared to support the policy just as if the [Cross-Border Action] had never been issued.'" *NMA*, 758 F.3d at 253 (quoting *Pac. Gas*, 506 F.2d at 38).

Finally, the Court takes note of a subliminal theme to all of plaintiffs' arguments regarding the Cross-Border Action: that the financial stakes are so high that it is impossible for the CFTC to issue a "non-binding" policy statement regarding the scope of the Title VII Rules' extraterritorial applications. Of course, it is established that "'the mere fact that [an agency action] may have a substantial impact does not transform it into a legislative rule.'" *Cent. Texas Tel. Coop. v. FCC*, 402 F.3d 205, 214 (D.C. Cir. 2005) (quoting *Am. Hosp. Ass'n*, 834 F.2d at 1046; *accord Cabais v. Egger*, 690 F.2d 234, 237 (D.C. Cir. 1982) (concluding that "[s]imply because agency action has substantial impact does not mean it is" a legislative rule). Plaintiffs nonetheless complain that, following the Cross-Border Action, its members "must now make binary decisions (to register or not? to report and 'clear' or not?) that carry significant legal sanctions if answered incorrectly and are essential to the agency's administration of the regulatory scheme." Pls.' Reply at 19. Plaintiffs' grievance is better addressed to Congress, for plaintiffs would face *precisely the same* binary decisions in the absence of the Cross-Border Action because the Title VII statutory and regulatory requirements apply extraterritorially through the independent operation of 7 U.S.C. § 2(i). *See infra* Section III.A.

In the end, the CFTC was not required to issue *any* guidance (let alone binding rules) regarding its intended enforcement policies pursuant to Section 2(i). Indeed, the CFTC's decision to provide such a non-binding policy statement benefits market participants and cannot now, all other things being equal, be turned against it. *Cf. Am. Mining Cong.*, 995 F.2d at 1112 ("The protection that Congress sought to secure by requiring notice and comment for legislative rules is not advanced by reading the exemption[s] . . . so narrowly as to drive agencies into pure

ad hocery—an ad hocery, moreover, that affords less notice, or less convenient notice, to affected parties."). The stakes simply are not so important that the bedrock principles of administrative law cease to apply.

The Court is thus left with a simple determination. The Cross-Border Action reads like a non-binding policy statement and has been neither characterized nor treated in practice as binding by the CFTC. The Cross-Border Action therefore represents "nothing more than [the CFTC's] privileged viewpoint in the legal debate" over the extraterritorial scope of the Title VII Rules. *See Ctr. for Auto Safety*, 452 F.3d at 808. Plaintiffs point to no case—and the Court could find none—where a facially non-binding document that an agency treats as non-binding in practice has been transmogrified by the court into a legislative rule. *See Cmty. Nutrition Inst.*, 818 F.2d at 949 (warning of the "peril" of courts "transmogrify[ing] . . . guidelines into binding norms"). This Court will not be the first. Instead, the Court embraces the wisdom of the "now-infamous 'duck test'": "WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, [THE COURT] THEREFORE HOLD[S] that it is a duck." *Hussain v. Obama*, 718 F.3d 964, 968 (D.C. Cir. 2013) (quoting *Dole v. Williams Enters., Inc.*, 876 F.2d 186, 188 n.2 (D.C. Cir. 1989)). Because the majority of the Cross-Border Action looks, walks, and quacks like a policy statement, the Court holds that the majority of the Cross-Border Action is a policy statement.

That said, there are some parts of the Cross-Border Action that even the CFTC concedes "could reasonably be considered interpretive rules"—namely the section aptly titled "Interpretation of Section 2(i)." CFTC Suppl. Br. at 10 (citing Cross-Border Action, 78 Fed. Reg. at 45297-300). Within this four-page section, the CFTC undertakes a "statutory analysis" of the jurisdictional nexus in 7 U.S.C. § 2(i) and, after consulting the statutory text, legislative

history, and relevant case law, makes discretionary determinations regarding its interpretation of the statutory standard. Cross-Border Action, 78 Fed. Reg. at 45297-300. In these four pages, the CFTC's analysis does not "merely represent[]" its "position with respect to how it will . . . typically enforce" Section 2(i). *See Syncor*, 127 F.3d at 94. Instead, it reflects the CFTC's construction of the statutory language in Section 2(i). This is the hallmark of an interpretive rule, rather than a policy statement. *Id.*

The CFTC's interpretation of Section 2(i) in the Cross-Border Action, however, does not constitute a legislative rule. The Cross-Border Action was not published in the Code of Federal Regulations, does not explicitly invoke the CFTC's general rulemaking authority, and does not effectively amend any prior legislative rules. *See Am. Mining Cong.*, 995 F.2d at 1112. And, most importantly, the CFTC's interpretation of Section 2(i) lacks any independent "force and effect of law." *Id.* at 1109. Even in the absence of the Cross-Border Action, "[t]here would . . . be an adequate legislative basis," *id.* at 1112, upon which the CFTC could enforce the Title VII Rules extraterritorially: Section 2(i) itself. As already noted, Section 2(i) provides the CFTC with the authority—without implementing regulations, *see infra* Section III.A—to enforce the Title VII Rules extraterritorially whenever activities "have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1). The CFTC's key interpretations of Section 2(i)—including that the term "direct" requires only "a reasonably proximate causal nexus" and that the term "activities" signals that effects and connections could be considered "in the aggregate"—do not stray far from the provision's text. *See* Cross-Border Action, 78 Fed. Reg. at 45300. They are simply "the agency's attempt to interpret the meaning of [the] statutory provision." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1309 (D.C. Cir. 1991). Because the interpretations are so tightly "drawn linguistically from the actual language of the

statute," *Paralyzed Veterans*, 117 F.3d at 588, they do not effect a "substantive regulatory change" to Section 2(i) or to the Title VII regime. *See Elec. Privacy Info. Ctr.*, 653 F.3d at 6. Instead, the CFTC could rely on Section 2(i) itself to apply the Title VII Rules extraterritorially in the manner anticipated by the Cross-Border Action's interpretation. *See Paralyzed Veterans*, 117 F.3d at 588.[27] The Court therefore concludes that the four-page section of the Cross-Border Action dedicated to the "Interpretation of Section 2(i)," 78 Fed. Reg. at 45297-300, is an interpretive, and not a legislative, rule.

## C.  *Reviewability Under the APA*

The APA subjects to judicial review only "[a]gency action[s] made reviewable by statute and final agency action[s] for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Here, there is no statute authorizing the review of the Cross-Border Action. And the Cross-Border Action does not qualify as "final agency action" because, as part interpretive rule and part policy statement, it is not "finally determinative of the issues or rights to which [it is] addressed," *Am. Tort Reform Ass'n*, 738 F.3d at 395 (D.C. Cir. 2013) (citing EDWARDS, ELLIOTT & LEVY, FEDERAL STANDARDS OF REVIEW, at 157); *accord NMA*, 758 F.3d at 250-51 (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)), and does not establish any norms binding on the CFTC or market participants. *See Ctr. for Auto Safety*, 452 F.3d at 800. Thus, the Cross-Border Action is not reviewable at this time. The Court therefore will grant summary

---

[27]     As the D.C. Circuit made clear in *American Mining Congress*, whether an interpretation is closely related enough to the underlying statute to be considered an interpretive rule is a distinct question from whether the interpretation is reasonable or enforceable. *See* 995 F.2d at 1113 ("An interpretive rule may be sufficiently within the language of a legislative rule to be a genuine interpretation . . . while at the same time being an incorrect interpretation of the agency's statutory authority."); *see also Cabais*, 690 F.2d at 238 ("A statement which is interpretative does not become substantive simply because it arguably contradicts the statute it interprets."). The Court has no occasion in this case to determine whether the CFTC's interpretations of Section 2(i) within the Cross-Border Action are reasonable or enforceable.

judgment to the CFTC as to plaintiffs' claims—procedural and substantive—regarding the Cross-Border Action.  If and when the CFTC applies the Cross-Border Action in an enforcement action or lawsuit, it will be reviewable in the context of that action and the CFTC "'must be prepared to support the policy just as if the [Cross-Border Action] had never been issued.'" *NMA*, 758 F.3d at 253 (quoting *Pac. Gas*, 506 F.2d at 38).

### III.   CHALLENGES TO THE TITLE VII RULES

Plaintiffs challenge the Title VII Rules on several grounds.  First, plaintiffs argue that because the Title VII Rules do not define the scope of their extraterritorial applications, they have no extraterritorial reach.  Pls.' Mot. at 16-17.  Second, and in the alternative, plaintiffs argue that by refusing to define the scope of the Title VII Rules' extraterritorial applications in those Rules, the CFTC failed "'to consider an important aspect of the problem' being regulated" and otherwise failed to adequately respond to significant public comments.  *Id.* at 17-20 (quoting *State Farm*, 463 U.S. at 43).  Finally, plaintiffs argue that the CFTC failed "to conduct an adequate cost-benefit analysis" that considered the costs and benefits of extraterritorial application of each of the challenged Title VII Rules.  *Id.* at 16, 20-22.  For the following reasons, the Court rejects plaintiffs' first two arguments, but agrees with plaintiffs that the CFTC was required to consider adequately the costs and benefits of extraterritorial application for some of the Title VII Rules, but failed to do so.

### A.   *Independent Operation of 7 U.S.C. § 2(i)*

Plaintiffs' initial argument that the Title VII Rules cannot apply extraterritorially because they do not define the scope of their extraterritorial applications is belied by the plain language of 7 U.S.C. § 2(i), the Dodd-Frank Act more generally, and established principles of law.

Section 2(i) provides that the Title VII provisions "relating to swaps that were enacted by the [Dodd-Frank Act] (*including any rule prescribed or regulation* promulgated under that Act), *shall not apply* to activities outside the United States *unless* those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1) (emphases added).  The plain text of this provision "clearly expresse[s]" Congress's "affirmative intention" to give extraterritorial effect to Title VII's statutory requirements, as well as to the Title VII rules or regulations prescribed by the CFTC, whenever the provision's jurisdictional nexus is satisfied.  *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (applying presumption against extraterritoriality "unless there is the affirmation intention of the Congress clearly expressed" to give the statute extraterritorial effect (internal quotation marks omitted)); *see also Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010).

Indeed, the Supreme Court has explicitly addressed a similarly structured provision in the Foreign Trade Antitrust Improvements Act.  *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).[28]  In that context, the Court observed that the provision's "technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach.  It then brings such conduct back within the Sherman Act's reach *provided that* the conduct" meets the provision's jurisdictional nexus.  *Id.* (emphases in original).  So too here.  Section 2(i)'s "technical language initially lays

_____

[28]    *See* 15 U.S.C. § 6a ("Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—(1) such conduct has a direct, substantial, and reasonably foreseeable effect—(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.").

down a general rule placing *all* [swap] activity" occurring outside of the United States beyond

Title VII's reach.  But it then expressly brings such swap activities "back within" Title VII's

purview *provided that* "those activities . . . have a direct and significant connection with

activities in, or effect on, commerce of the United States."  *See* 7 U.S.C. § 2(i)(1).

       Plaintiffs seem to concede the *potential* extraterritoriality of the Title VII

provisions, rules, and regulations.  They instead argue that the Title VII Rules cannot be applied

extraterritorially *until* the CFTC promulgates a regulation defining the scope of the Rules'

extraterritorial applications under Section 2(i).  *See* Pls.' Mot. at 43.  But plaintiffs' "argument

runs aground on bedrock administrative law, which puts 'the choice . . . between proceeding by

general rule or by individual, ad hoc litigation . . . primarily in the informed discretion of the

administrative agency.'"  *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir.

2009) (quoting *Chenery*, 332 U.S. at 202-03); *accord Vt. Yankee Nuclear Power Corp. v.

Natural Res. Def. Council*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or

extremely compelling circumstances the administrative agencies should be free to fashion their

own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge

their multitudinous duties." (internal quotation marks omitted)); *NLRB v. Bell Aerospace Co.*,

416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first

instance within the [agency]'s discretion.").  This long-standing principle recognizes the benefits

of "case-by-case evolution of statutory standards," particularly where, as here, "the agency may

not have had sufficient experience with a particular problem to warrant rigidifying its tentative

judgment into a hard and fast rule" and "the problem may be so specialized and varying in nature

as to be impossible of capture within the boundaries of a general rule."  *Chenery*, 332 U.S. at

202-03.

The Court therefore will question the CFTC's choice to proceed by adjudication only if Congress has clearly "specified" that proceeding by rulemaking is required. *See Michigan v. EPA*, 268 F.3d 1075, 1087-88 (D.C. Cir. 2001) (concluding that Congress required jurisdictional determinations to be made through notice and comment proceedings); *Shays v. FEC*, 511 F. Supp. 2d 19, 31 (D.D.C. 2007) ("It is not surprising . . . that plaintiffs have been unable to cite any case where a court, absent a clear directive from Congress, required an agency to institute rulemaking in the place of adjudication."). Congress has not done so in this case. Although many provisions in the Dodd-Frank Act explicitly require implementing regulations, Section 2(i) does not. *Compare* 7 U.S.C. § 2(i)(1), *with, e.g., id.* § 6s(e)(1) (explicitly requiring implementing regulations); *id.* § 6s(i)(2)(same); *id.* § 7a-1(k)(2) (same). Nor does it even hint at such a requirement. This should come as no surprise: Congress modeled Section 2(i) on other statutes with extraterritorial reach that operate without implementing regulations. *See Hoffman-La Roche*, 542 U.S. at 161-62 (applying Foreign Trade Antitrust Improvements Act directly); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (applying Foreign Sovereign Immunities Act directly).[29]

---

[29]     Contrary to plaintiffs' suggestion, Pls.' Mot. at 13, the fact that the SEC published a legislative rule defining the scope of its Title VII Rules' extraterritorial applications, *see* Application of "Security-Based Swap Dealer" and "Major Security-Based Swap Participant" Definitions to Cross-Border Security-Based Swap Activities, 79 Fed. Reg. 39068 (July 9, 2014), *republished*, 79 Fed. Reg. 47278 (Aug. 12, 2014), says nothing of the CFTC's obligation to do so. Agencies are generally free to proceed differently when addressing similar problems. In any event, while the CFTC had discretion to address the extraterritorial applications of its Title VII Rules through either rulemaking or adjudication, the SEC did not have that flexibility. Instead, the SEC was *required* to promulgate "rules or regulations" before applying its Title VII Rules extraterritorially. *See* 15 U.S.C. § 78dd(c) (stating that SEC's Title VII Rules shall not apply "without the jurisdiction of the United States, *unless* such person transacts such business in contravention of such *rules and regulations* as the [SEC] may prescribe as necessary or appropriate to prevent the evasion of any provision of this chapter" (emphases added)).

In the absence of any congressional indication to the contrary, the Court concludes that Section 2(i) operates independently, without the need for implementing regulations, and that the CFTC is well within its discretion to proceed by case-by-case adjudications, rather than rulemaking, when applying Section 2(i)'s jurisdictional nexus. *See Chenery*, 332 U.S. at 202-03. Accordingly, the Title VII Rules, as currently written, apply extraterritorially to the extent that Section 2(i)'s jurisdictional nexus is satisfied.

    *B.*    *Title VII Rules' Failures to Address Their Extraterritorial Applications*

Plaintiffs' second argument—that by failing to address the extraterritorial applications of the Title VII Rules within those Rules, the CFTC disregarded an "important aspect of the problem," *State Farm*, 463 U.S. at 43, and failed to respond to significant public comments—is similarly unpersuasive.[30]

First, because the CFTC has the discretion to define the reach of Section 2(i) through case-by-case adjudication rather than by rulemaking, *see supra* Section III.A, there exists no absolute requirement that the CFTC address within each Title VII Rule the scope of that Rule's extraterritorial application.

---

[30]    As an initial matter, plaintiffs fail to identify comments submitted for the Large Trader Reporting, Straight-Through Processing, and Clearing Determination Rules that addressed the scope of those Rules' extraterritorial applications or the costs and benefits of applying those Rules extraterritorially. *See supra* notes 2 & 17; CFTC Mot. at 53 n.27; CFTC Reply at 13 n.7. "It is well established that issues not raised in comments before the agency are waived and this Court will not consider them." *Nat'l Wildlife Fed'n*, 286 F.3d at 562; *accord Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("It is black-letter administrative law that '[a]bsent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.'" (alteration in original) (quoting *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991))). Accordingly, the Court will grant summary judgment to the CFTC as to all of plaintiffs' claims challenging the Large Trader Reporting, Straight-Through Processing, and Clearing Determination Rules. *See Nat'l Wildlife Fed'n*, 286 F.3d at 562 (declining "to reach the merits of [plaintiff]'s cost estimate challenges because neither [plaintiff] nor any other party before the agency raised any of these contentions during the administrative phase of the rulemaking process").

Second, the extraterritorial application of the Title VII Rules was not an "important aspect of the problem" that the CFTC needed to address when it promulgated those Rules. This is not to say that the breadth of the Title VII Rules' extraterritorial applications is not "important"—the parties agree that it is. *See* Pls.' Mot. at 17; CFTC Reply at 7; *see also Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("Whether an agency has overlooked 'an important aspect of the problem,' . . . turns on what a relevant substantive statute makes 'important.'"). But it was the CFTC's prerogative to define the "problem[s]" it sought to address within its Title VII Rules, and it decided *not* to address the "problem" of the Rules' extraterritorial applications. *See, e.g.*, Swap Entity Registration Rule, 77 Fed. Reg. at 2619-20 (considering the breadth of its extraterritorial application under Section 2(i) to be "beyond the scope of th[e] rulemaking"). Instead, the CFTC limited the scope of its Title VII Rulemakings to defining the substantive and procedural requirements applicable to regulated market participants. The question of *what* the Rules require of regulated market participants—the issue addressed—is markedly different than the question of precisely to *whom* the Rules would apply extraterritorially under Section 2(i). Indeed, the CFTC could reasonably answer the first question without explicitly addressing the second.[31] The Court therefore concludes that the

---

[31] Even if plaintiffs' contention that "[d]etermining which entities and activities are covered by a regulation is necessarily an important aspect of crafting the rule," Pls.' Mot. at 17, is generally correct, it is inapposite in this case. For Congress already addressed this "important" issue by defining the scope of the Title VII Rules' extraterritorial applications in the statute itself. The CFTC need not within each Title VII Rule it promulgates elaborate on every facet of the overall regulatory scheme; instead, the agency can rely on regulated market participants to reference other controlling statutes and regulations to address issues left unresolved by a given Title VII Rule. Just as plaintiffs could turn to the Entity Definition Rule to determine what the other Title VII Rules meant when they used the term "swap dealer," plaintiffs could look to the language in 7 U.S.C. § 2(i) to determine the scope of the Title VII Rules' extraterritorial applications. *See* Entity Definition Rule, 77 Fed. Reg. at 30693 n.1183 (noting that a foreign entity's registration as a swap dealer or major swap participant "would have to satisfy the requirements" of 7 U.S.C. § 2(i)).

Rules' extraterritorial scope was not an "aspect of the problem[s]" specifically at issue in the

Title VII Rulemakings. *Cf. Jorman v. Veterans Admin.*, 579 F. Supp. 1407, 1418 (N.D. Ill.

1984) (noting that just because integration was an important "goal" of the Fair Housing Act did

"not mean it is an 'important aspect' of the problem of administering" housing programs).

In any event, "as the Supreme Court has emphasized, '[n]othing prohibits federal

agencies from moving in an incremental manner.'" *ICI*, 720 F.3d at 378 (alteration in original)

(quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 522 (2009)). "Agencies, like

legislatures, do not generally resolve massive problems in one fell regulatory swoop. They

instead whittle away at them over time, refining their preferred approach as circumstances

change and as they develop a more nuanced understanding of how best to proceed."

*Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) (citation omitted) (citing *Chenery*, 332 U.S. at

202-03); *see also Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1207 (D.C. Cir. 1984) ("In

classifying economic activity, agencies . . . need not deal in one fell swoop with the entire

breadth of a novel development; instead, 'reform may take place one step at a time, addressing

itself to the phase of the problem which seems most acute to the [regulatory] mind.'" (alteration

in original) (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955))). Here, the CFTC

reasonably exercised its discretion to proceed in an incremental manner by excluding from its

Title VII Rules any consideration of the scope of the Rules' extraterritorial applications under 7

U.S.C. § 2(i), *see ICI*, 720 F.3d at 378, and instead choosing to address the Rules' extraterritorial

applications on a case-by-case basis through the Cross-Border Action. *See Nat'l Cable &*

*Telecomms. Ass'n*, 567 F.3d at 670.

Finally, the CFTC was under no obligation to respond to commenters raising the

issue of the Rules' extraterritorial applications. An agency "'need not address every comment,

but it must respond in a reasoned manner to those that raise significant problems.'" *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (quoting *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997)). "This requirement is not 'particularly demanding.'" *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (quoting *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). Indeed, "'[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" *Covad Commc'ns*, 450 F.3d at 550 (quoting *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984)).

In this case, because the issue of the Title VII Rules' extraterritorial applications was beyond the scope of the Rulemakings, the comments addressing the Rules' extraterritorial applications did not raise any "significant problems" or "relevant factors," *see Covad Commc'ns*, 450 F.3d at 550, that the CFTC needed to address within the Rules. *See Nat'l Mining Ass'n*, 116 F.3d at 549 (substantive response to comment not required where comments are "beyond the scope of the rulemaking"). Plaintiffs could not unilaterally expand the scope of the Title VII Rules through their comments, nor could they force the CFTC to initiate a separate rulemaking to address the Rules' extraterritorial applications under Section 2(i). *See WildEarth Guardians v. EPA*, 751 F.3d 649, 653 (D.C. Cir. 2014) ("[A]s we have made clear in the past, [w]e will overturn an agency's decision not to initiate a rulemaking only for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency." (second alteration in original) (internal quotation marks omitted)); *Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1223 (D.C. Cir. 1983) (private parties have "no right to compel the agency to hold rulemaking proceedings addressing *its specific recommendations* for amending the existing rules" (emphasis in original)); *WWHT, Inc. v. FCC*,

656 F.2d 807, 818 (D.C. Cir. 1981) ("It is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking."). Accordingly, the Court concludes that the CFTC did not act arbitrarily or capriciously with respect to its refusal to address within the Title VII Rules the scope of those Rules' extraterritorial applications.[32]

C.      *Sufficiency of the Title VII Rules' Cost-benefit Analyses Under 7 U.S.C. § 19(a)*

The Court agrees with plaintiffs that the CFTC was required but failed to consider adequately the costs and benefits of some of the Title VII Rules by excluding from its analyses consideration of the costs and benefits of those Rules' extraterritorial applications.

The CEA requires the CFTC, "[b]efore promulgating a regulation," 7 U.S.C. § 19(a)(1), to "'consider the costs and benefits' of its actions and 'evaluate[ ]' those costs and benefits 'in light of' five factors: '(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations.'" *ICI*, 720 F.3d at 377 (alteration in original) (quoting 7 U.S.C. § 19(a)(2)). "[C]ost-benefit analyses epitomize the types of decisions

_____

[32]      Many of the comments on which plaintiffs rely failed to address any aspect of the proposed Title VII Rules for which they were submitted. Instead, commenters used their comments to express to the CFTC their views on the general scope of Title VII's extraterritorial reach. *See* Comment from IIB on Swap Entity Registration Rule, Jan. 10, 2011 (JA at 1123-42) (twenty-page comment "proposing" a "framework for global supervision of cross-border swap activity by foreign banks); Comment from SIFMA on Swap Entity Registration Rule, Feb. 3, 2011 (JA at 1143-61) (nineteen-page comment addressing only the "extraterritorial application of Title VII . . . and the rules proposed"); *cf.* Comment from Sullivan & Cromwell LLP on Entity Definition Rule, Feb. 22, 2011 (JA at 1162-81) (twenty-page comment urging that entity definitions in Entity Definition Rule be modified to address scope of Title VII's extraterritorial application). These generalized comments cannot undermine the CFTC's discretion to proceed incrementally, whether by adjudication or by rulemaking.

that are most appropriately entrusted to the expertise of an agency," *Office of Comm'c'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983), and courts therefore "review such . . . cost-benefit analys[es] deferentially." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). The Court's limited role "'is to determine whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *ICI*, 720 F.3d at 377 (alteration in original) (quoting *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985)).

As cost-benefit analysis requirements go, Section 19(a) is not particularly demanding. Section 19(a) does not require the CFTC "to promulgate only rules that have low or no costs; rather, the agency is simply required to show that they '*considered*' and '*evaluated*' the costs of the rule." *Inv. Co. Inst.*, 891 F. Supp. 2d at 207 (emphases in original) (quoting 7 U.S.C. § 19(a)). Nor does Section 19(a) require the CFTC to conduct a "'rigorous, quantitative economic analysis,'" *ICI*, 720 F.3d at 379 (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 986 (D.C. Cir. 1985)), "to consider hypothetical costs that may never arise," *id.* at 378, or to "measure the immeasurable" benefits of "preventing future financial crises." *Id.* at 379. Indeed, the CFTC need not even gather additional market data or conduct empirical studies to support its analysis, *id.* at 379-80; *Chamber of Commerce v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005), so long as it reasonably addresses the uncertainty stemming from any data limitations. *See ICI*, 720 F.3d at 379-80.

Even considering Section 19(a)'s flexible requirements and the deferential standard of review to be applied, however, the Court agrees with plaintiffs that the CFTC failed to conduct adequate cost-benefit analyses for the Title VII Rules. The CFTC failed to

acknowledge, let alone "consider" and "evaluate," the costs and benefits of those Rules' extraterritorial applications. None of the CFTC's arguments justifies this failure.

The CFTC first argues that because Congress determined that the Title VII Rules would apply extraterritorially, *see* 7 U.S.C. § 2(i), "Section 19(a) . . . d[id] not require the CFTC to reconsider the costs and benefits of 'whether' it is 'necessary' to apply the Title VII Rules overseas." CFTC Mot. at 46 (quoting Pls.' Mot. at 21). This is true, but ultimately beside the point. Section 19(a) requires the CFTC to consider only "the costs and benefits *of the action of the Commission*," 7 U.S.C. § 19(a)(1) (emphasis added), not those resulting from statutory mandates. *See Nat'l Ass'n of Mfrs. v. SEC* ("*NAM*"), 748 F.3d 359, 369-70 (D.C. Cir. 2014) (SEC's reliance on Congress's "determin[ation] that [the rule's] costs were necessary and appropriate" was reasonable when Congress required SEC to promulgate the challenged rule); *cf.* Risk Management Rule, 77 Fed. Reg. at 20167 (explaining that, in applying Section 19(a), the CFTC considers only costs and benefits that "reflect the Commission's own determinations").[33] Because Congress made the determination that Title VII rules and regulations apply extraterritorially when the Section 2(i)'s jurisdictional nexus is satisfied, *see supra* Section III.A, Section 19(a) did not require the CFTC to reconsider whether it was "necessary"—or even desirable—to apply the Title VII Rules overseas, for "agencies surely do not have inherent authority to second-guess Congress' calculations." *Pub. Citizen v. FTC*, 869 F.2d 1541, 1557 (D.C. Cir. 1989); *see also NAM*, 748 F.3d at 369-70.

---

[33]     The D.C. Circuit decided *NAM* on April 14, 2014, one week after plaintiffs filed their opposition and reply brief, but several weeks before the CFTC filed its reply brief. The CFTC addressed *NAM* in its reply brief, CFTC Reply at 9-10, and the parties also filed notices of supplemental authority with the Court. *See* Plaintiffs' Notice of Supplemental Authority, May 13, 2014 [Dkt. No. 42]; CFTC's Response to Plaintiffs' Notice of Supplemental Authority, May 16, 2014 [Dkt. No. 44].

That said, Congress's decision that the Title VII Rules are to have extraterritorial application *did not* relieve the CFTC from its duty to consider the costs and benefits of a given Title VII Rule's extraterritorial application when it determined *what* each Rule required of regulated market participants. It is precisely because Congress determined that the Title VII Rules apply extraterritorially that the CFTC was required to address the costs and benefits of extraterritorial application as to each Title VII Rule. Consideration of only the costs and benefits of the domestic application of a given Title VII Rule, while ignoring the costs and benefits of its statutorily mandated application abroad, provides an incomplete accounting of the Rule's total costs and benefits. Although the CFTC could not have—after a full consideration of the Rule's costs and benefits—second-guessed Congress's decision that the Rule apply extraterritorially, it could have reevaluated its own discretionary choices regarding the substantive requirements of the Rule in light of its analysis. Indeed, the CFTC might have made different substantive choices if it found that the costs so outweighed the benefits that the Rule's specific transaction- or entity-level requirements were not worth the candle. But the CFTC could not reasonably evaluate, or even justify, the substantive requirements of the Rule based on a cost-benefit analysis that excluded the "relevant factor" of the costs and benefits of the Rule's extraterritorial application. *See ICI*, 720 F.3d at 377.

The CFTC nonetheless argues that, because plaintiffs do not point to any available data that it failed to consider regarding extraterritorial costs and benefits, the Title VII Rules' cost-benefit analyses were sufficient under Section 19(a). CFTC Mot. at 47-48 & n.22.[34]

---

[34]     The CFTC cherry picks the Title VII Rules for references to the extraterritorial applications to argue that it considered the costs and benefits of the Rules' extraterritorial applications. *See* CFTC Mot. at 48-50; CFTC Reply at 10. Even to the extent that these myriad citations indicate that the CFTC did consider the fact that the Rules would have extraterritorial

The CFTC is correct both that plaintiffs do not identify any specific data that the CFTC failed to take into account and that it had no duty to conduct independent studies to supplement the administrative records. *ICI*, 720 F.3d at 379-80. Indeed, reliable data on the costs and benefits of the Rules' extraterritorial applications likely did not exist at that time, since derivative swaps markets were unregulated and unmonitored prior to the Dodd-Frank Act. *See Inv. Co. Inst.*, 891 F. Supp. 2d at 171.

Even in the absence of such data, however, the CFTC had a duty to consider "as best it c[ould] the economic implications of the rule[s]." *Chamber of Commerce*, 412 F.3d at 143. As predicting costs and benefits without reliable data is a "primarily predictive" exercise, the CFTC needed only to "acknowledge [the] factual uncertainties and identify the considerations it found persuasive" in reaching its conclusions as to the costs and benefits of the Rules' extraterritorial applications. *Rural Cellular Ass'n*, 588 F.3d at 1105; *accord Chamber of Commerce*, 412 F.3d at 142 ("When . . . an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, our role is more limited; we require only that the agency so state and go on to identify the considerations it found persuasive." (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999))); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004) ("The agency's job is to exercise its expertise to make tough choices about which of the competing estimates is most plausible, and to hazard a guess as to which is correct, even if the lack of [data] means that the estimate will be imprecise."). The CFTC failed to do even that much. Its complete failure to address the extraterritorial costs and benefits—let alone to acknowledge the

---

application, they are no substitute for the consideration of the *costs and benefits* of the extraterritorial applications as required under Section 19(a).

lack of data or identify concomitant uncertainties—renders its cost-benefit analyses arbitrary and capricious. *See Chamber of Commerce*, 412 F.3d at 143.

Finally, the CFTC argues that "plaintiffs' primary objection . . . that Title VII Rules are 'duplicative' and swaps 'already are amply regulated under the laws of other nations'" was inaccurate at the time the Title VII Rules were promulgated. CFTC Mot. at 50-51 (quoting Pls.' Mot. at 21-22). As ISDA acknowledged, even after most of the Title VII Rules were promulgated, foreign regulations were "still developmental" and in some cases "not expected to be in effect" for years. *See* ISDA Comment on Cross-Border Action, Aug. 10, 2012, at 5-6 (JA at 895-96). The CFTC thus urges that it had no obligation to consider the "'hypothetical costs'" of these foreign regulations that had yet to materialize. CFTC Mot. at 51 (quoting *ICI*, 720 F.3d at 378). The Court agrees with the CFTC on this point. Because the foreign regulations were "not finalized" at the time of the Title VII Rulemakings, the costs of duplicative regulation by both the CFTC and foreign regulators were still "hypothetical" and did not have to be considered in the Rules. *See ICI*, 720 F.3d at 378.

That the CFTC had no duty to consider the costs of duplicative regulation raises the possibility that the costs and benefits of the Title VII Rules' extraterritorial applications were essentially identical to those of the Rules' domestic applications. If that were the case, then the CFTC functionally considered the extraterritorial costs and benefits of the Title VII Rules by considering the Rules' domestic costs and benefits. Indeed, Section 19(a) does not require the separate consideration of a Rule's domestic and extraterritorial costs and benefits, so long as the cost-benefit analysis makes clear that the CFTC reasonably considered both. But there is no indication in the Title VII Rules that the CFTC's cost-benefit analyses even tacitly considered both the Rules' domestic and extraterritorial applications. The Court therefore need not address

the possibility that the costs and benefits of the Title VII Rules' domestic and extraterritorial applications were functionally the same. *Chenery*, 332 U.S. at 196 ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

Instead, the record compels the Court to conclude that the CFTC's failure to address the costs and benefits of the Title VII Rules' extraterritorial applications signals that the CFTC failed to consider those costs and benefits as they relate, *inter alia*, to "considerations of protection of market participants" as well as "considerations of efficiency, competitiveness, and financial integrity of futures markets." 7 U.S.C. § 19(a)(2)(A)-(B). This failure renders the CFTC's cost-benefit analyses for the transaction-level Real-Time Reporting, Daily Trading Records, and Portfolio Reconciliation and Documentation Rules and the entity-level Entity Definition, Swap Entity Registration, Risk Management, Chief Compliance Officer, SDR Reporting, Historical SDR Reporting Rules, and SEF Registration Rules, arbitrary and capricious under 5 U.S.C. § 706(2)(A).

## IV.    REMEDY

Plaintiffs seek "partial vacatur of the [Title VII] Rules to the extent the CFTC claims they have extraterritorial application," and an injunction prohibiting the CFTC from applying

(1) "the Title VII Rules to swaps transactions in which both parties are organized or incorporated under the laws of a jurisdiction outside the United States, even if one party is a guaranteed or conduit affiliate of a 'U.S. person';"

(2) "the 'Transaction-Level Requirements' of the Title VII Rules to swaps with non-U.S. swap dealers or major swap participants, regardless of whether the counterparties use U.S. branches or U.S. personnel to execute their swaps;" and

> (3) "the SEF Registration Rule to non-U.S. multilateral trading platforms that
> limit the execution of swaps to counterparties organized or incorporated under
> the laws of a jurisdiction outside of the United States"

until the CFTC completes the required cost-benefit analyses. Pls.' Mot. at 44.  The CFTC

responds that the relief plaintiffs seek is beyond the Court's authority and otherwise unjustified.

CFTC Mot. at 59-65.

When a Court identifies an infirmity in a rule, vacatur and remand is the "normal"

remedy. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (vacating rule

for failure to comply with APA).  Courts have the discretion, however, to remand without

vacating an inadequately explained rule. *See, e.g., Black Oak Energy, LLC v. FERC*, 725 F.3d

230, 244 (D.C. Cir. 2013); *Delta Air Lines, Inc. v. Exp.-Imp. Bank*, 718 F.3d 974, 978 (D.C. Cir.

2013); *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d

1136, 1151-52 (D.C. Cir. 2005); *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d

1075, 1085 (D.C. Cir. 2003); *Sugar Cane Growers Co-op. v. Veneman*, 289 F.3d 89, 97-98 (D.C.

Cir. 2002).  "The appropriateness of vacating an inadequately explained agency action depends

on whether (1) the agency's decision is so deficient as to raise serious doubts whether the agency

can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly."

*N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860-61 (D.C. Cir. 2012) (citing *Allied-Signal,*

*Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)); *accord Am.*

*Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 179 (D.C. Cir. 2009) (applying *Allied-Signal* in

case where the SEC failed to adequately consider the costs and benefits of a rule under 15 U.S.C.

§ 77b(b)).

Any deficiency in the Title VII Rules is not so "serious" as to favor vacatur if the

CFTC can show that it "will be able to justify a future decision to retain the Rule[s]" on remand.

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049, *modified in part on reh'g*, 293 F.3d 537 (D.C. Cir. 2002).  Here, the Court finds it plausible—indeed, likely—that the CFTC will be able comply with its obligations under 7 U.S.C. § 19(a) "while reaching the same result." *Black Oak Energy*, 725 F.3d at 244 (remand for FERC to adequately explain its orders); *see also Delta Air Lines*, 718 F.3d at 978 (remand for Export-Import Bank to reasonably explain a key position taken in its economic analysis of loan guarantees); *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (remand for Department of Labor to more clearly justify its approach).

Importantly, the only issues necessarily before the CFTC on remand would be the *substance* of the Title VII Rules, *not* the scope of those Rules' extraterritorial applications under 7 U.S.C. § 2(i).[35]  Plaintiffs raise no complaints regarding the CFTC's evaluation of the general, often unquantifiable, benefits and costs of the domestic application of the Title VII Rules.  On remand, the CFTC would only need to make explicit which of those benefits and costs similarly apply to the Rules' extraterritorial applications.  Moreover, the record before the Court highlights some specific benefits of the extraterritorial application of the Title VII Rules, particularly relating to the prevention of regulatory subterfuge by U.S. firms that enter into swaps transactions through their foreign subsidiaries and affiliates, but retain the swaps' risk in the United States. *See* Srinivasan Decl. ¶¶ 15-38.

While the fact that some foreign jurisdictions have passed swaps regulations since the CFTC's promulgation of the Title VII Rules suggests that the Rules' extraterritorial applications may now raise issues of duplicative regulatory burdens, the CFTC may well

---

[35]     Indeed, one thing is certain:  the CFTC *may not* conclude on remand that the costs of extraterritorial application of a given Title VII Rule so outweigh the benefits that the Rule is flatly inapplicable abroad. *See supra* Section III.C.

conclude that its policy of substituted compliance largely negates these costs. In any event, it is the CFTC's role in the first instance to weigh those costs along with the Rules' benefits, *see Inv. Co. Inst.*, 891 F. Supp. 2d at 207, for which the Court's review will be "particularly deferential." *See Rural Cellular Ass'n*, 588 F.3d at 1105. After this analysis, the CFTC would need only to provide a reasoned explanation of why its full consideration of the costs and benefits does not justify a change in the substantive transaction- and entity-level requirements of the Title VII Rules. Plaintiffs have presented no argument as to how those Rules, even after a full accounting of the costs and benefits of their extraterritorial applications, would change. On this record, the Court is "willing to assume for now that the agency's error was one of form and not of substance," *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1184 (D.C. Cir. 1994), and thus there exists at least a "serious possibility," *Allied-Signal*, 988 F.2d at 151, that after remand the CFTC will repromulgate Title VII Rules containing the same substantive requirements.

Whether vacatur would cause disruptive consequences is "only barely relevant" when, as is the case here, it is apparent that the agency likely will be able to provide adequate justification for retaining its rules after remand. *Fox Television Stations*, 280 F.3d at 1049. Nonetheless, it is clear to the Court that vacatur of the Title VII Rules would indeed produce a bevy of "disruptive consequences." *Allied-Signal*, 988 F.2d at 151. Although the CFTC to date has not acted to enforce its Title VII Rules extraterritorially, there is no current Exemptive Order for the Rules' extraterritorial applications. *Cf. Am. Equity*, 613 F.3d at 179 (concluding that vacatur would not "be disruptive of the agency's regulatory program" when the challenged rule had not yet gone into effect). Indeed, the plaintiff associations' members' declarants have made clear that the members (or their foreign affiliates) already have come into compliance with the Rules as they apply extraterritorially. *See, e.g.*, JPMorgan Decl. ¶ 10(b) (after registering as a

"swap dealer," J.P. Morgan Securities plc "has had to follow prescriptive rules to modify its existing risk management programs" to comply with the Risk Management Rule); Goldman Decl. ¶ 8(d) (Goldman Sachs's foreign affiliates had already "take[n] . . . the steps and incur[red] the attendant costs" required by the Historical SDR Reporting Rule). As the CFTC's declarant explained, partially vacating the Title VII Rules to the extent they apply extraterritorially would remove from the CFTC's purview many entities and transactions that it currently regulates and thereby restrict the agency's ability to monitor and regulate the swaps markets to the extent Congress intended. *See* Srinivasan Decl. ¶¶ 15-18. Furthermore, after vacatur, U.S.-based swap dealers would be able to avoid Title VII regulations by engaging in transactions through their foreign subsidiaries and affiliates, even if the transactions' risk remained with the U.S.-based corporation. *Id.* ¶¶ 19-22.

Considering Title VII's purposes of reducing systemic risk and promoting market transparency, the Court finds that the partial vacatur of the inadequately explained Title VII Rules for some unknown period of time while the CFTC conducted new cost-benefit analyses would be unnecessarily disruptive to the CFTC's mission and the purposes of the Dodd-Frank Act. *See Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 635 (D.C. Cir. 2000) (leaving certain environmental standards in place on remand so as to not undermine the purpose of the statute); *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1458-59 (D.C. Cir. 1997) (leaving certain environmental standards in place on remand when vacatur would "result in an eighteen month period" of unregulated emissions); *cf. Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) (vacating rule where regulated parties would "remain subject to, and competition will be safeguarded by, the generally applicable antitrust laws"); *Natural Res. Def. Council v. EPA*, 489 F.3d 1364, 1375 (D.C. Cir. 2007) (vacating rule where parties would remain subject to other

environmental regulations). Based on these potential disruptive consequences, as well as the high likelihood that the CFTC will be able to justify the substance of its inadequately explained Title VII Rules on remand, the Court concludes that vacatur during remand is unwarranted in this case.[36]

## CONCLUSION

The majority of plaintiffs' claims fail because Congress has clearly indicated that the swaps provisions within Title VII of the Dodd-Frank Act—including any rules or regulations prescribed by the CFTC—apply extraterritorially whenever the jurisdictional nexus in 7 U.S.C. § 2(i) is satisfied. In this regard, plaintiffs' challenges to the extraterritorial application of the Title VII Rules merely seek to delay the inevitable. The Court will not question the CFTC's decision to proceed in interpreting and applying Section 2(i) on a case-by-case basis through adjudication; nor will it set aside the CFTC's decision to promulgate the Cross-Border Action to announce its non-binding policies regarding the Title VII Rules' extraterritorial applications. Instead, the Court will only remand to the CFTC those Title VII Rules that are supported by inadequate cost-benefit analyses.

For the foregoing reasons, the Court will dismiss plaintiffs' claims as to the Trade Execution Rule; grant summary judgment to the CFTC as to plaintiffs' claims regarding the Cross-Border Action, as well as the Large Trader Reporting, Straight-Through Processing, and

---

[36]     The Court denies plaintiffs' request for an injunction enjoining the CFTC from applying the Title VII Rules extraterritorially for many of the same reasons. "An injunction is a drastic and extraordinary remedy"—more drastic and extraordinary than vacatur—"which should not be granted as a matter of course." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Plaintiffs have failed to demonstrate any "irreparable injury" from the extraterritorial application of the Title VII Rules. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (applying "general rule that economic harm does not constitute irreparable injury"). Nor have they demonstrated that the balance of hardships or the public interest favors enjoining the CFTC from applying its Title VII Rules abroad as Congress intended.

Clearing Determination Rules; grant summary judgment to plaintiffs as to the remaining Title

VII Rules; and remand those Rules—the Real-Time Reporting, Daily Trading Records, Portfolio

Reconciliation and Documentation, Entity Definition, Swap Entity Registration, Risk

Management, Chief Compliance Officer, SDR Reporting, Historical SDR Reporting Rules, and

SEF Registration Rule—to the CFTC for it to conduct an adequate cost-benefit analysis under 7

U.S.C. § 19(a).  An Order consistent with this Opinion will be issued this same day.

PAUL L. FRIEDMAN
United States District Judge

DATE: 9/16/14